# Asa & Gilman Reporting, Inc.

*Jolene Asa, RPR*
*Beth Gilman, RPR*

COURT REPORTERS

P.O. Box 394
Kalispell, MT 59903-0394

(406) 752-5751
Fax (406) 257-3781

E-mail: asagilman@centurytel.net
www.montanacourtreporters.com

**BILL TO**
Michael A. Bliven, Esq.
Bliven Law Firm
278 Fourth Avenue E.N.
Kalispell, MT 59901

**INVOICE #** JMAB1205
**DATE** 12/14/2018

---

**FOR PROFESSIONAL SERVICES**

Statement Under Oath (Including Exhibits) Held on December 5, 2018 of
Noah Gillund - 64 Pages                                                        285.90
Appearance Fee for December 4, 2018 - No Charge

Tax ID #81-0513552          BALANCE DUE          **$285.90**

Thank you, Michael!
+
Merry Christmas!

Jolene

THANK YOU! WE APPRECIATE YOUR BUSINESS!!

## Asa & Gilman Reporting, Inc.

*Jolene Asa, RPR*
*Beth Gilman, RPR*

**COURT REPORTERS**

P.O. Box 394
Kalispell, MT 59903-0394

(406) 752-5751
Fax (406) 257-3781

E-mail: asagilman@centurytel.net
www.montanacourtreporters.com

December 17, 2018



Mr. Noah Gillund
P.O. Box 4732
Whitefish, MT 59937

In Re:  Statement Under Oath of Noah Gillund

Dear Mr. Gillund,

Please find enclosed a copy of the Statement Under Oath taken of you on December 5, 2018.

Please read the Statement Under Oath within the next 30 days and make any corrections on the enclosed Correction Page.  Please make any and all corrections on the Correction Page provided with your Statement Under Oath and not on the text itself.  Upon completion, please return the enclosed Correction Page to our office so counsel can be provided a copy.  You may keep the copy of the Statement Under Oath for your records.

Should you have any questions, please feel free to contact me.  Your prompt attention to this matter is greatly appreciated!

Sincerely,


Jolene Asa, RPR

Enclosures

cc:  Michael Bliven, Esq.

STATEMENT UNDER OATH

OF

NOAH GILLUND



Taken at Bliven Law Firm, PC

278 Fourth Avenue, E.N.

Kalispell, Montana

Wednesday, December 5, 2018 - 1:58 p.m.

Reported by Jolene Asa, RPR, and Notary Public

for the State of Montana, Flathead County

**1**

STATEMENT UNDER OATH
OF
NOAH GILLUND

Taken at Bliven Law Firm, PC
278 Fourth Avenue, E.N.
Kalispell, Montana
Wednesday, December 5, 2018 - 1:58 p.m.

Reported by Jolene Asa, RPR, and Notary Public
for the State of Montana, Flathead County

**2**

APPEARANCES

Michael Bliven, Esq.
Bliven Law Firm, PC
278 Fourth Avenue, E.N.
Kalispell, Montana 59901
mike@blivenlawfirm.com

**3**

EXAMINATION INDEX

EXAMINATION                    PAGE
BY MR. BLIVEN                   4

EXHIBIT INDEX

EXHIBIT   DESCRIPTION                        PAGE
1    Defendant Felder & Company        14
     LLC, d/b/a Stillwater Fish
     House's Second Supplemental
     Responses to Plaintiff's
     Combined First Discovery
     Requests to Defendant
     Felder/Stillwater Fish House
2    Gillund Time Sheet and            16
     Employee Summary

2-1  Dixon Time Sheet                  17

3    Deposition of Skylar Dixon        23

4    Montana Vehicle Crash Report      33

5    11/03/18 Gill Report              46

6    11/27/18 Gill Report              46

7    12/03/18 Gill Report              46

8    Stillwater Fish House Employee    50
     Handbook

**4**

NOAH GILLUND,
being first duly sworn to tell the truth, the whole
truth and nothing but the truth, testified as follows:

EXAMINATION
BY MR. BLIVEN:

Q.   Noah, I'm Michael Bliven, and I represent
Skylar Dixon in a case that he's filed against
Felder & Company, LLC, doing business as the
Stillwater Fish House, which is a case here in
Flathead County, Montana that I filed in 2017.
     And you're aware that there's an ongoing
case?

A.   Uh-huh.

Q.   Now, have you ever given a sworn statement
of any kind before?

A.   No.

Q.   Have you ever testified in court in any way?

A.   No.

Q.   The reason why we're here is because the
defendants sent us a supplemental response to combined
first discovery requests, and in that, which was dated
the 30th of November, 2018, they describe a number of
things that they say that you have knowledge of and
would testify to.

**5**

1    That's on page three where it says --
2    A.  What's the --
3    Q.  I can show you.
4        So on page three of that, they describe your
5    answers.  Do you have that in front of you?
6    A.  Uh-huh.  I do.
7    Q.  I would like to ask you some questions about
8    that, because when we received this, my client,
9    Skylar, was rather, quite surprised by the statements
10   here and did not think that they were entirely
11   accurate.  So let's go back to what I was talking
12   about earlier.
13       So I'd like to ask you questions about this
14   alleged statement on your part, and I'd also like to
15   ask you questions about what happened --
16   A.  Uh-huh.
17   Q.  -- so that we can get the record clarified
18   about what you remember and what your testimony is on
19   these issues, and in doing so, I want to emphasize on
20   the record that you're here voluntarily?
21   A.  Correct.
22   Q.  Because you want the record to be accurate?
23   A.  Yeah.
24   Q.  Now, if I ask you a question that you don't
25   understand or it doesn't seem fair or any of that,

**6**

1    please tell me.  I will rephrase it.  Lawyers
2    sometimes ask questions in ways that are too
3    complicated and don't necessarily make sense, and I've
4    done that before.  So if you don't understand a
5    question, please let me know.  Will you do that?
6    A.  Yeah.
7    Q.  The other thing is, try to answer out loud,
8    "Yes."  "No."  "I don't know."  "I don't remember."
9    A.  Okay.
10   Q.  And the reason I say that is because, when
11   she types it, "Yes" is pretty easy.  "Yeah," we don't
12   really necessarily know exactly what that means.  We
13   think it means "Yes."  In our normal conversation,
14   when we're out walking around, the way we speak, it's
15   fine, but when we testify and a court reporter is
16   taking it down, it's important we get words.
17   A.  Yeah.
18   Q.  "Yes, I understand"?
19   A.  Yes.
20   Q.  Okay.  If you need to stop, take a break, go
21   home, you're free to do that.
22   A.  Okay.
23   Q.  I don't have any right to keep you here, and
24   I don't want you to say anything today that is not
25   your recollection or how you feel or believe things

**7**

1    happened or that isn't true.
2    A.  Okay.
3    Q.  We spoke yesterday?
4    A.  Correct.
5    Q.  And when we spoke yesterday, I told you all
6    of those things; is that correct?
7    A.  Yes.
8    Q.  And yesterday, so that you could understand
9    what the defendants had said that you said in this
10   document and so that you could understand what was
11   actually going on in this case better, I provided you
12   with a number of documents, so let's go down what
13   those are.
14       One was the complaint that was filed on
15   August 30th, 2017 with our Cause No. DV-17-8530 (sic);
16   is that correct?
17   A.  Yes.
18   Q.  And then I also provided the answer filed by
19   the defendant's attorneys.  That answer is dated the
20   20th of April, 2018.
21       It does not appear to be in your pile.  Take
22   a look at this.  I know I showed you that to you
23   yesterday, and I'll make an extra copy, but you did
24   look at that yesterday, was my recollection.
25   A.  Yeah.  I remember looking at this.  Yeah, I

**8**

1    remember that.  Okay.
2    Q.  I'll make a copy of that for you in just a
3    minute, as soon as we take a short break.
4        I also provided and we just referred to
5    Defendant Felder & Company, LLC, d/b/a Stillwater Fish
6    House's Second Supplemental Responses to Plaintiff's
7    Combined First Discovery Requests.  I provided that to
8    you as well; correct?
9    A.  Correct.
10   Q.  I also provided the November 3rd, 2018
11   report of our human factors expert, Joellen Gill?
12   A.  Yeah.
13   Q.  I also provided you the November 27, 2018
14   supplemental report of Ms. Gill?
15   A.  Let's see.  The November what?
16   Q.  November --
17   A.  27th?
18   Q.  Yeah.
19   A.  Okay.  Yeah, I have that.
20   Q.  Then I also provided her December 3, 2018
21   second supplemental report?
22   A.  Yeah.
23   Q.  Meaning "Yes"?
24   A.  Yes.
25   Q.  Okay.  I also provided you the printouts

9

1   that I got from the Fish House in discovery that show
2   the work hours that you worked in 2014, which appear
3   to be from June 14, '14 up through August 30 of '14?
4   **A.   Yeah.**
5       Q.   This is Skylar's page.  Yeah.  You're on
6   this page.
7       Let me show you.  Here is Skylar, and then
8   here is Noah.
9   **A.   Okay.**
10      Q.   And then I also provided you with a complete
11  copy of Skylar's deposition --
12  **A.   Correct.**
13      Q.   -- that he gave on Tuesday, October 30, the
14  deposition itself being roughly 85 pages, and then I
15  also gave you the correction page?
16  **A.   Yeah.  Yes, you did.**
17      Q.   Now, is there anything else that you can
18  think of right now that you would like to look at,
19  such as the crash report of the crash or anything else
20  that you want to see before I ask any more questions?
21  **A.   No.  I don't think so.**
22      Q.   If you do decide that there's anything else
23  you want to look at, please just let me know.  I'm
24  happy to share with you the court filings or any of
25  these other documents --

10

1   **A.   Sure.**
2       Q.   -- because it's very important that not only
3   you understand that I am simply trying to give you the
4   opportunity to tell your story and address these facts
5   but that I've given you the opportunity to look at
6   anything you want to know and just be totally fair to
7   you, because from what I understand from you, that's
8   not exactly what happened when you were contacted by
9   the investigator for the Fish House's lawyers and
10  then, frankly, when they talked to you.
11  **A.   Uh-huh.**
12      Q.   Does "Uh-huh" mean "Yes"?
13  **A.   Yes.  Sorry about that.**
14      Q.   So let's talk about that.
15  **A.   Okay.**
16      Q.   How were you contacted by them so that,
17  ultimately, I get this statement in the mail?  Who
18  called you?  What happened?
19  **A.   His name was Claude.  I can't remember his**
20  **last name, but he said people call him Sonny, and he**
21  **called me -- I was in the middle of work.  I don't**
22  **remember exactly what time it was, but he asked me if**
23  **I was working where he called, and so I said "Yeah."**
24  **And he asked if he could give my cell phone**
25  **number to whoever was going to call me and ask me**

11

1   **questions, and I gave him -- I told him that I would**
2   **be at work when I did get the call so I'd be in town,**
3   **because I live out of service and won't get any calls**
4   **on my cell phone.**
5       Q.   In Olney?
6   **A.   Yeah.**
7       Q.   Now, this was prepared by -- this document
8   was prepared by the Moore, Cockrell, Goicoechea,
9   Johnson firm, and it was signed by Katie Matic for
10  Dale Cockrell.  Did you speak to Dale Cockrell?
11  **A.   I don't remember.**
12      Q.   Do you remember speaking to a Brad Condra?
13  **A.   Yeah.  That sounds way more familiar.**
14      Q.   Now, you talked to him on the phone?
15  **A.   Correct.**
16      Q.   And they asked you questions?
17  **A.   Yeah.  I had to step out, outside.  I was**
18  **just in the middle of work, you know.  I was kind of**
19  **still in the work mind-set, so I had to step outside**
20  **and get away from everything to be able to listen to**
21  **anything.**
22      Q.   So did that affect in any -- do you think
23  that affected your ability to think about questions
24  before you answered them or answer them accurately?
25  **A.   I think so to a point, just the fact that I**

12

1   **was at work and wanting to work, you know, and --**
2   **rather than wasting hours at work.**
3       Q.   Now, I asked Mr. Cockrell if this statement
4   was recorded.  My recollection was he told me it
5   wasn't, but when I asked you about this a few minutes
6   ago, before we started, you indicated that they may
7   have asked you if they could record it?
8   **A.   Yeah.**
9       Q.   So, then, the next question is, prior to me
10  getting this and then showing it to you yesterday, had
11  you seen this recitation of what your testimony was
12  going to be or what they thought you told them?
13  **A.   Before I came here?**
14      Q.   Yes.
15  **A.   No.**
16      Q.   Okay.  Not to put too fine a point on it,
17  but you did not review --
18  **A.   Anything.**
19      Q.   -- this statement of your answers until I
20  showed them to you yesterday?
21  **A.   Correct.**
22      Q.   Now, did they tell you anything or give you
23  information to lead you to believe that you needed to
24  give a statement, or how did that go?
25  **A.   They just said they had questions for me**

## 13

1  since I was the driver. That's really all they --
2  Q. All right. And in terms of how you got here
3  today, you got a call from my investigator, Joe?
4  A. Correct.
5  Q. Okay. And in terms of you coming in to give
6  your statement and, again, because you don't have an
7  attorney and you're not a defendant or, you know, a
8  party to this case, I want to make sure that the
9  record is clear that I haven't offered you any kind of
10  compensation or inducement, you know, any --
11  A. Yeah.
12  Q. -- benefit to come in and give your
13  statement?
14  A. Yeah.
15  Q. Further, I haven't threatened you or told
16  you that if you don't give a statement a bunch of bad
17  things are going to happen, although I have told you
18  that I've been told by the Fish House's attorneys that
19  those attorneys had discussed bringing you in as a
20  defendant because they don't think it's their fault.
21  They think it's your fault.
22  A. Right.
23  Q. We talked about that. But that being said,
24  why are you here, I guess is maybe a better way of
25  saying it? Why do you want to talk about what

## 14

1  happened and explain what happened that night other
2  than the fact that we've asked you to give a statement
3  and clear this up?
4  A. Really, just to hopefully untwist my words
5  and say what happened, what I believe happened and, I
6  guess, yeah, my part of the story without anything
7  being turned around on anyone.
8  Q. Okay. Let's see if we can accomplish that.
9  Like I said, please tell me -- if anything I say or
10  ask you doesn't make sense or if I say something that
11  isn't accurate to you, please tell me, because what
12  we're trying to do is get your accurate, truthful
13  testimony, you know, on paper --
14  A. Right.
15  Q. -- so that we can move forward.
16  A. Okay.
17  Q. So let's go ahead and mark that statement
18  that they took from you as Exhibit 1.
19  (Exhibit 1 was marked.)
20  MR. BLIVEN: I'm going to copy this for him.
21  (Break held from 2:16 p.m. to 2:18 p.m.)
22  MR. BLIVEN: We took a momentary break so I
23  could make a copy and use the rest room, and we're
24  back.
25  /////

## 15

1  BY MR. BLIVEN:
2  Q. So in that discovery that includes your
3  statement, starting on page three that's been marked
4  as Exhibit 1, it's my understanding that you think
5  that there are either some inaccuracies or
6  misstatements in there?
7  A. Correct.
8  Q. So that being the case, rather than going
9  back and picking that apart, so to speak, what I'd
10  like to do is start with your testimony about what
11  happened that evening, and then we'll go back and talk
12  about those issues.
13       Let's go back to the evening of August 30th.
14  That's when you went to work?
15  A. Correct.
16  Q. Tell me about -- did you go to work that
17  day? How did it work there? Just go ahead and give
18  me a little information about your job.
19  A. I usually showed up and would just jump on
20  the sprayer. I'd be just spraying dishes because
21  there would usually be a cart full of dishes from
22  prepping. So we'd have to get all those dishes done
23  before we could run the restaurant, really, and just
24  occasional taking out the trash. If a lobster needed
25  to be killed, me or Skylar or Parker would be the ones

## 16

1  killing the lobster.
2       Really, it was a fairly normal day at work.
3  I mean, it was the end of summer, and it was pretty
4  busy that night. Yeah. Got off. Felt like a normal
5  day, busy day. I don't know.
6  Q. All right. So how old were you when you
7  started working at the Fish House?
8  A. 15.
9  Q. And your 16th birthday --
10  A. Was a week before.
11  Q. The wreck?
12  A. Yeah.
13  Q. Now, the time sheet shows that on the 30th
14  of August you started work at -- three thirty-five was
15  when you clocked in?
16  A. Right.
17  Q. And then it shows that you clocked out at
18  midnight fifty-two or eight minutes to one on the
19  morning of the 31st?
20  A. Correct.
21  Q. Now, if we look at that time sheet, which
22  we're going to mark -- we're going to mark these time
23  sheet pages as Exhibit 2.
24  (Exhibit 2 was marked.)
25  /////

17

1 BY MR. BLIVEN:
2 Q. Why don't you go ahead and take the exhibit.
3 I'll take your copy, if that's okay.
4 Go ahead and highlight Skylar's name at the
5 top of page one.
6 MR. BLIVEN: We marked this wrong.
7 (Discussion off the record.)
8 (Exhibit 2-1 was marked.)
9 BY MR. BLIVEN:
10 Q. Okay. We got this remarked because we left
11 off page one that's going to be Exhibit 2-1. In the
12 lower right-hand corner, it says "SFH 00477," because
13 we received this from the Fish House. That's
14 Stillwater Fish House, and that's the document number.
15 We call it the Bates stamp.
16 A. Sure.
17 Q. Go ahead and highlight "Skylar" up on the
18 top in yellow.
19 A. (Witness complied.)
20 Q. Let's go to Exhibit 2. Excellent. On the
21 next page go ahead and highlight you in orange?
22 A. (Witness complied.)
23 Q. Why don't you go ahead and highlight the
24 dates and times, those three columns, for the 30th,
25 29th, 28th, 27th.

18

1 A. The three, "Date, "Time" --
2 Q. Yes, "Date, "Time In," "Time Out," because
3 that's what we're talking about.
4 A. (Witness complied.)
5 Q. Now, at the time of the crash, you were 16?
6 A. Correct.
7 Q. You're 15 when you get hired?
8 A. Yeah.
9 Q. At the time of the crash, Skylar is 15?
10 A. Correct.
11 Q. How about Parker?
12 A. He was 15.
13 Q. Since this wreck happened, are you aware
14 that the U.S. Department of Labor did an investigation
15 regarding wage and hour violations by the Fish House
16 in terms of having minor employees working too many
17 hours and too late at night?
18 A. Yeah.
19 Q. Did they talk to you and take your
20 statement?
21 A. No. They asked me if I wanted to be a part
22 of the case or whatever, and I didn't want anything to
23 do with it. I didn't want to be in the position I
24 already got myself in.
25 Q. Understandable. But you're aware of that

19

1 process?
2 A. Yeah.
3 Q. At the time did you have any idea that these
4 activities that the Fish House was doing, making you
5 guys work these hours, was illegal?
6 A. I didn't.
7 Q. So now let's take a look at that week. On
8 the 30th you got there at three thirty-five, and you
9 got out at just a little before one o'clock in the
10 morning?
11 A. Right.
12 Q. The night before you got there at three
13 fifty-two, and you didn't clock out until one
14 twenty-five in the morning?
15 A. Yeah.
16 Q. And the night before that you got there at
17 three forty-five, and you clocked out at --
18 A. Twelve fifty-two.
19 Q. Twelve fifty-two, eight minutes to
20 one o'clock on that night.
21 The night before that you clocked in at
22 three fifty-one, and they didn't let you out -- you
23 couldn't clock out until twenty-four minutes after
24 midnight on that day?
25 A. Correct.

20

1 Q. So you had four straight nights of working
2 after midnight and working over nine hours for three
3 straight nights, including the night --
4 A. Uh-huh.
5 Q. -- that the wreck happened, and almost nine
6 hours on the 27th?
7 A. Right.
8 Q. And it looks like you didn't work on the
9 25th or 26th, but you did work from the 20th to the
10 24th?
11 A. Right.
12 Q. And it was on the 18th that you turned 16;
13 is that correct?
14 A. 19th.
15 Q. Okay. That's why we ask the questions.
16 Now, going back to Exhibit 1, it says,
17 "Mr. Gillund does not remember much of anything about
18 the accident after the vehicle went into the ditch."
19 Does that refer to you're upside down at that point,
20 or does that refer to when your tires go off the road
21 the first time, if it refers to -- what the heck does
22 that refer to?
23 A. When I -- like the point that I don't
24 remember?
25 Q. Yeah. When is the point at which you don't

**21**

1  remember?
2    A.  Right as I was coming out of the ditch, I
3  seen the ground go crooked, and as soon as I seen the
4  ground go crooked, it was black until I woke up in the
5  hospital.
6    Q.  And did you suffer a head injury in this
7  crash?
8    A.  Yes, I did. I was in a coma for five days
9  or so.
10    Q.  I'm really sorry to hear that. You seem to
11  have recovered.
12    A.  Yeah. For the most part. Still have the
13  occasional balance problems that I had to get over.
14  They were pretty bad at first, but kind of got them
15  under control now.
16    Q.  Now, it then goes on to say, "He was not
17  tired the night of the accident as he was used to the
18  work hours." To me that seems potentially unlikely.
19  It then goes on to say that, He typically went to
20  sleep after he got home and typically did not get up
21  until around eleven, including the day of the
22  accident.
23    A.  Right.
24    Q.  I talked to you about this yesterday, and
25  you said that that's not your normal sleep pattern, or

**22**

1  circadian rhythm is what it's known scientifically as.
2    A.  Before I started the job, I was a morning
3  person. I would wake up at, like, six or seven.
4    Q.  And to the extent that -- this part about
5  you going to bed late and getting up at eleven, was
6  that for any other reason than the fact that the Fish
7  House was making you work this schedule?
8    A.  No.
9    Q.  After you stopped working at the Fish House,
10  did you go back to normal sleep patterns?
11    A.  Yeah, I did.
12    Q.  How long did you work at the Fish House
13  after this?
14    A.  I didn't work at the Fish House after the
15  car accident.
16    Q.  So what happened to the job? I mean, did
17  you quit? Did they fire you? What happened?
18    A.  I honestly don't know. They didn't tell me
19  to come back, and I was told that I didn't have to go
20  back. I don't know if I was fired or what, really.
21    Q.  What else would you call it?
22    A.  Yeah. Very true.
23    Q.  Now, you worked with Skylar that evening?
24    A.  Correct.
25    Q.  And Skylar previously gave his deposition to

**23**

1  the attorney for the Fish House, and I gave you a copy
2  of that deposition, and you have a copy in front of
3  you?
4    A.  Correct.
5    Q.  Let's mark that deposition as Exhibit 3.
6    (Exhibit 3 was marked.)
7  BY MR. BLIVEN:
8    Q.  Now, you're aware, even though you don't
9  remember this happening, that the vehicle rolled and
10  Skylar's leg was pinned and he ultimately lost his
11  leg?
12    A.  Right.
13    Q.  To your knowledge did Skylar suffer a head
14  injury or have a loss of consciousness?
15    A.  No.
16    Q.  You've reviewed Skylar's deposition?
17    A.  Correct.
18    Q.  If I tell you -- and feel free to disagree,
19  please -- that in his deposition testimony he doesn't
20  claim to have a head injury and he recalls these
21  events pretty clearly in his mind --
22    A.  Sure.
23    Q.  No. 1, he didn't suffer a head injury, as
24  far as you know?
25    A.  Correct.

**24**

1    Q.  And, secondly, from reviewing his deposition
2  and, frankly, from you talking to him -- including,
3  what, in the hospital in Seattle?
4    A.  I didn't go to Seattle, but when he got back
5  and he was in the recovery place -- I can't remember
6  what it was called -- I stayed the night there with
7  him once or twice.
8    Q.  Okay. Good. Thanks for clearing that up.
9  The point is, he has a pretty clear recollection --
10    A.  Yeah.
11    Q.  -- of the night and the events?
12    A.  Way better recollection than I do.
13    Q.  That was my next question, and that is, to
14  the extent that what he said in his deposition is
15  different than what's written in this statement that
16  you allegedly gave in Exhibit 1 -- I'm going to ask
17  you, in general, would you rely on Skylar's
18  recollection more or your own?
19    A.  Definitely Skylar's.
20    Q.  In terms of specifics, I'm going to go over
21  with you some specifics about what he talked about.
22    A.  Okay.
23    Q.  But I'll ask you first generally. Is there
24  anything in Skylar's deposition about what happened
25  that evening or that early morning, I guess-- it goes

**25**

1  evening into early morning.
2    A.  Correct.
3    Q.  The evening of the 30th and the morning of
4  the 31st.
5    A.  Uh-huh.
6    Q.  When you reviewed his deposition -- and,
7  again, I discussed it with you yesterday. I provided
8  these documents to you and sent you home with them so
9  you'd have a chance to read them overnight; is that
10  true?
11    A.  Correct. Right. Yeah.
12    Q.  In fact, we had talked about you giving your
13  sworn statement yesterday, but because of time
14  constraints and because I wanted to make sure you had
15  plenty of time to review these materials before I
16  asked you about them, I sent you home?
17    A.  Yeah.
18    Q.  And then you agreed to come back today,
19  after you could review them and think about it and
20  make sure you wanted to give a statement, that then
21  you could come back and do it today?
22    A.  Correct.
23    Q.  So was there anything in his deposition that
24  you reviewed -- and when I say "His deposition," I
25  mean the pages 1 through 85 of his testimony and the

**26**

1  correction page, which is at the very end and is in
2  his handwriting --
3    A.  Right.
4    Q.  Is there anything in there that you say, No,
5  that's not what happened, or, I disagree with that?
6    A.  **The only thing would be when he assumed that**
7  **I might have fallen asleep. That's the only thing,**
8  **because I don't think I fell asleep. I was just tired**
9  **in a conversation.**
10    Q.  All right. I'm glad you brought that up,
11  because he put on the correction page, Page 27,
12  Line 14, "Something," period. "I believe Noah fell
13  asleep. I was looking out the window."
14    A.  Okay.
15    Q.  So you don't think you fell asleep, but
16  that's not even really inconsistent, because he says,
17  I believe he fell asleep. I was looking out the
18  window. So he's not accusing you of being asleep?
19    A.  Yeah.
20    Q.  He just thinks that you did?
21    A.  Right.
22    Q.  But he didn't know that for sure.
23    Now let's get down to what matters about
24  that. Were you tired?
25    A.  **Yes. It was one in the morning after work,**

**27**

1  **you know. I'm not going to do anything but go to**
2  **sleep, really, when I get home.**
3    Q.  And in his deposition Skylar noted -- and
4  I'm going to tell you exactly where as soon as I find
5  it.
6      Skylar said that there were times that he
7  was too tired working there before the accident.
8  That's on page 16. He said, "Yes. I felt extremely
9  tired." Had you ever felt tired before that night
10  when you left?
11    A.  **Yeah. Yes, I had.**
12    Q.  And then on page 28, Skylar was asked by
13  Mr. Cockrell at line 11, "Did Noah act tired before
14  you guys left the restaurant, like he was sleepy? Was
15  he yawning or anything?"
16      And Skylar answered, Yes. "We were yawning,
17  and we had to, like, stretch and all that. Tired. It
18  was a pretty busy night."
19      Any disagreement with that?
20    A.  **I don't disagree, definitely. That would be**
21  **something we'd do after a night like that. I just**
22  **don't remember down to the point of stretching and**
23  **breathing, you know.**
24    Q.  You don't have any specific recollection of
25  yawning and stretching?

**28**

1    A.  Yeah. Correct.
2    Q.  But that's something that had happened
3  before?
4    A.  Correct.
5    Q.  And if Skylar says that it was like that on
6  that night, you believe --
7    A.  It's very likely, yeah.
8    Q.  Then why don't you go ahead and go to
9  page 30, and it goes from 30 to 31. In the beginning
10  of 31, he talks about Skylar looking out the window.
11  Is there anything on pages 30 or 31 that is different
12  than your recollection? And that includes talking to
13  a chef or a supervisor named Dan and him smoking a
14  cigarette before you guys got in the car. I don't
15  know if you remember that part.
16    A.  I vaguely do.
17    Q.  Okay. So if you look at what he said at
18  pages 30 and 31, is there anything in there that you
19  disagree with or that you don't think is accurate
20  based on your recollection?
21    A.  No. It all seems accurate to me.
22    Q.  Okay. If we go to page four of Exhibit 1
23  and you go down to the fourth full paragraph, it says
24  "The day Mr. Gillund and Skylar clocked out."
25    A.  Okay.

29

1    Q.   First of all, it wasn't the day? It was,
2  basically, one o'clock in the morning?
3    A.   Yeah.
4    Q.   Okay.  And it talks about you taking off
5  your shirts, grabbing a bowl of soda (sic) and going
6  out to Noah's car.
7         Now, Skylar talks about talking to this
8  assistant manager or chef person for ten minutes or
9  more while the guy smoked a cigarette.  In your stated
10 testimony or what they thought you would say, it
11 doesn't say anything about visiting with him or him
12 smoking a cigarette.  In fact, it says that you didn't
13 visit with him.  It says, "Mr. Gillund and Skylar did
14 not visit with the manager before leaving."
15   **A.   I remember visiting with the manager before**
16 **leaving.  Like, I remember sitting -- I don't remember**
17 **what we visited about, but I remember sitting down on**
18 **the bench out the walk-in and visiting after we closed**
19 **up.**
20   Q.   And that's what Skylar said in his
21 testimony.
22   **A.   Right.**
23   Q.   And you remember that?
24   **A.   Yes.**
25   Q.   And, also, that you and Skylar didn't smoke

30

1  any marijuana that evening or have any alcohol, and,
2  in fact, this is not in your statement.  It is in
3  Skylar's.  He didn't -- that's not something he did,
4  is my understanding, back then.
5    **A.   Correct.**
6    Q.   You admitted that you had used marijuana
7  before, but you didn't use it that night?
8    **A.   Correct.**
9    Q.   I was confronted in this case with the
10 allegation by the Fish House that that's what happened
11 that night is that you guys went outside and smoked
12 marijuana or something and then you got in the crash.
13   **A.   That's what a lot of people -- that's what I**
14 **heard after the accident too.  That was the rumor**
15 **going around.**
16   Q.   Just so we're clear, did Skylar ever smoke
17 marijuana with you there?
18   **A.   No.  No.  He was even less into it than**
19 **anyone else there.**
20   Q.   My understanding was that he wasn't into it
21 at all.
22   **A.   Yeah.  Exactly.  He had no interest.**
23   Q.   Here is the question I have.  Did you ever
24 use marijuana at the Fish House after you got off work
25 with the manager or assistant manager or any of the

31

1  chefs?
2    **A.   No.  Never at the Fish House.  Never after**
3  **work.**
4    Q.   In between the time that you guys then left
5  the parking lot in your vehicle -- strike that.
6         In the time between walking away from the
7  manager --
8    **A.   Okay.**
9    Q.   -- and driving down the road toward home,
10 did you guys do anything else of significance or
11 anything that would have affected your driving?
12   **A.   No.  We were just going normal straight from**
13 **the Fish House right to Parker -- sorry.  Not Parker.**
14 **Right to Skylar's house to drop him off so I could go**
15 **home and go to bed myself.**
16   Q.   And the reason why I'm asking is because
17 there has been discussion -- and in our case it's been
18 something of an issue -- regarding the time of the
19 crash versus the time you guys clocked out.
20   **A.   Right.**
21   Q.   Now, in his deposition Skylar talked about
22 checking the kitchen one last time.
23   **A.   Yeah.  We always checked it one last time**
24 **before we left.**
25   Q.   Is that, like, also in the same time frame

32

1  that you would have gotten the chocolate mints, thrown
2  your shirt in the hamper and gone out to your car?
3    **A.   Yeah.  Yeah.**
4    Q.   Did you do that stuff before or after you
5  clocked out?
6    **A.   I usually -- I'd clock out and then take my**
7  **shirt off, and that night was the first time I ever**
8  **decided to take any of those mint chocolates, and I**
9  **grabbed a drink and ended up visiting with Dan or**
10 **whatever his name was.  Not for too long.  Like, ten,**
11 **fifteen minutes, maybe.  Probably ten.**
12   Q.   That's why I'm asking.  Because if you clock
13 out at fifty-two and then the crash happens, according
14 to the crash report, at a later time -- so what I'm
15 going to do now is -- I don't think -- I know I showed
16 you a copy yesterday, but let's get a copy of the
17 crash report and look at that time frame and discuss
18 what, if anything, happened --
19   **A.   Sure.**
20   Q.   -- and get that time frame addressed here.
21        So what we're going to do is, I'm going to
22 print that out, a copy of it, and give it to you, and
23 we're just going to go off the record for just a
24 second so we can do that.
25        (Break held from 2:50 p.m. to 2:52 p.m.)

33

1    (Exhibit 4 was marked.)
2  BY MR. BLIVEN:
3    Q.  I've given you Exhibit 4, which I will tell
4  you is the crash report that we obtained from the
5  incident, and I believe I gave that to you yesterday,
6  or at least we looked at it.  Go ahead and just take a
7  second to look at it again because I'll ask you if
8  that seems like, to you, this relates to the event.
9    A.  It looks accurate.
10   Q.  So the crash report states that the crash
11 happened at one-fifteen a.m. and that the reported
12 time was one-twenty a.m.  You don't have any
13 recollection of the time span between the crash and
14 when people showed up?
15   A.  No.
16   Q.  In Skylar's deposition he said it seemed
17 like it was --
18   A.  That's what he had told me too.
19   Q.  -- a long time.
20   A.  Yeah.
21   Q.  But even if we assume that the crash did
22 happen at one-fifteen and not earlier, which is what
23 Skylar, frankly, thinks --
24   A.  Okay.
25   Q.  -- because he related that it seemed like a

34

1  long time before ambulances or --
2    A.  Anyone showed up to --
3    Q.  Yeah.  More than five minutes.  Right?  But
4  let's just assume hypothetically that that's accurate.
5  If you guys put your clothes away, checked the kitchen
6  and then went outside and talked to this guy and then
7  got in your car, how long does it take to drive from
8  the Fish House to where the crash happened?
9    A.  Probably four or five minutes.
10   Q.  So if you guys left the Fish House at ten
11 after --
12   A.  Okay.
13   Q.  -- then that would line up with that time of
14 the crash?
15   A.  Right.
16   Q.  And if you talked to him for ten minutes and
17 you spent a few minutes getting out of the place --
18   A.  Yeah.
19   Q.  -- and a minute or two in the car --
20   A.  Right.
21   Q.  -- there isn't any extra time, by my
22 calculations.
23   A.  Yeah.  Correct.  Me too.
24   Q.  And for our record, you guys weren't in any
25 particular hurry that night?

35

1    A.  No.
2    Q.  You know, some people, they're driving away
3  before it even seems like they've clocked out.  Some
4  people take their time.
5    A.  Yeah.
6    Q.  Does it seem like you guys were in any hurry
7  that evening?
8    A.  No.  We weren't.
9    Q.  Let's get back to the statement, the
10 supplemental answer of the statement that you
11 allegedly gave.
12       I think we've addressed that you were, in
13 fact, tired?
14   A.  Yeah.
15   Q.  Now, let's get on to, just before the crash,
16 you looked over to say something to Skylar, and then
17 you felt the passenger side get into the gravel, and
18 then when you tried to work your way out of the ditch,
19 you lost control.
20   A.  Okay.
21   Q.  It goes on to say, "He did not feel Skylar
22 was distracting him when the accident occurred.  They
23 were just talking."  Skylar says that you weren't
24 talking at the time, that there had been a period of
25 silence, which is why he thought you fell asleep.

36

1    A.  Sure.
2    Q.  And he was just looking out the window.
3    A.  Right.
4    Q.  First of all, Skylar wasn't distracting
5  you --
6    A.  Yeah.  No.
7    Q.  -- on the drive?
8        Secondly, were you talking at the time this
9  happened?
10   A.  I remember -- I remember having a
11 conversation on the straight stretch before the turn
12 of the accident.  If there was a moment of silence, it
13 was because we lost stuff to keep saying about the
14 conversation we were on, and my mind was still on the
15 conversation in that gap of time.
16       So I remember looking over to talk to
17 Skylar, like jumping back into the conversation, and
18 right as I tried that, I felt my passenger tires hit
19 the gravel.  And with my mind being on that
20 conversation at that time of the night, I maybe wasn't
21 100 percent focused on the road, if that makes sense.
22   Q.  It does to me.  Just for the purposes of
23 anybody that will read this, which is why we're having
24 the conversation, having it taken down, is it fair to
25 say that, when it's not one o'clock in the morning, at

1 age 16 you can actually talk to somebody and drive a
2 car at the same time without it causing problems?
3     **A. Right.**
4     Q. But on this particular event, it's after
5 one o'clock in the morning, and you've now worked four
6 nights in a row?
7     **A. Yeah.**
8     Q. Now you're on the way home, and Skylar goes
9 silent because it was a gap in conversation, as he
10 relates it. He's looking out the window. You turn to
11 look at him, and that's when you lose control of the
12 vehicle, essentially?
13     **A. Right.**
14     Q. And then we get on to this other statement
15 in here that took us by surprise where they said, on
16 page four, "Mr. Gillund believes the vehicle he was
17 driving had a tendency to drift to the right. Since
18 the accident, Mr. Gillund's family purchased the exact
19 same model of vehicle. It too had the tendency
20 to drift to the right." That doesn't make a lot of
21 sense to me. Did you say that?
22     **A. I did say that the car that I was -- the**
23 **Windstar that I wrecked, it had some front-end**
24 **problems. Like, I can't remember if it was wheel**
25 **bearing or ball joint or alignment or anything, but I**

1 **know it had a tendency to pull, but I knew how to pull**
2 **against it, you know, how to drive that vehicle in its**
3 **condition.**
4     **After the accident, we ended up buying**
5 **another Windstar of a different color, and after maybe**
6 **six months of driving it, it worked out those same**
7 **problems, kind of had -- it pulled to one side or the**
8 **other.**
9     Q. Was it dramatic or just a little bit?
10     **A. No. It wasn't very dramatic.**
11     Q. It's the kind of thing, though, that you
12 were used to and didn't cause problems as long as you
13 were alert --
14     **A. Yeah.**
15     Q. -- and awake?
16     **A. Exactly.**
17     Q. So to the extent that pulling to the right a
18 little bit may have been an issue in this instance,
19 that would have been because you're just not alert
20 enough and paying attention enough and capable of
21 focusing enough because you're so tired --
22     **A. Correct.**
23     Q. -- to keep it on track?
24     **A. Yeah.**
25     Q. You don't blame the car for this?

1     **A. No. That was just a question they had that**
2 **I answered.**
3     Q. Now, then it goes on to say that you didn't
4 complain about being tired to anyone at the Fish House
5 and that you didn't hear Skylar complain about being
6 tired other than Skylar would occasionally complain
7 about being at work. In his deposition Skylar
8 actually talked about not wanting to work those hours.
9     **A. Sure. Yeah.**
10     Q. Again, now that you're here and you've
11 looked at what he said and looked at what they said
12 that you said, you know, again, what would you say
13 about -- would you disagree with what Skylar said
14 about how he at least told them on one occasion
15 that -- or that he had been tired --
16     **A. I'm sure Skylar has told people at work that**
17 **he was tired or asked about a schedule change or**
18 **anything.**
19     Q. So you believe him when he says that?
20     **A. Yeah.**
21     Q. Why in the heck do you think that it says on
22 this supplemental answer that that's what you said? I
23 mean, did you tell them that and you just now are
24 clarifying it, or do you think they got it wrong?
25     **A. Again, I was at work, kind of in a rush,**

1 **trying to get done with talking to these guys, and I**
2 **vaguely remember days Skylar wishing he wasn't at**
3 **work, but who doesn't have days they wish they weren't**
4 **working, you know.**
5     Q. You guys are 15. You just turned 16. Was
6 the Fish House the kind of place where you had good,
7 open lines of communication with your supervisor and
8 the owner where you could say, Oh, no. We have this
9 issue, or, I want to change my schedule, or something
10 and they were open to that?
11     **A. Not really. They weren't super flexible**
12 **with schedules.**
13     Q. And there were other 15-year-olds --
14     **A. Yeah.**
15     Q. -- working there?
16     How old was Parker?
17     **A. He was 15, I'm pretty sure.**
18     Q. What's Parker's last name?
19     **A. Hill.**
20     Q. Hill.
21     **A. I believe someone talked to him a while ago.**
22     Q. At the end of this, on page five, it notes
23 that you talked to Skylar about three weeks the day
24 this done or before they talked to you. At
25 this point that would be -- I don't know -- about a

41

1 month ago or so, maybe a little longer.
2   A.   Sure.
3   Q.   And that Skylar seemed to be happy and doing
4 well. What does that mean, "Happy and doing well," if
5 that's what you said?
6   A.   When I showed up, he was -- I told nobody
7 that I was going to Skylar's. I was on my way by and
8 decided, Let's knock on Skylar's door. So I knocked
9 on his door, and Skylar opened the door, and, Noah is
10 here. Everyone invites me inside.
11       And we're conversating (sic) for a while,
12 and me and Skylar go out on the porch, and we were
13 talking for a good hour, hour and a half maybe, and
14 his mom kind of started bringing up stuff about the
15 lawsuit, and Skylar was kind of, like, pushing it,
16 like, We don't really want to talk about this at the
17 moment. We haven't seen each other for a month or so.
18 We want to talk about other stuff, what we've been
19 doing.
20   Q.   And you guys are still friends?
21   A.   Yeah.
22   Q.   And he was glad to see you?
23   A.   Yeah.
24   Q.   And he didn't want to talk about the
25 lawsuit, is what you're saying?

42

1   A.   Exactly.
2   Q.   But his mom brought it up. When you talked
3 about him doing well and being happy, Skylar has got a
4 positive attitude in life, in general?
5   A.   Yeah. He's got a good sense of humor, and
6 it helps him.
7   Q.   And it seems that despite him having this
8 catastrophic injury and losing his leg he's really
9 trying to make the best of things?
10   A.   Yeah. He's trying to, definitely.
11   Q.   Not that it hasn't been hard. Not that he
12 hasn't had problems.
13   A.   Yeah.
14   Q.   Because he has. And so by "Doing well," all
15 things considered, he's doing well?
16   A.   No. I just meant, like, attitude-wise, you
17 know.
18   Q.   But when you talked to him on that day, as
19 you just said, he didn't try to talk to you about the
20 lawsuit or get you to say things --
21   A.   Right.
22   Q.   -- or suggest to you what you should be
23 saying or doing?
24   A.   Yeah.
25   Q.   He was just glad to see you and catch up?

43

1   A.   Yeah. Exactly.
2   Q.   Okay. Do you think it's a good idea for a
3 business owner and a bunch of adults to make young
4 people work at hours they shouldn't be working under
5 the labor laws and that putting them on the road at
6 one a.m. --
7   A.   Uh-huh.
8   Q.   -- is not prudent or reasonable and that
9 it's understandable or predictable or foreseeable that
10 someone could get really hurt as a result?
11   A.   Oh, yeah. I don't think it's very smart to
12 be putting kids at that age at that time on the road,
13 personally.
14   Q.   And there's some discussion here about how
15 many times you gave Skylar a ride home.
16   A.   Yeah.
17   Q.   He talked in his deposition about it being a
18 few times that summer.
19   A.   Uh-huh.
20   Q.   Three times or so.
21   A.   Correct. I thought it was a few more,
22 maybe.
23   Q.   You thought it was a few more. It's my
24 understanding that Skylar's mom -- that she'd come and
25 get him wherever she could.

44

1   A.   Correct.
2   Q.   But there became a problem with her having
3 to get out of bed at, like, one o'clock in the morning
4 to come get him.
5   A.   Right.
6   Q.   And Skylar testified his recollection is
7 that -- whether he testified to this part or not, I'll
8 just tell you that this is what he would say, that
9 that particular night he said, Look, Mom. We're going
10 to get off work late probably again. You don't need
11 to come and get me. He'll give me a ride home --
12   A.   Yeah.
13   Q.   -- and that she went along -- her testimony
14 would be that she said, Well, okay. This time, and
15 that's because, again, this had become hard for her,
16 and, you know, you're a nice young man. You're
17 responsible. I mean --
18   A.   Yeah.
19   Q.   I guess the question I have for you is,
20 around that, you don't blame her for him being in the
21 car with you?
22   A.   No, I don't.
23   Q.   Do you believe that the Fish House is
24 responsible for this crash happening?
25   A.   Yes.

45

1   Q.   Are you working now?
2   A.   I am.
3   Q.   What are you doing?
4   A.   I do bindery at Top Copy Printing.
5   Q.   What hours do you generally work?
6   A.   In the summer it's eight or nine to five.
7   Right now I've been getting off early because it's the
8   slow season.
9   Q.   Have they ever had you work past midnight?
10  A.   No.
11  Q.   You're 19 or 20 now?
12  A.   20.
13  Q.   When you look back at this now, as a
14  20-year-old and having worked and looking back at you
15  guys being 15 and then just turning 16 and them
16  keeping you there until late and knowing that the
17  Department of Labor came in and did this investigation
18  and found these violations, I guess, do you kind of
19  look at it differently than you did when you were 15,
20  16 in terms of --
21  A.   Yeah, I do.  When I was 15 and 16, I had no
22  knowledge, really, of what the laws were.  I didn't
23  know that at 15 you were supposed to be off at a
24  certain time, and I just kind of went along with it
25  trying to get money, I guess, but -- then I had to

46

1   spend all that money I saved up for all summer on a
2   new car for my parents.
3   Q.   So let's mark next the November 3 report of
4   Ms. Gill.
5        (Exhibit 5 was marked.)
6   BY MR. BLIVEN:
7   Q.   And then what I'll also do, so we can talk
8   about all these at the same time, is mark the
9   November 27 report as six and the December 3 as seven.
10       (Exhibit 6 was marked.)
11       (Exhibit 7 was marked.)
12  BY MR. BLIVEN:
13  Q.   So going to Exhibit 5, the November 3
14  report, she describes the description of the incident
15  on page one, going onto page two.
16  A.   On which one, November 3?
17  Q.   Exhibit 5, which is --
18  A.   Okay.  November 3rd?
19  Q.   The November 3, the original report.
20  A.   I have that one.
21  Q.   Okay.  So you've got it?
22  A.   Yeah.
23  Q.   Take a look again at that paragraph starting
24  with "Description of Incident," and then there's
25  another paragraph that goes onto page two.

47

1        Again, I gave these all to you yesterday so
2   you could review them?
3   A.   Correct.
4   Q.   Does her recitation of the description of
5   the incident -- is that accurate?
6   A.   I'm sorry.  Could you repeat what you just
7   said?
8   Q.   What she said in those two paragraphs on
9   pages one and two, "Description of Incident," that's
10  accurate?
11  A.   Yeah.  Yes.
12  Q.   And when you look at her report and what she
13  talks about about labor standards and not making young
14  people work late and then also having a driver's
15  license with a GDL restriction, Graduated Driver's
16  Licensing, on page three that talks about the hours --
17  when you look at that, what does that lead you to
18  believe in terms of, again, this issue of should the
19  Fish House have put you guys in this position,
20  particularly Skylar, at one o'clock in the morning,
21  not having a way to get home other than with another
22  minor, who, frankly, is only allowed a passenger if a
23  family member or the teen is supervised by a licensed
24  adult driver?  That didn't apply to this case.
25  A.   Right.

48

1   Q.   So they shouldn't have put him in a
2   situation where he's going home with you?
3   A.   Right.
4   Q.   At one a.m.?
5   A.   Yeah.
6   Q.   And that when you left the Fish House, they
7   knew --
8   A.   Yeah.  They knew, yeah.
9   Q.   And you'd done this a couple times before?
10  A.   Yeah.
11  Q.   At least three times before.  So, again,
12  they knew --
13  A.   They knew, yeah.
14  Q.   -- what was going on?
15       They knew Skylar couldn't get home?
16  A.   Correct.
17  Q.   Couldn't drive?
18  A.   Yeah.
19  Q.   And that unless his mom gets out of bed and
20  comes and gets him, which I would submit is not a
21  reasonable expectation on their part --
22  A.   Yeah.
23  Q.   -- they're putting him in the car with you?
24  A.   Yeah.
25  Q.   And they're putting him in the car with you

49

1  after you've worked these long hours?
2  A. Yeah.
3  Q. And you're understandably tired?
4  A. Yeah.
5  Q. Now, she talks about, in the report, the
6  difference between daylight hours and nighttime hours
7  and the circadian timing system, commonly referred to
8  as the circadian rhythm, which I talked about earlier,
9  and about the impact that the lack of sleep had,
10  especially on teenagers --
11  A. Uh-huh.
12  Q. -- and how, basically, that's just really
13  dangerous and not safe.
14  A. Right.
15  Q. And, then, anything about what she says in
16  this report that you disagree with or doesn't make
17  sense to you?
18  A. No.
19  Q. Did you know about Stillwater's management
20  safety policy?
21  A. Which one --
22  Q. She talks about the Stillwater management
23  safety policy statement.
24  A. Is that on the third page?
25  Q. That's on --

50

1  A. This one here.
2  Q. That's on page five.
3  A. I had never read it while working there, no.
4  Q. So they had this policy manual --
5  A. Sure.
6  Q. -- apparently, which I am actually going to
7  give you a copy of, and we're going to mark it as our
8  next exhibit, and I'm going to let you take a look at
9  it. We didn't go over this yesterday.
10  (Break held from 3:21 p.m. to 3:24 p.m.)
11  (Exhibit 8 was marked.)
12  MR. BLIVEN: Okay. I'm back.
13  BY MR. BLIVEN:
14  Q. I'm handing you what has been marked as
15  Exhibit 8, and it's the Stillwater Fish House employee
16  manual, is what we'll call it, and it includes a
17  discussion of safety. I'm going to hand this to you
18  and let you take a look at it.
19  (Break held from 3:25 p.m. to 3:28 p.m.)
20  MR. BLIVEN: We're back on the record.
21  BY MR. BLIVEN:
22  Q. I printed for you the Stillwater Fish House
23  employee manual, we'll call it, and safety policies
24  handbook, I guess is what they call it. Yeah.
25  Employee handbook.

51

1  In the lower right-hand corner, it says
2  "SFH 00337." That's because we got this -- those are
3  Bates stamps. In a lawsuit, when you give people
4  documents, there a Bates stamp so that everyone knows
5  what you're talking about.
6  A. Sure.
7  Q. So we got this from the Fish House in our
8  lawsuit in our discovery. Have you seen this before?
9  A. Never.
10  Q. Did you notice in Skylar's deposition where
11  you said he hadn't seen it either?
12  A. Yeah, actually.
13  Q. You did see that?
14  A. Yeah.
15  Q. So in here it talks about safety, and in her
16  reports Ms. Gill talks about that, and that's where I
17  was on page five in the management safety policy
18  statement, and it talks about all this training you're
19  supposed to get, safety training you're supposed to
20  get.
21  A. Right.
22  Q. You didn't get it?
23  A. No.
24  Q. Do you remember any safety training
25  whatsoever at all?

52

1  A. No.
2  Q. We weren't provided a signed copy of this
3  handbook that was signed by you or Skylar.
4  A. Me or Skylar. Yeah.
5  Q. So certainly I believe you if you tell me
6  that you didn't get it.
7  And then as Ms. Gill says on her last page,
8  page seven, "Stillwater recognized the need to provide
9  an employment conducive to employee health and
10  safety." They put this policy statement in place.
11  However, they completely didn't follow it, and then
12  she says, "Such failures by Stillwater were the
13  underlying cause of Mr. Dixon's incident and
14  subsequent injuries." Does that make sense to you,
15  what she was saying?
16  A. Yeah. I would agree with that.
17  Q. So then let's go to Exhibit 6, which is the
18  November 27 report from her.
19  A. I don't know what I just did with that guy.
20  Q. Here.
21  A. Okay.
22  Q. And you did review this, Exhibit 6?
23  A. Yes, I did. Yeah.
24  Q. And one of the things is this whole talking
25  to Dan afterward, after you guys got off work.

53

1   **A. Yeah.**
2   Q. And then one thing that this policy handbook
3  gives us that's quite striking in my opinion --
4   **A. That you're not supposed to be there for**
5  **longer than five minutes after you clock out?**
6   Q. That's not the only one. How about that Dan
7  Vogel is the general manager?
8   **A. Oh.**
9   Q. Is that the same Dan?
10   **A. Maybe. It could be, very definitely. Yeah.**
11  **That's kind of --**
12   Q. Do you remember a different Dan?
13   **A. Huh-uh.**
14   Q. That was not an audible, out loud for our
15  court --
16   **A. Sorry. No.**
17   Q. So that brings us back to the point that,
18  again, Stillwater Fish House knew that you had to give
19  him a ride home --
20   **A. Yes.**
21   Q. -- and Dan, who is supposed to impose the
22  safety policy and follow it, didn't?
23   **A. Correct.**
24   Q. Anything in Exhibit 6 that you think is
25  inaccurate?

54

1   **A. No.**
2   Q. Anything that Skylar testified to, Nos. 1 to
3  10?
4   **A. No.**
5   Q. Meaning "No," it's not inaccurate --
6   **A. It looks accurate to me.**
7   Q. The only thing that may need to be corrected
8  is that Skylar "testified that neither he nor
9  Mr. Gillund consumed alcohol or smoked pot," which is
10  true. You didn't do it that night. Skylar, in his
11  deposition, on the last page of his deposition, the
12  correction page -- on the last page he corrected it to
13  say that, "I know Noah was not smoking pot." You
14  didn't that night?
15   **A. Right.**
16   Q. "He knew it was illegal. He wouldn't do it
17  at work or otherwise, and I was around him at work and
18  after work." So he was around you at work. You
19  wouldn't do it at work, and you didn't do it after
20  work. You didn't do it there. You already testified
21  to that?
22   **A. Correct.**
23   Q. Then that gets us to the last report.
24  We're about done. We're getting there.
25   **A. December 3rd?**

55

1   Q. Yeah, the December 3rd. This is kind of
2  important. This is what we've been talking about.
3  She refers to the statement that she was
4  given, those supplemental responses.
5   **A. Okay.**
6   Q. And she talks about that in the second
7  paragraph, and that's where she says that "Such
8  directly contradicting statements indicate that
9  Mr. Gillund is confused about the events of the crash
10  as would be expected following a head injury.
11  Independent of his memory regarding the accident, his
12  actions are certainly consistent with falling asleep."
13  Having looked at her report, Skylar's
14  testimony and us talking about it, would you agree
15  with her that your actions, even if you didn't fall
16  asleep, are consistent with falling asleep? In other
17  words --
18   **A. Yeah. Having symptoms of needing to fall**
19  **asleep?**
20   Q. Yes.
21   **A. Yeah.**
22   Q. And that your lack of attention and getting
23  distracted wasn't because you were talking to Skylar?
24  In fact, it's when you stopped talking --
25   **A. Right.**

56

1   Q. -- that you got distracted or that you got
2  unreliable?
3   **A. Right.**
4   Q. Because when you were talking to him, you
5  were awake?
6   **A. Correct.**
7   Q. And then when you stopped talking --
8   **A. Started drifting off, kind of. Yeah.**
9   Q. So perhaps -- and you tell me -- not only
10  did you then perhaps -- well, you definitely drifted
11  on the road?
12   **A. Yeah.**
13   Q. But it's certainly as likely as not, if not
14  more likely than not, that the car drifted because
15  certainly your brain was drifting?
16   **A. Right.**
17   Q. Whether or not you were actually falling
18  asleep or not --
19   **A. Doesn't -- yeah.**
20   Q. You're in the twilight zone? You're not
21  fully away?
22   **A. Yeah.**
23   Q. And then she says, "Clearly, structuring
24  work hours as Stillwater did creates a significant
25  hazard for 16-year-old Mr. Gillund and 15-year-old

**57**

1 Mr. Dixon as they travel home in the early morning
2 hours after working long shifts."
3   **A.  That's how it ended.  Right?**
4   Q.  But you agree with that?
5   **A.  Yeah, I do agree with that.**
6   Q.  So, again, anything in that report, what she
7 said there on that page, that you disagree with?  In
8 other words, does she have this right?
9   **A.  Yeah.  From what I read off of it, it looks**
10 **accurate to me.  I wouldn't argue against it.**
11   Q.  Would you agree that your statements or --
12 they're not even necessarily your statements, but your
13 statement or your testimony as presented in those
14 supplemental answers in our exhibit --
15   **A.  What are you looking for?**
16   Q.  I'm looking for the supplemental answers
17 that I've actually marked as an exhibit that we've
18 talked about.
19      Here they are.  Exhibit 1.
20      So would you agree with her that those
21 statements about you not being asleep or not being
22 tired and being distracted as is stated aren't
23 consistent and that what is consistent is, again, to
24 the extent that you were, quote, unquote, distracted,
25 it was because you were exhausted, tired?

**58**

1   **A.  Right.**
2   Q.  Shouldn't be driving?
3   **A.  Yeah.**
4   Q.  Now, we did mark the pages on the time
5 sheet.  We marked the crash report as an exhibit.
6      Okay.  So before we go off the record, I
7 want to ask you a couple more things.
8      Have I given you the opportunity to read
9 carefully all of these documents that we are going to
10 attach by giving either them to you yesterday, giving
11 you overnight to look at them and read them, or giving
12 you extra time while we were sitting here and going
13 off the record so you could take time to read them?
14   **A.  Yeah, you've given me time to read these.**
15   Q.  And we started around a little after
16 one-thirty, and it's now almost --
17   **A.  Two-forty.**
18   Q.  Yeah.  It's two-forty, and that's because
19 we've taken significant breaks to make sure you had
20 time to read things and could think about them?
21   **A.  Correct.**
22   Q.  Do you feel that my questions have been fair
23 and that you've understood them?
24   **A.  Yes.**
25   Q.  Our transcript does not reflect the tone of

**59**

1 my voice.
2   **A.  Sure.**
3   Q.  Would you agree that I've spoken slowly or
4 at least slowly enough that you can understand and in
5 a relaxed, friendly tone of voice and in an open
6 manner?
7   **A.  Yeah.  I believe --**
8   Q.  In other words, I'm not here yelling at you,
9 and I'm not telling you what to say?
10   **A.  Exactly.  I feel like you're helping me**
11 **by --**
12   Q.  I'm trying to get your testimony
13 accurately --
14   **A.  Right.**
15   Q.  -- and find out what happened accurately --
16   **A.  Yeah.**
17   Q.  -- and whether or not this other statement
18 is what you said or if that's what you meant, if
19 that's what they recorded.
20   **A.  Sure.**
21   Q.  That all being said, a couple more things.
22      Is there anything about this crash or the
23 work at Stillwater that you want to add or explain?
24   **A.  Not at the moment.  Not that I can think of,**
25 **no.**

**60**

1   Q.  Now, also, in the further interest of
2 fairness and justice, you have the right to what's
3 called read and sign.  So Jolene is going to send you
4 a copy of this statement for you to read it, sign it
5 and make any corrections on the correction page if you
6 want.
7   **A.  Sure.**
8   Q.  If you don't do it within 30 days, it's
9 considered that you signed it.
10   **A.  Okay.**
11   Q.  I would prefer that you actually do read it
12 and sign it and make any corrections that you feel are
13 necessary.
14   **A.  Okay.**
15   Q.  Are you willing to do that?
16   **A.  Yeah.**
17   Q.  What is the mailing address that you want
18 her to send this to?
19   **A.  P.O. Box 4732.  Zip code, 59937.**
20   Q.  So that's Whitefish?
21   **A.  Yeah.**
22   Q.  And, again, just in the effort of
23 completeness and accuracy, we've marked a total
24 of seven exhibits.
25   **A.  I've got No. 8 right here.**

**61**

1   Q.  Eight. I'm sorry. Eight exhibits which
2 will be attached to this, so you can look at them
3 again if you wish and refer back to them --
4   **A. Okay.**
5   Q.  -- and that you've had the opportunity and
6 have reviewed all those documents that we're
7 attaching.
8   **A. Sure.**
9   Q.  I guess the last question is, do you think
10 that it's fair and reasonable that the Fish House or
11 at least their insurance company should fully
12 compensate Skylar for this lifetime injury?
13   **A. Yeah. I agree with that. I feel that would**
14 **be fair.**
15   Q.  All right. Noah, I really appreciate you
16 agreeing to come in and clarify all this and give us
17 your testimony.
18       I told you before we started that it is
19 possible that at a later time we may need to take your
20 deposition, because we have an ongoing proceeding,
21 and whoever is representing those other parties may
22 want to talk to you. I've told you that can happen.
23   **A. Right.**
24   Q.  And so you're aware of that. Again, I
25 haven't made you any promises or offered you anything

**62**

1 in exchange for coming in and giving this testimony?
2 You've done it voluntarily --
3   **A. Yeah.**
4   Q.  -- because you want to tell the truth and do
5 the right thing?
6   **A. Correct. Yeah.**
7   Q.  All right. Thank you very much. I really
8 appreciate your time again. Anything else you want to
9 add?
10   **A. No.**
11   Q.  Okay.
12   **A. Not that I can think of.**
13   Q.  So at this time we'll end your statement,
14 and she'll send you a copy so that you can read and
15 sign.
16   **A. Cool.**
17     MR. BLIVEN: Thank you.
18     (Whereupon, the Statement Under Oath of
19 NOAH GILLUND was concluded at 3:45 p.m., and signature
20 was reserved.)

**63**

1     REPORTER'S CERTIFICATE
2 State of Montana  )
3 County of Flathead )
4   I, Jolene Asa, Registered Professional Reporter
5 and Notary Public for the State of Montana, residing
6 in Kalispell, Montana, do hereby certify:
7   THAT I did report the foregoing matter at the
8 time and place stated in the above-entitled matter
9 after having duly sworn NOAH GILLUND; and
10   THAT the foregoing pages constitute a true and
11 accurate transcription of the testimony of NOAH
12 GILLUND that was taken in shorthand by me and reduced
13 to writing under my direction to the best of my
14 ability; and
15   THAT I am not an attorney nor counsel of any of
16 the parties, nor a relative or employee of any
17 attorney or counsel connected with the action, nor
18 financially interested in the action.
19   IN WITNESS WHEREOF, I have hereunto subscribed my
20 name and affixed my seal on this ___ day of
21 _____, ___.
22
23
24     _____
25     JOLENE ASA, RPR

**64**

1     CORRECTION PAGE
2 PAGE LINE   CORRECTION
3
4
5
6
7
8
9
10
11
12
13
14
15
16   I have read the foregoing testimony and
17 believe the same to be true, except for the
18 corrections noted above.
19   DATED this ___ day of _____,
20 ___.
21
22
23     _____
24 NOAH GILLUND
25

## A

a.m 33:11,12 43:6
  48:4
ability 11:23 63:14
able 11:20
above-entitled 63:8
accident 20:18
  21:17,22 22:15
  27:7 30:14 35:22
  36:12 37:18 38:4
  55:11
accomplish 14:8
accuracy 60:23
accurate 5:11,22
  14:11,12 28:19,21
  33:9 34:4 47:5,10
  54:6 57:10 63:11
accurately 11:24
  59:13,15
accusing 26:18
act 27:13
action 63:17,18
actions 55:12,15
activities 19:4
add 59:23 62:9
address 10:4 60:17
addressed 32:20
  35:12
admitted 30:6
adult 47:24
adults 43:3
affect 11:22
affixed 63:20
afterward 52:25
age 37:1 43:12
ago 12:6 40:21 41:1
agree 52:16 55:14
  57:4,5,11,20 59:3
  61:13
agreed 25:18
agreeing 61:16
ahead 14:17 15:17
  17:2,4,17,21,23
  28:8 33:6
alcohol 30:1 54:9
alert 38:13,19
alignment 37:25
allegation 30:10

alleged 5:14
allegedly 24:16
  35:11
allowed 47:22
ambulances 34:1
answer 6:7 7:18,19
  11:24 35:10 39:22
answered 11:24
  27:16 39:2
answers 5:5 12:19
  57:14,16
anybody 36:23
apart 15:9
apparently 50:6
appear 7:21 9:2
apply 47:24
appreciate 61:15
  62:8
April 7:20
argue 57:10
Asa 1:24 63:4,25
asked 10:22,24
  11:16 12:3,5,7
  14:2 18:21 25:16
  27:12 39:17
asking 31:16 32:12
asleep 26:7,8,13,15
  26:17,18 35:25
  55:12,16,16,19
  56:18 57:21
assistant 29:8 30:25
assume 33:21 34:4
assumed 26:6
attach 58:10
attached 61:2
attaching 61:7
attention 38:20
  55:22
attitude 42:4
attitude-wise 42:16
attorney 13:7 23:1
  63:15,17
attorneys 7:19
  13:18,19
audible 53:14
August 7:15 9:3
  15:13 16:14
Avenue 1:17 2:4

awake 38:15 56:5
aware 4:12 18:13
  18:25 23:8 61:24

## B

back 5:11 14:24
  15:9,11,13 20:16
  22:10,19,20 24:4
  25:18,21 30:4
  35:9 36:17 45:13
  45:14 50:12,20
  53:17 61:3
bad 13:16 21:14
balance 21:13
ball 37:25
based 28:20
basically 29:2 49:12
Bates 17:15 51:3,4
bearing 37:25
bed 22:5 31:15 44:3
  48:19
beginning 28:9
believe 6:25 12:23
  14:5 26:12,17
  28:6 33:5 39:19
  40:21 44:23 47:18
  52:5 59:7 64:17
believes 37:16
bench 29:18
benefit 13:12
best 42:9 63:13
better 7:11 13:24
  24:12
bindery 45:4
birthday 16:9
bit 38:9,18
black 21:4
blame 38:25 44:20
Bliven 1:17 2:3,3
  3:3 4:6,7 14:20,22
  15:1 17:1,6,9 23:7
  33:2 46:6,12
  50:12,13,20,21
  62:17
bowl 29:5
Box 60:19
Brad 11:12
brain 56:15

break 6:20 8:3
  14:21,22 32:25
  50:10,19
breaks 58:19
breathing 27:23
bringing 13:19
  41:14
brings 53:17
brought 26:10 42:2
bunch 13:16 43:3
business 4:9 43:3
busy 16:4,5 27:18
buying 38:4

## C

C 2:1
calculations 34:22
call 10:20,25 11:2
  13:3 17:15 22:21
  50:16,23,24
called 10:18,21,23
  24:6 60:3
calls 11:3
capable 38:20
car 22:15 28:14
  29:6 32:2 34:7,19
  37:2,22 38:25
  44:21 46:2 48:23
  48:25 56:14
carefully 58:9
cart 15:21
case 4:8,10,13 7:11
  13:8 15:8 18:22
  30:9 31:17 47:24
catastrophic 42:8
catch 42:25
cause 7:15 38:12
  52:13
causing 37:2
cell 10:24 11:4
certain 45:24
certainly 52:5 55:12
  56:13,15
CERTIFICATE
  63:1
certify 63:6
chance 25:9
change 39:17 40:9

checked 31:23 34:5
checking 31:22
chef 28:13 29:8
chefs 31:1
chocolate 32:1
chocolates 32:8
cigarette 28:14 29:9
  29:12
circadian 22:1 49:7
  49:8
claim 23:20
clarified 5:17
clarify 61:16
clarifying 39:24
Claude 10:19
clear 13:9 14:3 24:9
  30:16
clearing 24:8
clearly 23:21 56:23
client 5:8
clock 19:13,23 32:6
  32:12 53:5
clocked 16:15,17
  19:17,21 28:24
  31:19 32:5 35:3
closed 29:18
clothes 34:5
Cockrell 11:8,10,10
  12:3 27:13
code 60:19
color 38:5
columns 17:24
coma 21:8
combined 3:9 4:21
  8:7
come 13:12 22:19
  25:18,21 43:24
  44:4,11 61:16
comes 48:20
coming 13:5 21:2
  62:1
commonly 49:7
communication
  40:7
company 3:7 4:9
  8:5 61:11
compensate 61:12
compensation

13:10
complain 39:4,5,6
complaint 7:14
complete 9:10
completely 52:11
completeness 60:23
complicated 6:3
complied 17:19,22
  18:4
concluded 62:19
condition 38:3
Condra 11:12
conducive 52:9
confronted 30:9
confused 55:9
connected 63:17
consciousness 23:14
considered 42:15
  60:9
consistent 55:12,16
  57:23,23
constitute 63:10
constraints 25:14
consumed 54:9
contacted 10:8,16
contradicting 55:8
control 21:15 35:19
  37:11
conversating 41:11
conversation 6:13
  26:9 36:11,14,15
  36:17,20,24 37:9
Cool 62:16
copy 7:23 8:2 9:11
  14:20,23 17:3
  23:1,2 32:16,16,22
  45:4 50:7 52:2
  60:4 62:14
corner 17:12 51:1
correct 5:21 7:4,6
  7:16 8:8,9 9:12
  11:15 12:21 13:4
  15:7,15 16:20
  18:6,10 19:25
  20:13 22:24 23:4
  23:17,25 25:2,11
  25:22 28:1,4 30:5
  30:8 34:23 38:22

43:21 44:1 47:3
  48:16 53:23 54:22
  56:6 58:21 62:6
corrected 54:7,12
correction 9:15
  26:1,11 54:12
  60:5 64:1,2
corrections 60:5,12
  64:18
counsel 63:15,17
County 1:25 4:11
  63:3
couple 48:9 58:7
  59:21
court 4:18 6:15 9:24
  53:15
crash 3:14 9:19,19
  18:5,9 21:7 30:12
  31:19 32:13,14,17
  33:4,10,10,13,21
  34:8,14 35:15
  44:24 55:9 58:5
  59:22
creates 56:24
crooked 21:3,4

**D**
d/b/a 3:7 8:5
Dale 11:10,10
Dan 28:13 32:9
  52:25 53:6,9,12,21
dangerous 49:13
Date 18:1,2
dated 4:22 7:19
  64:19
dates 17:24
day 15:17 16:2,5,5
  19:24 21:21 28:24
  29:1 40:23 42:18
  63:20 64:19
daylight 49:6
days 21:8 40:2,3
  60:8
December 1:18 8:20
  46:9 54:25 55:1
decide 9:22
decided 32:8 41:8
defendant 3:7,9 8:5

13:7,20
defendant's 7:19
defendants 4:21 7:9
definitely 24:19
  27:20 42:10 53:10
  56:10
Department 18:14
  45:17
deposition 3:13
  9:11,14 22:25
  23:2,5,16,19 24:1
  24:14,24 25:6,23
  25:24 27:3 31:21
  33:16 39:7 43:17
  51:10 54:11,11
  61:20
describe 4:23 5:4
describes 46:14
description 3:6
  46:14,24 47:4,9
despite 42:7
difference 49:6
different 24:15
  28:11 38:5 53:12
differently 45:19
direction 63:13
directly 55:8
disagree 23:18 26:5
  27:20 28:19 39:13
  49:16 57:7
disagreement 27:19
discovery 3:9 4:22
  8:7 9:1 15:2 51:8
discuss 32:17
discussed 13:19
  25:7
discussion 17:7
  31:17 43:14 50:17
dishes 15:20,21,22
distracted 55:23
  56:1 57:22,24
distracting 35:22
  36:4
ditch 20:18 21:2
  35:18
Dixon 3:12,13 4:8
  57:1
Dixon's 52:13

document 7:10 11:7
  17:14
documents 7:12
  9:25 25:8 51:4
  58:9 61:6
doing 4:9 5:19 19:4
  41:3,4,19 42:3,4
  42:15,23 45:3
door 41:8,9,9
dramatic 38:9,10
drift 37:17,20
drifted 56:10,14
drifting 56:8,15
drink 31:14
drive 34:7 36:7 37:1
  38:2 48:17
driver 13:1 47:24
driver's 47:14,15
driving 31:9,11
  35:2 37:17 38:6
  58:2
drop 31:14
duly 4:2 63:9
DV-17-8530 7:15

**E**
E 2:1,1
E.N 1:17 2:4
earlier 5:12 33:22
  49:8
early 24:25 25:1
  45:7 57:1
easy 6:11
effort 60:22
eight 16:18 19:19
  45:6 61:1,1
either 15:5 51:11
  58:10
eleven 21:21 22:5
emphasize 5:19
employee 3:11,18
  50:15,23,25 52:9
  63:16
employees 18:16
employment 52:9
ended 32:9 38:4
  57:3
entirely 5:10

especially 49:10
Esq 2:3
essentially 37:12
evening 15:11,13
  22:23 24:25 25:1
  25:3 30:1 35:7
event 33:8 37:4
events 23:21 24:11
  55:9
exact 37:18
exactly 6:12 10:8,22
  27:4 30:22 38:16
  42:1 43:1 59:10
EXAMINATION
  3:1,2 4:5
Excellent 17:20
exchange 62:1
exhausted 57:25
exhibit 3:5,6 14:18
  14:19 15:4 16:23
  16:24 17:2,8,11,20
  20:16 23:5,6
  24:16 28:22 33:1
  33:3 46:5,10,11,13
  46:17 50:8,11,15
  52:17,22 53:24
  57:14,17,19 58:5
exhibits 60:24 61:1
expectation 48:21
expected 55:10
expert 8:11
explain 14:1 59:23
extent 22:4 24:14
  38:17 57:24
extra 7:23 34:21
  58:12
extremely 27:8

**F**
fact 11:25 14:2 22:6
  25:12 29:12 30:2
  35:13 55:24
factors 8:11
facts 10:4
failures 52:12
fair 5:25 10:6 36:24
  58:22 61:10,14
fairly 16:2

fairness 60:2
fall 55:15,18
fallen 26:7
falling 55:12,16
 56:17
familiar 11:13
family 37:18 47:23
far 23:24
fault 13:20,21
feel 6:25 23:18
 35:21 58:22 59:10
 60:12 61:13
Felder 3:7 4:9 8:5
Felder/Stillwater
 3:10
fell 26:8,12,15,17
 35:25
felt 16:4 27:8,9
 35:17 36:18
fifteen 32:11
fifty-one 19:22
fifty-two 16:18
 19:13,18,19 32:13
filed 4:8,11 7:14,18
filings 9:24
financially 63:18
find 27:4 59:15
fine 6:15 12:16
fire 22:17
fired 22:20
firm 1:17 2:3 11:9
first 3:9 4:2,22 8:7
 20:21 21:14 24:23
 29:1 32:7 36:4
Fish 3:7,10,18 4:10
 8:5 9:1 10:9 13:18
 16:7 17:13,14
 18:15 19:4 22:6,9
 22:12,14 23:1
 30:10,24 31:2,13
 34:8,10 39:4 40:6
 44:23 47:19 48:6
 50:15,22 51:7
 53:18 61:10
five 21:8 34:3,9
 40:22 45:6 50:2
 51:17 53:5
Flathead 1:25 4:11

63:3
flexible 40:11
focused 36:21
focusing 38:21
follow 52:11 53:22
following 55:10
follows 4:3
foregoing 63:7,10
 64:16
foreseeable 43:9
forty-five 19:17
forward 14:15
found 45:18
four 20:1 28:22
 34:9 37:5,16
fourth 1:17 2:4
 28:23
frame 31:25 32:17
 32:20
frankly 10:10 24:2
 33:23 47:22
free 6:21 23:18
friendly 59:5
friends 41:20
front 5:5 23:2
front-end 37:23
full 15:21 28:23
fully 56:21 61:11
further 13:15 60:1

**G**
gap 36:15 37:9
GDL 47:15
general 24:17 42:4
 53:7
generally 24:23
 45:5
getting 12:10 22:5
 34:17 45:7 54:24
 55:22
Gill 3:15,16,17 8:11
 8:14 46:4 51:16
 52:7
Gillund 1:7 3:11 4:1
 20:17 28:24 29:13
 37:16 54:9 55:9
 56:25 62:19 63:9
 63:12 64:24

Gillund's 37:18
give 10:3,24 12:22
 12:24 13:5,12,16
 14:2 15:17 25:20
 32:22 44:11 50:7
 51:3 53:18 61:16
given 4:15 10:5 33:3
 55:4 58:8,14
gives 53:3
giving 25:12 58:10
 58:10,11 62:1
glad 26:10 41:22
 42:25
go 5:11 6:20 7:12
 12:24 14:17 15:11
 15:13,16,17 17:2,4
 17:17,20,21,23
 20:20 21:3,4
 22:10,19 24:4,20
 27:1 28:8,8,22,23
 31:14,15 32:23
 33:6 41:12 50:9
 52:17 58:6
goes 21:16,19 24:25
 28:9 35:21 37:8
 39:3 46:25
Goicoechea 11:8
going 7:11 10:25
 12:12 13:17 14:20
 15:8 16:22,22
 17:11 20:16 22:5
 24:16,20 27:1,4
 29:5 30:15 31:12
 32:15,21,21,23
 41:7 44:9 46:13
 46:15 48:2,14
 50:6,7,8,17 58:9
 58:12 60:3
good 24:8 40:6
 41:13 42:5 43:2
gotten 32:1
grabbed 32:9
grabbing 29:5
Graduated 47:15
gravel 35:17 36:19
ground 21:3,4
guess 13:24 14:6
 24:25 44:19 45:18

45:25 50:24 61:9
guy 29:9 34:6 52:19
guys 19:5 27:14
 28:14 30:11 31:4
 31:10,19 34:5,10
 34:24 35:6 40:1,5
 41:20 45:15 47:19
 52:25

**H**
half 41:13
hamper 32:2
hand 50:17
handbook 3:19
 50:24,25 52:3
 53:2
handing 50:14
handwriting 26:2
happen 13:17 33:22
 61:22
happened 5:15 7:1
 10:8,18 14:1,1,5,5
 15:11 18:13 20:5
 22:16,17 24:24
 26:5 28:2 30:10
 32:18 33:11 34:8
 36:9 59:15
happening 23:9
 44:24
happens 32:13
happy 9:24 41:3,4
 42:3
hard 42:11 44:15
hazard 56:25
He'll 44:11
head 21:6 23:13,20
 23:23 55:10
health 52:9
hear 21:10 39:5
heard 30:14
heck 20:21 39:21
held 14:21 32:25
 50:10,19
helping 59:10
helps 42:6
hereunto 63:19
highlight 17:4,17,21
 17:23

Hill 40:19,20
hired 18:7
hit 36:18
home 6:21 21:20
 25:8,16 27:2 31:9
 31:15 37:8 43:15
 44:11 47:21 48:2
 48:15 53:19 57:1
honestly 22:18
hopefully 14:4
hospital 21:5 24:3
hour 18:15 41:13,13
hours 9:2 12:2
 18:17 19:5 20:2,6
 21:18 39:8 43:4
 45:5 47:16 49:1,6
 49:6 56:24 57:2
house 3:10,18 4:10
 9:1 16:7 17:13,14
 18:15 19:4 22:7,9
 22:12,14 23:1
 30:10,24 31:2,13
 31:14 34:8,10
 39:4 40:6 44:23
 47:19 48:6 50:15
 50:22 51:7 53:18
 61:10
House's 3:8 8:6
 10:9 13:18
Huh-uh 53:13
human 8:11
humor 42:5
hurry 34:25 35:6
hurt 43:10
hypothetically 34:4

**I**
idea 19:3 43:2
illegal 19:5 54:16
impact 49:9
important 6:16 10:2
 55:2
impose 53:21
inaccuracies 15:5
inaccurate 53:25
 54:5
incident 33:5 46:14
 46:24 47:5,9

52:13
**includes** 15:2 28:12
50:16
**including** 20:3
21:21 24:2
**inconsistent** 26:16
**Independent** 55:11
**INDEX** 3:1,5
**indicate** 55:8
**indicated** 12:6
**inducement** 13:10
**information** 12:23
15:18
**injuries** 52:14
**injury** 21:6 23:14
23:20,23 42:8
55:10 61:12
**inside** 41:10
**instance** 38:18
**insurance** 61:11
**interest** 30:22 60:1
**interested** 63:18
**investigation** 18:14
45:17
**investigator** 10:9
13:3
**invites** 41:10
**issue** 31:18 38:18
40:9 47:18
**issues** 5:19 15:12

**J**

**job** 15:18 22:2,16
**Joe** 13:3
**Joellen** 8:11
**Johnson** 11:9
**joint** 37:25
**Jolene** 1:24 60:3
63:4,25
**jump** 15:19
**jumping** 36:17
**June** 9:3
**justice** 60:2

**K**

**Kalispell** 1:18 2:4
63:6
**Katie** 11:9

**keep** 6:23 36:13
38:23
**keeping** 45:16
**kids** 43:12
**killed** 15:25
**killing** 16:1
**kind** 4:16 11:18
13:9 21:14 38:7
38:11 39:25 40:6
41:14,15 45:18,24
53:11 55:1 56:8
**kitchen** 31:22 34:5
**knew** 38:1 48:7,8,12
48:13,15 53:18
54:16
**knock** 41:8
**knocked** 41:8
**know** 6:5,8,12 7:22
9:23 10:6 11:18
12:1 13:7,10
14:13 16:5 22:18
22:20 23:24 26:22
27:1,23 28:15
32:15 35:2 38:1,2
39:12 40:4,25
42:17 44:16 45:23
49:19 52:19 54:13
**knowing** 45:16
**knowledge** 4:24
23:13 45:22
**known** 22:1
**knows** 51:4

**L**

**labor** 11:14 43:5
45:17 47:13
**lack** 49:9 55:22
**late** 18:17 22:5
44:10 45:16 47:14
**Law** 1:17 2:3
**laws** 43:5 45:22
**lawsuit** 41:15,25
42:20 51:3,8
**lawyers** 6:1 10:9
**lead** 12:23 47:17
**leaving** 29:14,16
**left** 17:10 27:10,14
31:4,24 34:10

48:6
**leg** 23:10,11 42:8
**let's** 5:11 7:12 8:15
10:14 14:8,17
15:13 17:20 19:7
23:5 26:23 32:16
34:4 35:9,15 41:8
46:3 52:17
**license** 47:15
**licensed** 47:23
**Licensing** 47:16
**life** 42:4
**lifetime** 61:12
**line** 26:12 27:13
34:13 64:2
**lines** 40:7
**listen** 11:20
**little** 15:18 19:9
38:9,18 41:1
58:15
**live** 11:3
**LLC** 3:7 4:9 8:5
**lobster** 15:24 16:1
**long** 22:12 32:10
33:19 34:1,7
38:12 49:1 57:2
**longer** 41:1 53:5
**look** 7:22,24 9:18
9:23 10:5 16:21
19:7 28:17 32:17
33:7 37:11 44:9
45:13,19 46:23
47:12,17 50:8,18
58:11 61:2
**looked** 33:6 35:16
39:11,11 55:13
**looking** 7:25 26:13
26:17 28:10 36:2
36:16 37:10 45:14
57:15,16
**looks** 20:8 33:9 54:6
57:9
**lose** 37:11
**losing** 42:8
**loss** 23:14
**lost** 23:10 35:19
36:13
**lot** 30:13 31:5 37:20

**loud** 6:7 53:14
**lower** 17:12 51:1

**M**

**mail** 10:17
**mailing** 60:17
**making** 19:4 22:7
47:13
**man** 44:16
**management** 49:19
49:22 51:17
**manager** 29:8,14,15
30:25,25 31:7
53:7
**manner** 59:6
**manual** 50:4,16,23
**marijuana** 30:1,6
30:12,17,24
**mark** 14:17 16:22
16:22 23:5 46:3,8
50:7 58:4
**marked** 14:19 15:3
16:24 17:6,8 23:6
33:1 46:5,10,11
50:11,14 57:17
58:5 60:23
**materials** 25:15
**Matic** 11:9
**matter** 63:7,8
**matters** 26:23
**mean** 10:12 16:3
22:16 25:25 39:23
41:4 44:17
**Meaning** 8:23 54:5
**means** 6:12,13
**meant** 42:16 59:18
**member** 47:23
**memory** 55:11
**Michael** 2:3 4:7
**middle** 10:21 11:18
**midnight** 16:18
19:24 20:2 45:9
**mike@blivenlawf...**
2:5
**mind** 23:21 36:14
36:19
**mind-set** 11:19
**minor** 18:16 47:22

**mint** 32:8
**mints** 32:1
**minute** 8:3 34:19
**minutes** 12:5 16:18
19:19,23 29:8
32:11 34:3,9,16,17
53:5
**misstatements** 15:6
**model** 37:19
**mom** 41:14 42:2
43:24 44:9 48:19
**moment** 36:12
41:17 59:24
**momentary** 14:22
**money** 45:25 46:1
**Montana** 1:18,25
2:4 3:14 4:11 63:2
63:5,6
**month** 41:1,17
**months** 38:6
**Moore** 11:8
**morning** 16:19
19:10,14 22:2
24:25 25:1,3
26:25 29:2 36:25
37:5 44:3 47:20
57:1
**move** 14:15

**N**

**N** 2:1
**name** 10:19,20 17:4
32:10 40:18 63:20
**named** 28:13
**necessarily** 6:3,12
57:12
**necessary** 60:13
**need** 6:20 44:10
52:8 54:7 61:19
**needed** 12:23 15:24
**needing** 55:18
**neither** 54:8
**never** 31:2,2 50:3
51:9
**new** 46:2
**nice** 44:16
**night** 14:1 16:4
18:17 19:12,16,20

19:21 20:3 21:17
24:6,11 27:9,18,21
28:6 30:7,11 32:7
34:25 36:20 44:9
54:10,14
**nights** 20:1,3 37:6
**nighttime** 49:6
**nine** 20:2,5 45:6
**Noah** 1:7 4:1,7 9:8
26:12 27:13 41:9
54:13 61:15 62:19
63:9,11 64:24
**Noah's** 29:6
**normal** 6:13 16:2,4
21:25 22:10 31:12
**Nos** 54:2
**Notary** 1:24 63:5
**noted** 27:3 64:18
**notes** 40:22
**notice** 51:10
**November** 4:23
8:10,13,15,16 46:3
46:9,13,16,18,19
52:18
**number** 4:23 7:12
10:25 17:14

**O**

**o'clock** 19:9,20 29:2
36:25 37:5 44:3
47:20
**Oath** 1:5 62:18
**obtained** 33:4
**occasion** 39:14
**occasional** 15:24
21:13
**occasionally** 39:6
**occurred** 35:22
**October** 9:13
**offered** 13:9 61:25
**Oh** 40:8 43:11 53:8
**okay** 6:9,20,22 7:2
8:1,19,25 9:9
10:15 12:16 13:5
14:8,16 17:3,10
20:15 24:8,22
26:14 28:17,22,25
29:4 31:8 33:24

34:12 35:20 43:2
44:14 46:18,21
50:12 52:21 55:5
58:6 60:10,14
61:4 62:11
**old** 16:6 40:16
**Olney** 11:5
**once** 24:7
**one-fifteen** 33:11,22
**one-thirty** 58:16
**one-twenty** 33:12
**ones** 15:25
**ongoing** 4:12 61:20
**open** 40:7,10 59:5
**opened** 41:9
**opinion** 53:3
**opportunity** 10:4,5
58:8 61:5
**orange** 17:21
**original** 46:19
**outside** 11:17,19
30:11 34:6
**overnight** 25:9
58:11
**owner** 40:8 43:3

**P**

**P** 2:1,1
**p.m** 1:18 14:21,21
32:25,25 50:10,10
50:19,19 62:19
**P.O** 60:19
**page** 3:2,6 5:1,4 9:5
9:6,15 15:3 17:5
17:11,21 26:1,11
26:11 27:8,12
28:9,22 37:16
40:22 46:15,15,25
47:16 49:24 50:2
51:17 52:7,8
54:11,12,12 57:7
60:5 64:1,2
**pages** 9:14 16:23
25:25 28:11,18
47:9 58:4 63:10
**paper** 14:13
**paragraph** 28:23
46:23,25 55:7

**paragraphs** 47:8
**parents** 46:2
**Parker** 15:25 18:11
31:13,13 40:16
**Parker's** 40:18
**parking** 31:5
**part** 5:14 14:6
18:21 21:12 22:4
28:15 44:7 48:21
**particular** 34:25
37:4 44:9
**particularly** 47:20
**parties** 61:21 63:16
**party** 13:8
**passenger** 35:17
36:18 47:22
**pattern** 21:25
**patterns** 22:10
**paying** 38:20
**PC** 1:17 2:3
**people** 10:20 30:13
33:14 35:2,4
39:16 43:4 47:14
51:3
**percent** 36:21
**period** 26:12 35:24
**person** 22:3 29:8
**personally** 43:13
**phone** 10:24 11:4
11:14
**picking** 15:9
**pile** 7:21
**pinned** 23:10
**place** 24:5 34:17
40:6 52:10 63:8
**Plaintiff's** 3:8 8:6
**please** 6:1,5 9:23
14:9,11 23:19
**plenty** 25:15
**point** 11:25 12:16
20:19,23,25 24:9
27:22 40:25 53:17
**policies** 50:23
**policy** 49:20,23 50:4
51:17 52:10 53:2
53:22
**porch** 41:12
**position** 18:23

47:19
**positive** 42:4
**possible** 61:19
**pot** 54:9,13
**potentially** 21:18
**predictable** 43:9
**prefer** 60:11
**prepared** 11:7,8
**prepping** 15:22
**presented** 57:13
**pretty** 6:11 16:3
21:14 23:21 24:9
27:18 40:17
**previously** 22:25
**print** 32:22
**printed** 50:22
**Printing** 45:4
**printouts** 8:25
**prior** 12:9
**probably** 32:11
34:9 44:10
**problem** 44:2
**problems** 21:13
37:2,24 38:7,12
42:12
**proceeding** 61:20
**process** 19:1
**Professional** 63:4
**promises** 61:25
**provide** 52:8
**provided** 7:11,18
8:4,7,10,13,20,25
9:10 25:7 52:2
**prudent** 43:8
**Public** 1:24 63:5
**pull** 38:1,1
**pulled** 38:7
**pulling** 38:17
**purchased** 37:18
**purposes** 36:22
**pushing** 41:15
**put** 12:16 26:11
34:5 47:19 48:1
52:10
**putting** 43:5,12
48:23,25

**Q**

**question** 5:24 6:5
12:9 24:13 30:23
39:1 44:19 61:9
**questions** 5:7,13,15
6:2 9:20 11:1,16
11:23 12:25 20:15
58:22
**quit** 22:17
**quite** 5:9 53:3
**quote** 57:24

**R**

**R** 2:1
**read** 25:9 36:23
50:3 57:9 58:8,11
58:13,14,20 60:3,4
60:11 62:14 64:16
**really** 6:12 13:1
14:4 15:23 16:2
21:10 22:20 26:16
27:2 40:11 41:16
42:8 43:10 45:22
49:12 61:15 62:7
**reason** 4:20 6:10
22:6 31:16
**reasonable** 43:8
48:21 61:10
**recalls** 23:20
**received** 5:8 17:13
**recitation** 12:11
47:4
**recognized** 52:8
**recollection** 6:25
7:24 12:4 24:9,12
24:18 27:24 28:12
28:20 33:13 44:6
**record** 5:17,20,22
12:7 13:9 17:7
32:23 34:24 50:20
58:6,13
**recorded** 12:4 59:19
**recovered** 21:11
**recovery** 24:5
**reduced** 63:12
**refer** 20:19,20,22
61:3
**referred** 8:4 49:7
**refers** 20:21 55:3

**reflect** 58:25
**regarding** 18:15
  31:18 55:11
**Registered** 63:4
**related** 33:25
**relates** 33:8 37:10
**relative** 63:16
**relaxed** 59:5
**rely** 24:17
**remarked** 17:10
**remember** 5:18 6:8
  7:25 8:1 10:19,22
  11:11,12 20:17,24
  21:1 23:9 24:5
  27:22 28:15 29:15
  29:16,16,17,23
  36:10,10,16 37:24
  40:2 51:24 53:12
**repeat** 47:6
**rephrase** 6:1
**report** 3:14,15,16
  3:17 8:11,14,21
  9:19 32:14,17
  33:4,10 46:3,9,14
  46:19 47:12 49:5
  49:16 52:18 54:23
  55:13 57:6 58:5
  63:7
**reported** 1:24 33:11
**reporter** 6:15 63:4
**REPORTER'S**
  63:1
**reports** 51:16
**represent** 4:7
**representing** 61:21
**requests** 3:9 4:22
  8:7
**reserved** 62:20
**residing** 63:5
**response** 4:21
**responses** 3:8 8:6
  55:4
**responsible** 44:17
  44:24
**rest** 14:23
**restaurant** 15:23
  27:14
**restriction** 47:15

**result** 43:10
**review** 12:17 25:15
  25:19 47:2 52:22
**reviewed** 23:16 25:6
  25:24 61:6
**reviewing** 24:1
**rhythm** 22:1 49:8
**ride** 43:15 44:11
  53:19
**right** 6:23 9:18 13:2
  13:22 14:14 16:6
  16:16 19:11 20:7
  20:11 21:2,23
  23:12 25:11 26:3
  26:10,21 29:22
  31:13,14,20 34:3
  34:15,20 36:3,18
  37:3,13,17,20
  38:17 42:21 44:5
  45:7 47:25 48:3
  49:14 51:21 54:15
  55:25 56:3,16
  57:3,8 58:1 59:14
  60:2,25 61:15,23
  62:14
**right-hand** 17:12
  51:1
**road** 20:20 31:9
  36:21 43:5,12
  56:11
**rolled** 23:9
**room** 14:23
**roughly** 9:14
**row** 37:6
**RPR** 1:24 63:25
**rumor** 30:14
**run** 15:23
**rush** 39:25

      **S**

**S** 2:1
**safe** 49:13
**safety** 49:20,23
  50:17,23 51:15,17
  51:19,24 52:10
  53:22
**saved** 46:1
**saying** 13:25 36:13

  41:25 42:23 52:15
**says** 5:1 17:12 20:16
  26:16 28:5,23
  29:12,13 35:23
  39:19,21 49:15
  51:1 52:7,12 55:7
  56:23
**schedule** 22:7 39:17
  40:9
**schedules** 40:12
**scientifically** 22:1
**seal** 63:20
**season** 45:8
**Seattle** 24:3,4
**second** 3:8 8:6,21
  32:24 33:7 55:6
**secondly** 24:1 36:8
**see** 8:15 9:20 14:8
  41:22 42:25 51:13
**seen** 12:11 21:3,3
  41:17 51:8,11
**send** 60:3,18 62:14
**sense** 6:3 14:10
  36:21 37:21 42:5
  49:17 52:14
**sent** 4:21 25:8,16
**service** 11:3
**seven** 22:3 46:9
  52:8 60:24
**SFH** 17:12 51:2
**share** 9:24
**she'd** 43:24
**she'll** 62:14
**sheet** 3:11,12 16:13
  16:21,23 58:5
**shifts** 57:2
**shirt** 32:2,7
**shirts** 29:5
**short** 8:3
**shorthand** 63:12
**show** 5:3 9:1,7
**showed** 7:22 12:20
  15:19 32:15 33:14
  34:2 41:6
**showing** 12:10
**shows** 16:13,17
**sic** 7:15 29:5 41:11
**side** 35:17 38:7

**sign** 60:3,4,12 62:15
**signature** 62:19
**signed** 11:9 52:2,3
  60:9
**significance** 31:10
**significant** 56:24
  58:19
**silence** 35:25 36:12
**silent** 37:9
**simply** 10:3
**sitting** 29:16,17
  58:12
**situation** 48:2
**six** 22:3 38:6 46:9
**Skylar** 3:13 4:8 5:9
  9:7 15:25 17:17
  18:9 22:23,25
  23:13 27:3,6,12,16
  28:5,10,24 29:7,13
  29:20,25 30:16
  31:21 33:23 35:16
  35:21,23 36:4,17
  37:8 39:5,6,7,13
  39:16 40:2,23
  41:3,9,12,15 42:3
  43:15 44:6 47:20
  48:15 52:3,4 54:2
  54:8,10 55:23
  61:12
**Skylar's** 9:5,11 17:4
  23:10,16 24:17,19
  24:24 30:3 31:14
  33:16 41:7,8
  43:24 51:10 55:13
**sleep** 21:20,25
  22:10 27:2 49:9
**sleepy** 27:14
**slow** 45:8
**slowly** 59:3,4
**smart** 43:11
**smoke** 29:25 30:16
**smoked** 29:9 30:11
  54:9
**smoking** 28:13
  29:12 54:13
**soda** 29:5
**somebody** 37:1
**Sonny** 10:20

**soon** 8:3 21:3 27:4
**sorry** 10:13 21:10
  31:13 47:6 53:16
  61:1
**sounds** 11:13
**span** 33:13
**speak** 6:14 11:10
  15:9
**speaking** 11:12
**specific** 27:24
**specifics** 24:20,21
**spend** 46:1
**spent** 34:17
**spoke** 7:3,5
**spoken** 59:3
**sprayer** 15:20
**spraying** 15:20
**stamp** 17:15 51:4
**stamps** 51:3
**standards** 47:13
**start** 15:10
**started** 12:6 16:7,14
  22:2 41:14 56:8
  58:15 61:18
**starting** 15:3 46:23
**State** 1:25 63:2,5
**stated** 29:9 57:22
  63:8
**statement** 1:5 4:15
  5:14 10:17 12:3
  12:19,24 13:6,13
  13:16 14:2,17
  15:3 18:20 24:15
  25:13,20 30:2
  35:9,10 37:14
  49:23 51:18 52:10
  55:3 57:13 59:17
  60:4 62:13,18
**statements** 5:9 55:8
  57:11,12,21
**states** 33:10
**stayed** 24:6
**step** 11:17,19
**Stillwater** 3:7,18
  4:10 8:5 17:14
  49:22 50:15,22
  52:8,12 53:18
  56:24 59:23

Stillwater's 49:19
stop 6:20
stopped 22:9 55:24
    56:7
story 10:4 14:6
straight 20:1,3
    31:12 36:11
stretch 27:17 36:11
stretching 27:22,25
strike 31:5
striking 53:3
structuring 56:23
stuff 32:4 36:13
    41:14,18
submit 48:20
subscribed 63:19
subsequent 52:14
suffer 21:6 23:13,23
suggest 42:22
Summary 3:11
summer 16:3 43:18
    45:6 46:1
super 40:11
supervised 47:23
supervisor 28:13
    40:7
supplemental 3:8
    4:21 8:6,14,21
    35:10 39:22 55:4
    57:14,16
supposed 45:23
    51:19,19 53:4,21
sure 10:1 13:8
    17:16 23:22 25:14
    25:20 26:22 32:19
    36:1 39:9,16
    40:17 41:2 50:5
    51:6 58:19 59:2
    59:20 60:7 61:8
surprise 37:15
surprised 5:9
sworn 4:2,15 25:13
    63:9
symptoms 55:18
system 49:7

T
take 6:20 7:21 8:3

17:2,3 18:19 19:7
    32:6,8 33:6 34:7
    35:4 46:23 50:8
    50:18 58:13 61:19
taken 1:17 36:24
    58:19 63:12
talk 10:14 13:25
    15:11 18:19 36:16
    37:1 41:16,18,24
    42:19 46:7 61:22
talked 10:10 11:14
    13:23 21:24 24:21
    25:12 31:21 34:6
    34:16 39:8 40:21
    40:23,24 42:2,18
    43:17 49:8 57:18
talking 5:11 18:3
    24:2 28:12 29:7
    35:23,24 36:8
    40:1 41:13 51:5
    52:24 55:2,14,23
    55:24 56:4,7
talks 28:10 29:4,7
    47:13,16 49:5,22
    51:15,16,18 55:6
teen 47:23
teenagers 49:10
tell 4:2 6:1 10:4
    12:22 14:9,11
    15:16 22:18 23:18
    27:4 33:3 39:23
    44:8 52:5 56:9
    62:4
telling 59:9
ten 29:8 32:10,11
    34:10,16
tendency 37:17,19
    38:1
terms 13:2,5 18:16
    24:20 45:20 47:18
testified 4:3,18 44:6
    44:7 54:2,8,20
testify 4:25 6:15
testimony 5:18
    12:11 14:13 15:10
    23:19 25:25 29:10
    29:21 44:13 55:14
    57:13 59:12 61:17

62:1 63:11 64:16
Thank 62:7,17
Thanks 24:8
thing 6:7 26:6,7
    38:11 53:2 54:7
    62:5
things 4:24 6:25 7:6
    13:17 42:9,15,20
    52:24 58:7,20
    59:21
think 5:10 6:13 9:18
    9:21 11:22,23,25
    13:20,21 15:4
    25:19 26:8,15
    28:19 32:15 35:12
    39:21,24 43:2,11
    53:24 58:20 59:24
    61:9 62:12
thinks 26:20 33:23
third 49:24
thirty-five 16:14
    19:8
thought 12:12
    29:10 35:25 43:21
    43:23
threatened 13:15
three 5:1,4 15:3
    16:14 17:24 18:1
    19:8,12,17,22 20:2
    40:23 43:20 47:16
    48:11
thrown 32:1
time 3:11,12 10:22
    16:13,21,22 18:1,2
    18:2,5,9 19:3
    20:21 25:13,15
    31:4,6,18,19,22,23
    31:25 32:7,14,17
    32:20 33:12,13,19
    34:1,13,21 35:4,24
    36:8,15,20 37:2
    43:12 44:14 45:24
    46:8 58:4,12,13,14
    58:20 61:19 62:8
    62:13 63:8
times 17:24 27:6
    43:15,18,20 48:9
    48:11

timing 49:7
tired 21:17 26:8,24
    27:7,9,9,13,17
    35:13 38:21 39:4
    39:6,15,17 49:3
    57:22,25
tires 20:20 36:18
today 6:24 13:3
    25:18,21
told 7:5 11:1 12:4
    12:12 13:15,17,18
    22:19 33:18 39:14
    39:16 41:6 61:18
    61:22
tone 58:25 59:5
top 17:5,18 45:4
total 60:23
totally 10:6
town 11:2
track 38:23
training 51:18,19
    51:24
transcript 58:25
transcription 63:11
trash 15:24
travel 57:1
tried 35:18 36:18
true 7:1 22:22 25:10
    54:10 63:10 64:17
truth 4:2,3,3 62:4
truthful 14:12
try 6:7 42:19
trying 10:3 14:12
    40:1 42:9,10
    45:25 59:12
Tuesday 9:13
turn 36:11 37:10
turned 14:7 20:12
    40:5
turning 45:15
Twelve 19:18,19
twenty-five 19:14
twenty-four 19:23
twice 24:7
twilight 56:20
two 34:19 46:15,25
    47:8,9
two-forty 58:17,18

types 6:11
typically 21:19,20

U
U.S 18:14
Uh-huh 4:14 5:6,16
    10:11,12 20:4
    25:5 43:7,19
    49:11
ultimately 10:17
    23:10
underlying 52:13
understand 5:25
    6:4,18 7:8,10 10:3
    10:7 59:4
understandable
    18:25 43:9
understandably
    49:3
understanding 15:4
    30:4,20 43:24
understood 58:23
unquote 57:24
unreliable 56:2
untwist 14:4
upside 20:19
use 14:23 30:7,24
usually 15:19,21
    32:6

V
vaguely 28:16 40:2
vehicle 3:14 20:18
    23:9 31:5 37:12
    37:16,19 38:2
versus 31:19
violations 18:15
    45:18
visit 29:13,14
visited 29:17
visiting 29:11,15,18
    32:9
Vogel 53:7
voice 59:1,5
voluntarily 5:20
    62:2

W

wage 18:15
wake 22:3
walk-in 29:18
walking 6:14 31:6
want 5:19,22 6:24
 9:20,23 10:6 13:8
 13:25 18:22,23
 40:9 41:16,18,24
 58:7 59:23 60:6
 60:17 61:22 62:4
 62:8
wanted 18:21 25:14
 25:20
wanting 12:1 39:8
wasn't 12:5 29:1
 30:20 36:4,20
 38:10 40:2 55:23
wasting 12:2
way 4:18 6:14 11:13
 13:24 24:12 35:18
 37:8 41:7 47:21
ways 6:2
we'll 15:11 50:16,23
 62:13
we're 4:20 6:14
 14:12,23 16:22,22
 18:3 30:16 32:21
 32:23 36:23 41:11
 44:9 50:7,20
 54:24,24 61:6
we've 14:2 35:12
 41:18 55:2 57:17
 58:19 60:23
Wednesday 1:18
week 16:10 19:7
weeks 40:23
went 15:14 20:18
 21:19 30:11 34:6
 44:13 45:24
weren't 34:24 35:8
 35:23 40:3,11
 52:2
whatsoever 51:25
wheel 37:24
WHEREOF 63:19
Whitefish 60:20
willing 60:15
window 26:13,18

28:10 36:2 37:10
Windstar 37:23
 38:5
wish 40:3 61:3
wishing 40:2
Witness 17:19,22
 18:4 63:19
woke 21:4
words 6:16 14:4
 55:17 57:8 59:8
work 9:2 10:21 11:2
 11:18,19 12:1,1,2
 15:14,16,17 16:2
 16:14 19:5 20:8,9
 21:18 22:7,12,14
 26:25 30:24 31:3
 35:18 39:7,8,16,25
 40:3 43:4 44:10
 45:5,9 47:14
 52:25 54:17,17,18
 54:18,19,20 56:24
 59:23
worked 9:2 22:23
 37:5 38:6 45:14
 49:1
working 10:23 16:7
 18:16 20:1,2 22:9
 27:7 40:4,15 43:4
 45:1 50:3 57:2
wouldn't 54:16,19
 57:10
wreck 16:11 18:13
 20:5
wrecked 37:23
writing 63:13
written 24:15
wrong 17:6 39:24

X

Y

yawning 27:15,16
 27:25
yeah 5:23 6:6,11,17
 7:25,25 8:12,18,19
 8:22 9:4,5,16
 10:23 11:6,13,17
 12:8 13:11,14

14:6 16:4,12 18:8
 18:18 19:2,15
 20:25 21:12 22:11
 22:22 24:10 25:11
 25:17 26:19 27:11
 28:1,7 29:3 30:22
 31:23 32:3,3
 33:20 34:3,18,23
 35:5,14 36:6 37:7
 38:14,24 39:9,20
 40:14 41:21,23
 42:5,10,13,24 43:1
 43:11,16 44:12,18
 45:21 46:22 47:11
 48:5,8,8,10,13,18
 48:22,24 49:2,4
 50:24 51:12,14
 52:4,16,23 53:1,10
 53:20 55:1,18,21
 56:8,12,19,22 57:5
 57:9 58:3,14,18
 59:7,16 60:16,21
 61:13 62:3,6
yelling 59:8
yellow 17:18
yesterday 7:3,5,8,23
 7:24 12:10,20
 21:24 25:7,13
 32:16 33:5 47:1
 50:9 58:10
young 43:3 44:16
 47:13

Z

Zip 60:19
zone 56:20

0

00337 51:2
00477 17:12

1

1 3:7 14:18,19 15:4
 20:16 23:23 24:16
 25:25 28:22 54:2
 57:19
1:58 1:18
10 54:3

100 36:21
11 27:13
11/03/18 3:15
11/27/18 3:16
12/03/18 3:17
14 3:7 9:3,3,3 26:12
15 16:8 18:7,9,12
 40:5,17 45:15,19
 45:21,23
15-year-old 56:25
15-year-olds 40:13
16 3:11 18:5 20:12
 27:8 37:1 40:5
 45:15,20,21
16-year-old 56:25
16th 16:9
17 3:12
18th 20:12
19 45:11
19th 20:14

2

2 3:11 16:23,24
 17:20
2-1 3:12 17:8,11
2:16 14:21
2:18 14:21
2:50 32:25
2:52 32:25
20 45:11,12
20-year-old 45:14
2014 9:2
2017 4:11 7:15
2018 1:18 4:23 7:20
 8:10,13,20
20th 7:20 20:9
23 3:13
24th 20:10
25th 20:9
26th 20:9
27 8:13 26:11 46:9
 52:18
278 1:17 2:4
27th 8:17 17:25
 20:6
28 27:12
28th 17:25
29th 17:25

3

3 3:13 8:20 23:5,6
 46:3,9,13,16,19
3:21 50:10
3:24 50:10
3:25 50:19
3:28 50:19
3:45 62:19
30 9:3,13 28:9,9,11
 28:18 60:8
30th 4:23 7:15
 15:13 16:13 17:24
 19:8 25:3
31 28:9,10,11,18
31st 16:19 25:4
33 3:14
3rd 8:10 46:18
 54:25 55:1

4

4 3:3,14 33:1,3
46 3:15,16,17
4732 60:19

5

5 1:18 3:15 46:5,13
 46:17
50 3:18
59901 2:4
59937 60:19

6

6 3:16 46:10 52:17
 52:22 53:24

7

7 3:17 46:11

8

8 3:18 50:11,15
 60:25
85 9:14 25:25

9

Dale R. Cockrell
MOORE, COCKRELL,
GOICOECHEA & JOHNSON, P.C.
145 Commons Loop, Suite 200
P.O. Box 7370
Kalispell, MT 59904-0370
Telephone: (406) 751-6000
Facsimile: (406) 756-6522
Email: dcockrell@mcgalaw.com

*Attorneys for Defendant Felder & Company LLC*
*d/b/a Stillwater Fish House*

### MONTANA ELEVENTH JUDICIAL DISTRICT COURT
### FLATHEAD COUNTY

SKYLAR DIXON,

      Plaintiff,

v.

FELDER & COMPANY LLC, d/b/a
STILLWATER FISH HOUSE,

      Defendant.

Cause No. DV-17-853D



**DEFENDANT FELDER &
COMPANY LLC, d/b/a
STILLWATER FISH HOUSE'S
SECOND SUPPLEMENTAL
RESPONSES TO PLAINTIFF'S
COMBINED FIRST DISCOVERY
REQUESTS TO DEFENDANT
FELDER/STILLWATER FISH
HOUSE**

TO:    Plaintiff and his attorneys of record, Michael A. Bliven and Aaron J. Brann:

      Pursuant to the Montana Rules of Civil Procedure, Defendant Felder & Company LLC /

Stillwater Fish House ("Stillwater"), hereby submits its Second Supplemental Response to

Plaintiff's Combined First Discovery Requests to Defendant Felder/Stillwater Fish House as

follows:

      <u>INTERROGATORY NO. 2:</u> Identify by name, address and phone number each and every

person known to you or your attorneys who has any knowledge of, or who purports to have any

knowledge of any of the facts of this case. By the facts of this case, we mean the allegations against

DEFENDANT FELDER & COMPANY LLC, D/B/A STILLWATER FISH HOUSE'S SECOND
SUPPLEMENTAL RESPONSES TO PLAINTIFF'S COMBINED FIRST DISCOVERY REQUESTS
TO DEFENDANT FELDER/STILLWATER FISH HOUSE

Page 1

the defendants in the Complaint filed by the Plaintiff. By this Interrogatory, we seek the names, addresses and telephone numbers of all witnesses who have any knowledge of any fact pertinent to either liability and/or damages, for each include a brief statement of their knowledge

ANSWER:

Jesse Felder, Owner
Felder & Company, LLC d/b/a
Stillwater Fish House
2635 Hwy 93 W
Whitefish, MT 59937
Telephone: (406) 249-8672
Email: jesse@stillwaterfishhouse.com

Mr. Felder has knowledge concerning the hiring and employment policies of the company, hours worked by Plaintiff, and Plaintiff's work the night before the accident.

Adrienne Felder, Spouse, Bookkeeper
Telephone: (406) 871-1314
Email: adrienne@stillwaterfishhouse.com

Ms. Felder has knowledge concerning payroll for the company and thus, hours worked by employees.

Marco Aguiar

Mr. Aguiar is a server currently employed by Defendant and who was also employed with Defendant in August, 2014.

Daynn Dowell

Ms. Dowell is a server currently employed by Defendant and who was also employed with Defendant in August, 2014.

Kyle Craig

Mr. Craig works in the kitchen area and was also employed with Defendant in August, 2014.

Other employees of Defendant in August, 2014 may have information relating to the claim depending upon how it is ultimately determined, e.g., what were the hiring and employment policies of the company.    Defendant has filed a (Freedom of Information Act (FOIA)) with

Page 2

the U.S. Department of Labor, Wage and Hours Division to obtain documentation from that Federal Agency that may identify other employees of Defendant in August, 2014 who may be witnesses. That information has not yet been provided to Defendant by the U.S. Department of Labor.

All individuals named in any documents that are produced through the requests for production of documents may have information relevant to the claim and should be considered as possible witnesses to be supplemented later.

FIRST SUPPLEMENTAL ANSWER: Plaintiff and Noah Gillund.

**SECOND SUPPLEMENTAL ANSWER:**

Noah Gillund is believed to have knowledge of the following and would testify as follows:

Mr. Gillund does not remember much of anything about the accident after the vehicle went into the ditch. He did not go to sleep during the drive from the restaurant to where the accident occurred. He was not tired the night of the accident as he was used to the work hours. He typically went to sleep late after he got home from work and typically did not get up until around 11:00 am or so; this includes the day of the accident.

Mr. Gillund remembers that just before the accident, he looked over to say something to Skyler, then felt the passenger side go into the gravel, the vehicle then went off the road and when he tried to work his way out of the ditch, he lost control. He believes he said like "Oh, shit!" He really does not remember anything else about the accident, other than as the vehicle turned over, seeing the grass (sideways), and then waking up in the hospital. He did not feel Skyler was distracting him when the accident occurred; they were just talking. He feels like he got distracted talking to Skyler and believes the accident is his fault for getting distracted. Mr.

Gillund also believes that on the way home, other than when he went off the road when the accident happened, he did not go onto the road shoulder.

Mr. Gillund believes the vehicle he was driving had a tendency to drift to the right. Since the accident, Mr. Gillund's family purchased the exact same model of vehicle; it too has a tendency to drift to the right.

Mr. Gillund never complained about being tired to anyone at the Stillwater Fish House, nor did he ever complain to anyone at the Stillwater Fish House about working too much. He never heard Skyler complain about being tired, other than Skyler would occasionally (two or three times) complain about being at work. Mr. Gillund felt it was Skyler complaining because he would rather be doing something other than working, not that he was tired.

Mr. Gillund gave Skyler a ride home a lot that summer, typically two-three times/week. He is not sure, but the two-three times/week frequency may have increased as the summer progressed.

The day Mr. Gillund and Skyler clocked out, Mr. Gillund thinks all they did before going to Noah's car was to take off their white work shirts, throw them in the hamper, grab some chocolate mints out of a bowl, possibly a soda, and then get into Noah's car. He believes the only person there when Noah and Skyler clocked out was the assistant manager-he does not remember the assistant manager's name; he does remember the assistant manager was a "tall guy." Mr. Gillund and Skyler did not visit with the manager before leaving.

We believe that Mr. Gillund will testify that neither he nor Skyler smoked pot or had any alcohol that night. While Mr. Gillund had in the past smoked pot, he had not that night.

Mr. Gillund is pretty sure he never gave any statement to his insurance company. He does know his insurance company paid $25,000 within a month or two, at most, of the accident.

Mr. Gillund now sees Skyler maybe once a month or so, but not very often. Mr. Gillund did see Skyler about three weeks ago. Skyler seemed to be pretty happy and doing well. Skyler and his mom talked about the lawsuit and what might happen, but he does not remember what they said.

DATED this 30th day of November, 2018.

MOORE, COCKRELL,
GOICOECHEA & JOHNSON, P.C.

_for Dale R. Cockrell_

Dale R. Cockrell
145 Commons Loop, Suite 200
P.O. Box 7370
Kalispell, MT 59904-0370
Email: dcockrell@mcgalaw.com

*Attorney for Defendant Felder &Company,*
*LLC, d/b/a Stillwater Fish House*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was duly served on counsel of record by U.S. mail, postage prepaid, and addressed as follows this 30th day of November, 2018:

Michael A. Bliven
Aaron J. Brann
Bliven Law Firm, PC
278 Fourth Avenue E.N.
Kalispell, MT 59901
*Attorneys for Plaintiff*


By: _____
Anna Arvidson

1 - Stillwater Fish House
6235 Hwy 93 West
Whitefish, MT 59937

**Daily Labor**
02/05/2014 – 02/04/2016

Page 5
02/05/2016 – 3:41 PM
6.7.25

14-15

| Date | Decl Tips | Emp Tippable Sales |
|------|-----------|---------------------|
| 08/22/2014 | 0.00 | 0.00 |
| 08/19/2014 | 0.00 | 0.00 |
| 08/17/2014 | 0.00 | 0.00 |
| 08/13/2014 | 0.00 | 0.00 |
| 08/12/2014 | 0.00 | 0.00 |
| 08/10/2014 | 0.00 | 0.00 |
| 08/07/2014 | 0.00 | 0.00 |
| 08/06/2014 | 0.00 | 0.00 |
| 08/05/2014 | 0.00 | 0.00 |
| 08/03/2014 | 0.00 | 0.00 |
| 08/02/2014 | 0.00 | 0.00 |
| 08/01/2014 | 0.00 | 0.00 |
| 07/30/2014 | 0.00 | 0.00 |
| 07/30/2014 | 0.00 | 0.00 |
| 07/30/2014 | 0.00 | 0.00 |
| 07/29/2014 | 0.00 | 0.00 |
| 07/26/2014 | 0.00 | 0.00 |
| 07/25/2014 | 0.00 | 0.00 |
| 07/22/2014 | 0.00 | 0.00 |
| 07/21/2014 | 0.00 | 0.00 |
| 07/19/2014 | 0.00 | 0.00 |
| 07/16/2014 | 0.00 | 0.00 |
| 07/15/2014 | 0.00 | 0.00 |
| 07/14/2014 | 0.00 | 0.00 |
| 07/13/2014 | 0.00 | 0.00 |
| 07/12/2014 | 0.00 | 0.00 |
| 07/11/2014 | 0.00 | 0.00 |
| 07/05/2014 | 0.00 | 0.00 |
| 07/03/2014 | 0.00 | 0.00 |
| 07/02/2014 | 0.00 | 0.00 |
| 06/28/2014 | 0.00 | 0.00 |
| 06/27/2014 | 0.00 | 0.00 |
| 06/26/2014 | 0.00 | 0.00 |
| 06/25/2014 | 0.00 | 0.00 |
| 06/21/2014 | 0.00 | 0.00 |
| 06/20/2014 | 0.00 | 0.00 |
| 06/19/2014 | 0.00 | 0.00 |
| 06/18/2014 | 0.00 | 0.00 |
| 06/14/2014 | 0.00 | 0.00 |
| 06/13/2014 | 0.00 | 0.00 |
| 06/07/2014 | 0.00 | 0.00 |
| 06/06/2014 | 0.00 | 0.00 |
| 05/31/2014 | 0.00 | 0.00 |
| 05/30/2014 | 0.00 | 0.00 |
| 05/24/2014 | 0.00 | 0.00 |
| 05/23/2014 | 0.00 | 0.00 |
| 05/17/2014 | 0.00 | 0.00 |

*** Gillund Noah ***

45
Reg 3 viols
35 after 7pm
10 over 8 hrs

Tiphell 16

| Date | Time In | Time Out | Reg. Rate | Reg. Hrs | Reg. Pay | OT Rate | OT Hrs | OT Pay | Tot Hrs | Tot Pay | CC Tips |
|------|---------|----------|-----------|----------|----------|---------|--------|--------|---------|---------|---------|
| 08/30/2014 | 15:35 | 0:52 | 9.00 | 9.29 | 83.61 | 0.00 | 0.00 | 0.00 | 9.29 | 83.61 | 0.00 |
| 08/29/2014 | 15:52 | 1:25 | 9.00 | 9.55 | 85.95 | 0.00 | 0.00 | 0.00 | 9.55 | 85.95 | 0.00 |
| 08/28/2014 | 15:45 | 0:52 | 9.00 | 9.12 | 82.08 | 0.00 | 0.00 | 0.00 | 9.12 | 82.08 | 0.00 |
| 08/27/2014 | 15:51 | 0:24 | 9.00 | 8.55 | 76.95 | 0.00 | 0.00 | 0.00 | 8.55 | 76.95 | 0.00 |
| 08/24/2014 | 15:25 | 22:34 | 9.00 | 6.28 | 56.52 | 13.51 | 0.87 | 11.75 | 7.15 | 68.27 | 0.00 |
| 08/23/2014 | 15:51 | 23:50 | 9.00 | 7.98 | 71.82 | 0.00 | 0.00 | 0.00 | 7.98 | 71.82 | 0.00 |
| 08/22/2014 | 15:53 | 1:01 | 9.00 | 9.13 | 82.17 | 0.00 | 0.00 | 0.00 | 9.13 | 82.17 | 0.00 |
| 08/21/2014 | 15:47 | 1:07 | 9.00 | 9.33 | 83.97 | 0.00 | 0.00 | 0.00 | 9.33 | 83.97 | 0.00 |
| 08/20/2014 | 17:16 | 0:33 | 9.00 | 7.28 | 65.52 | 0.00 | 0.00 | 0.00 | 7.28 | 65.52 | 0.00 |
| 08/17/2014 | 15:50 | 23:00 | 9.00 | 7.17 | 64.53 | 0.00 | 0.00 | 0.00 | 7.17 | 64.53 | 0.00 |
| 08/16/2014 | 15:42 | 23:39 | 9.00 | 7.95 | 71.55 | 0.00 | 0.00 | 0.00 | 7.95 | 71.55 | 0.00 |
| 08/15/2014 | 15:57 | 23:20 | 9.00 | 7.38 | 66.42 | 0.00 | 0.00 | 0.00 | 7.38 | 66.42 | 0.00 |


JA EXHIBIT
2
Gillund

SFH 00478

D-3d

1 - Stillwater Fish House
6235 Hwy 93 West
Whitefish, MT 59937

# Daily Labor
## 02/05/2014 -- 02/04/2016

| Date | Time In | Time Out | Reg. Rate | Reg. Hrs | Reg. Pay | OT Rate | OT Hrs | OT Pay | Tot Hrs | Tot Pay | CC Tips |
|------|---------|----------|-----------|----------|----------|---------|--------|--------|---------|---------|---------|
| 08/14/2014 | 15:31 | 23:49 | 9.00 | 8.30 | 74.70 | 0.00 | 0.00 | 0.00 | 8.30 | 74.70 | 0.00 |
| 08/10/2014 | 15:43 | 23:20 | 9.00 | 7.62 | 68.58 | 0.00 | 0.00 | 0.00 | 7.62 | 68.58 | 0.00 |
| 08/10/2014 | 12:51 | 14:38 | 9.00 | 1.78 | 16.02 | 0.00 | 0.00 | 0.00 | 1.78 | 16.02 | 0.00 |
| 08/09/2014 | 15:48 | 0:04 | 9.00 | 8.27 | 74.43 | 0.00 | 0.00 | 0.00 | 8.27 | 74.43 | 0.00 |
| 08/08/2014 | 17:00 | 0:01 | 9.00 | 7.02 | 63.18 | 0.00 | 0.00 | 0.00 | 7.02 | 63.18 | 0.00 |
| 08/04/2014 | 15:54 | 0:34 | 9.00 | 8.67 | 78.03 | 0.00 | 0.00 | 0.00 | 8.67 | 78.03 | 0.00 |
| 08/01/2014 | 15:58 | 0:21 | 9.00 | 8.38 | 75.42 | 0.00 | 0.00 | 0.00 | 8.38 | 75.42 | 0.00 |
| 07/30/2014 | 15:55 | 23:49 | 9.00 | 7.90 | 71.10 | 0.00 | 0.00 | 0.00 | 7.90 | 71.10 | 0.00 |
| 07/29/2014 | 16:11 | 0:06 | 9.00 | 7.92 | 71.28 | 0.00 | 0.00 | 0.00 | 7.92 | 71.28 | 0.00 |
| 07/28/2014 | 16:00 | 23:47 | 9.00 | 7.78 | 70.02 | 0.00 | 0.00 | 0.00 | 7.78 | 70.02 | 0.00 |
| 07/26/2014 | 15:54 | 1:10 | 9.00 | 8.26 | 74.34 | 13.50 | 1.00 | 13.50 | 9.26 | 87.84 | 0.00 |
| 07/24/2014 | 15:31 | 23:59 | 9.00 | 8.47 | 76.23 | 0.00 | 0.00 | 0.00 | 8.47 | 76.23 | 0.00 |
| 07/23/2014 | 15:49 | 23:28 | 9.00 | 7.65 | 68.85 | 0.00 | 0.00 | 0.00 | 7.65 | 68.85 | 0.00 |
| 07/22/2014 | 15:43 | 23:37 | 9.00 | 7.90 | 71.10 | 0.00 | 0.00 | 0.00 | 7.90 | 71.10 | 0.00 |
| 07/21/2014 | 16:53 | 23:36 | 9.00 | 7.72 | 69.48 | 0.00 | 0.00 | 0.00 | 7.72 | 69.48 | 0.00 |
| 07/17/2014 | 15:52 | 20:28 | 9.00 | 4.60 | 41.40 | 0.00 | 0.00 | 0.00 | 4.60 | 41.40 | 0.00 |
| 07/16/2014 | 15:26 | 23:35 | 9.00 | 8.15 | 73.35 | 0.00 | 0.00 | 0.00 | 8.15 | 73.35 | 0.00 |
| 07/15/2014 | 15:10 | 23:32 | 9.00 | 8.36 | 75.24 | 0.00 | 0.00 | 0.00 | 8.36 | 75.24 | 0.00 |
| 07/14/2014 | 15:32 | 23:16 | 9.00 | 7.73 | 69.57 | 0.00 | 0.00 | 0.00 | 7.73 | 69.57 | 0.00 |
| 07/10/2014 | 15:48 | 0:41 | 9.00 | 8.88 | 79.92 | 0.00 | 0.00 | 0.00 | 8.88 | 79.92 | 0.00 |
| 07/09/2014 | 17:37 | 0:26 | 9.00 | 6.82 | 61.38 | 0.00 | 0.00 | 0.00 | 6.82 | 61.38 | 0.00 |
| 07/07/2014 | 16:45 | 0:19 | 9.00 | 7.57 | 68.13 | 0.00 | 0.00 | 0.00 | 7.57 | 68.13 | 0.00 |
| 07/06/2014 | 17:30 | 23:24 | 9.00 | 5.90 | 53.10 | 0.00 | 0.00 | 0.00 | 5.90 | 53.10 | 0.00 |
| 07/05/2014 | 16:44 | 1:25 | 9.00 | 8.68 | 78.12 | 0.00 | 0.00 | 0.00 | 8.68 | 78.12 | 0.00 |
| 07/03/2014 | 15:57 | 23:47 | 9.00 | 7.83 | 70.47 | 0.00 | 0.00 | 0.00 | 7.83 | 70.47 | 0.00 |
| 06/30/2014 | 16:50 | 23:19 | 9.00 | 6.48 | 58.32 | 0.00 | 0.00 | 0.00 | 6.48 | 58.32 | 0.00 |
| 06/29/2014 | 16:40 | 22:42 | 9.00 | 6.03 | 54.27 | 0.00 | 0.00 | 0.00 | 6.03 | 54.27 | 0.00 |
| 06/28/2014 | 15:54 | 23:20 | 9.00 | 7.43 | 66.87 | 0.00 | 0.00 | 0.00 | 7.43 | 66.87 | 0.00 |
| 06/27/2014 | 16:00 | 23:20 | 9.00 | 7.33 | 65.97 | 0.00 | 0.00 | 0.00 | 7.33 | 65.97 | 0.00 |
| 06/23/2014 | 16:24 | 22:20 | 9.00 | 5.93 | 53.37 | 0.00 | 0.00 | 0.00 | 5.93 | 53.37 | 0.00 |
| 06/22/2014 | 16:54 | 23:27 | 9.00 | 6.55 | 58.95 | 0.00 | 0.00 | 0.00 | 6.55 | 58.95 | 0.00 |
| 06/21/2014 | 16:45 | 0:04 | 9.00 | 7.32 | 65.88 | 0.00 | 0.00 | 0.00 | 7.32 | 65.88 | 0.00 |
| 06/20/2014 | 16:01 | 0:00 | 9.00 | 7.98 | 71.82 | 0.00 | 0.00 | 0.00 | 7.98 | 71.82 | 0.00 |
| 06/16/2014 | 16:47 | 23:53 | 9.00 | 7.10 | 63.90 | 0.00 | 0.00 | 0.00 | 7.10 | 63.90 | 0.00 |
| 06/15/2014 | 16:41 | 23:33 | 9.00 | 6.87 | 61.83 | 0.00 | 0.00 | 0.00 | 6.87 | 61.83 | 0.00 |
| 06/14/2014 | 16:05 | 23:46 | 9.00 | 7.68 | 69.12 | 0.00 | 0.00 | 0.00 | 7.68 | 69.12 | 0.00 |

| Date | Decl Tips | Emp Tippable Sales |
|------|-----------|--------------------|
| 08/30/2014 | 0.00 | 0.00 |
| 08/29/2014 | 0.00 | 0.00 |
| 08/28/2014 | 0.00 | 0.00 |
| 08/27/2014 | 0.00 | 0.00 |
| 08/24/2014 | 0.00 | 0.00 |
| 08/23/2014 | 0.00 | 0.00 |
| 08/22/2014 | 0.00 | 0.00 |
| 08/20/2014 | 0.00 | 0.00 |
| 08/17/2014 | 0.00 | 0.00 |
| 08/15/2014 | 0.00 | 0.00 |
| 08/14/2014 | 0.00 | 0.00 |
| 08/10/2014 | 0.00 | 0.00 |
| 08/09/2014 | 0.00 | 0.00 |
| 08/08/2014 | 0.00 | 0.00 |
| 08/04/2014 | 0.00 | 0.00 |
| 08/01/2014 | 0.00 | 0.00 |
| 07/30/2014 | 0.00 | 0.00 |
| 07/29/2014 | 0.00 | 0.00 |
| 07/28/2014 | 0.00 | 0.00 |
| 07/25/2014 | 0.00 | 0.00 |
| 07/24/2014 | 0.00 | 0.00 |
| 07/23/2014 | 0.00 | 0.00 |
| 07/22/2014 | 0.00 | 0.00 |

D-3e

SFH 00479

1 - Stillwater Fish House
6235 Hwy 93 West
Whitefish, MT 59937

**Daily Labor**
02/05/2014 -- 02/04/2016

Page 7
02/05/2016 — 3:41 PM
6.7.26

| Date | Decl Tips | Emp Tippable Sales |
|------|-----------|--------------------|
| 07/21/2014 | 0.00 | 0.00 |
| 07/17/2014 | 0.00 | 0.00 |
| 07/16/2014 | 0.00 | 0.00 |
| 07/15/2014 | 0.00 | 0.00 |
| 07/14/2014 | 0.00 | 0.00 |
| 07/10/2014 | 0.00 | 0.00 |
| 07/09/2014 | 0.00 | 0.00 |
| 07/07/2014 | 0.00 | 0.00 |
| 07/06/2014 | 0.00 | 0.00 |
| 07/05/2014 | 0.00 | 0.00 |
| 07/03/2014 | 0.00 | 0.00 |
| 06/30/2014 | 0.00 | 0.00 |
| 06/28/2014 | 0.00 | 0.00 |
| 06/27/2014 | 0.00 | 0.00 |
| 06/23/2014 | 0.00 | 0.00 |
| 06/22/2014 | 0.00 | 0.00 |
| 06/21/2014 | 0.00 | 0.00 |
| 06/20/2014 | 0.00 | 0.00 |
| 06/16/2014 | 0.00 | 0.00 |
| 06/15/2014 | 0.00 | 0.00 |
| 06/14/2014 | 0.00 | 0.00 |

| Date | Time In | Time Out | Reg. Rate | Reg. Hrs | Reg. Pay | OT Rate | OT Hrs | OT Pay | Tot Hrs | Tot Pay | CC Tips |
|------|---------|----------|-----------|----------|----------|---------|--------|--------|---------|---------|---------|
| TOTALS: | | | 9.00 | 1275.45 | 11479.40 | 13.50 | 1.87 | 25.25 | 1277.32 | 11504.65 | 3794.47 |

| Date | Decl Tips | Emp Tippable Sales |
|------|-----------|--------------------|
| TOTALS: | 3794.47 | 23297.75 |

## SUMMARY

| Employee Name | Date | Time In | Time Out | Reg. Rate | Reg. Hrs | Reg. Pay | OT Rate | OT Hrs | OT Pay | Tot Hrs |
|---------------|------|---------|----------|-----------|----------|----------|---------|--------|--------|---------|
| Andrade, Laurie | | | | 7.90 | 191.46 | 1512.52 | 0.00 | 0.00 | 0.00 | 191.46 |
| Chester, Joseph | | | | 9.00 | 340.21 | 3061.89 | 0.00 | 0.00 | 0.00 | 340.21 |
| Dixon, Skyler | | | | 9.56 | 379.91 | 3630.16 | 0.00 | 0.00 | 0.00 | 379.91 |
| Gillund, Noah | | | | 9.00 | 363.87 | 3274.83 | 13.50 | 1.87 | 25.25 | 365.74 |
| TOTALS: | | | | 9.00 | 1275.45 | 11479.40 | 13.50 | 1.87 | 25.25 | 1277.32 |

| Employee Name | Tot Pay | CC Tips | Decl Tips | Emp Tippable Sales |
|---------------|---------|---------|-----------|--------------------|
| Andrade, Laurie | 1512.52 | 3785.47 | 3785.47 | 23167.00 |
| Chester, Joseph | 3061.89 | 9.00 | 9.00 | 130.75 |
| Dixon, Skyler | 3630.16 | 0.00 | 0.00 | 0.00 |
| Gillund, Noah | 3300.08 | 0.00 | 0.00 | 0.00 |
| TOTALS: | 11504.65 | 3794.47 | 3794.47 | 23297.75 |

**************************** End of Report ****************************

SFH 00480

1 - Stillwater Fish House
6235 Hwy 93 West
Whitefish, MT 59937

14-15

**Daily Labor**
02/05/2014 -- 02/04/2016

Page 4
02/05/2016 -- 3:41 PM
6.7.26

| Date | | Decl Tips | Emp Tippable Sales |
|------|--|-----------|--------------------|

## *** Dixon Skyler ***   DOB: 2/16/99   15 yrs old during entire employment

*(handwritten left margin:* 54 / Reg 3 viols / 38 after 9 pm / 16 over 8 hrs *)*

| Date | Time In | Time Out | Reg. Rate | Reg. Hrs | Reg. Pay | OT Rate | OT Hrs | OT Pay | Tot Hrs | Tot Pay | CC Tips |
|------|---------|----------|-----------|----------|----------|---------|--------|--------|---------|---------|---------|
| 08/30/2014 | 15:56 | 0:50 | 10.00 | 8.90 | 89.00 | 0.00 | 0.00 | 0.00 | 8.90 | 89.00 | 0.00 |
| 08/29/2014 | 16:02 | 1:15 | 10.00 | 9.21 | 92.10 | 0.00 | 0.00 | 0.00 | 9.21 | 92.10 | 0.00 |
| 08/26/2014 | 15:42 | 22:42 | 10.00 | 7.00 | 70.00 | 0.00 | 0.00 | 0.00 | 7.00 | 70.00 | 0.00 |
| 08/24/2014 | 15:54 | 22:34 | 10.00 | 6.67 | 66.70 | 0.00 | 0.00 | 0.00 | 7.00 | 70.00 | 0.00 |
| 08/23/2014 | 15:51 | 23:50 | 10.00 | 7.99 | 79.90 | 0.00 | 0.00 | 0.00 | 7.99 | 79.90 | 0.00 |
| 08/22/2014 | 15:53 | 1:01 | 10.00 | 9.13 | 91.30 | 0.00 | 0.00 | 0.00 | 9.13 | 91.30 | 0.00 |
| 08/19/2014 | 16:43 | 23:47 | 10.00 | 8.07 | 80.70 | 0.00 | 0.00 | 0.00 | 8.07 | 80.70 | 0.00 |
| 08/17/2014 | 10:03 | 17:23 | 10.00 | 7.33 | 73.30 | 0.00 | 0.00 | 0.00 | 7.33 | 73.30 | 0.00 |
| 08/13/2014 | 15:48 | 22:58 | 10.00 | 7.17 | 71.70 | 0.00 | 0.00 | 0.00 | 7.33 | 73.30 | 0.00 |
| 08/12/2014 | 9:47 | 16:24 | 10.00 | 6.62 | 66.20 | 0.00 | 0.00 | 0.00 | 6.62 | 66.20 | 0.00 |
| 08/10/2014 | 15:55 | 23:20 | 10.00 | 7.42 | 74.20 | 0.00 | 0.00 | 0.00 | 7.42 | 74.20 | 0.00 |
| 08/07/2014 | 16:04 | 16:54 | 10.00 | 6.83 | 68.30 | 0.00 | 0.00 | 0.00 | 6.83 | 68.30 | 0.00 |
| 08/06/2014 | 8:27 | 16:33 | 10.00 | 8.10 | 81.00 | 0.00 | 0.00 | 0.00 | 8.10 | 81.00 | 0.00 |
| 08/05/2014 | 9:57 | 18:09 | 10.00 | 8.20 | 82.00 | 0.00 | 0.00 | 0.00 | 8.20 | 82.00 | 0.00 |
| 08/03/2014 | 15:57 | 23:05 | 10.00 | 7.13 | 71.30 | 0.00 | 0.00 | 0.00 | 7.13 | 71.30 | 0.00 |
| 08/02/2014 | 16:00 | 2:00 | 10.00 | 10.00 | 100.00 | 0.00 | 0.00 | 0.00 | 10.00 | 100.00 | 0.00 |
| 08/01/2014 | 17:00 | 0:21 | 10.00 | 7.35 | 73.50 | 0.00 | 0.00 | 0.00 | 7.35 | 73.50 | 0.00 |
| 07/30/2014 | 16:36 | 16:11 | 10.00 | 0.58 | 5.80 | 0.00 | 0.00 | 0.00 | 0.58 | 5.80 | 0.00 |
| 07/30/2014 | 9:44 | 9:44 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 07/30/2014 | 9:56 | 15:27 | 10.00 | 5.52 | 55.20 | 0.00 | 0.00 | 0.00 | 5.52 | 55.20 | 0.00 |
| 07/29/2014 | 10:01 | 17:50 | 10.00 | 7.82 | 78.20 | 0.00 | 0.00 | 0.00 | 7.82 | 78.20 | 0.00 |
| 07/26/2014 | 16:52 | 0:23 | 10.00 | 8.52 | 85.20 | 0.00 | 0.00 | 0.00 | 8.52 | 85.20 | 0.00 |
| 07/26/2014 | 16:21 | 1:10 | 10.00 | 8.82 | 88.20 | 0.00 | 0.00 | 0.00 | 8.82 | 88.20 | 0.00 |
| 07/22/2014 | 10:39 | 16:29 | 10.00 | 7.89 | 78.90 | 0.00 | 0.00 | 0.00 | 7.83 | 78.30 | 0.00 |
| 07/21/2014 | 10:02 | 16:57 | 10.00 | 6.92 | 69.20 | 0.00 | 0.00 | 0.00 | 6.92 | 69.20 | 0.00 |
| 07/19/2014 | 16:17 | 0:52 | 10.00 | 8.58 | 85.80 | 0.00 | 0.00 | 0.00 | 8.58 | 85.80 | 0.00 |
| 07/18/2014 | 16:34 | 0:33 | 10.00 | 7.98 | 79.80 | 0.00 | 0.00 | 0.00 | 7.98 | 79.80 | 0.00 |
| 07/15/2014 | 9:58 | 17:31 | 10.00 | 7.55 | 75.50 | 0.00 | 0.00 | 0.00 | 7.55 | 75.50 | 0.00 |
| 07/14/2014 | 9:52 | 17:36 | 10.00 | 7.73 | 77.30 | 0.00 | 0.00 | 0.00 | 7.73 | 77.30 | 0.00 |
| 07/13/2014 | 16:36 | 0:05 | 9.00 | 7.48 | 67.32 | 0.00 | 0.00 | 0.00 | 7.48 | 67.32 | 0.00 |
| 07/12/2014 | 16:54 | 2:03 | 9.00 | 9.15 | 82.35 | 0.00 | 0.00 | 0.00 | 9.15 | 82.35 | 0.00 |
| 07/11/2014 | 16:54 | 1:43 | 9.00 | 8.82 | 79.38 | 0.00 | 0.00 | 0.00 | 8.82 | 79.38 | 0.00 |
| 07/05/2014 | 17:04 | 1:25 | 9.00 | 8.35 | 75.15 | 0.00 | 0.00 | 0.00 | 8.35 | 75.15 | 0.00 |
| 07/03/2014 | 15:55 | 23:47 | 9.00 | 7.87 | 70.83 | 0.00 | 0.00 | 0.00 | 7.87 | 70.83 | 0.00 |
| 07/02/2014 | 16:42 | 0:33 | 9.00 | 7.85 | 70.65 | 0.00 | 0.00 | 0.00 | 7.85 | 70.65 | 0.00 |
| 06/28/2014 | 15:54 | 23:20 | 9.00 | 7.43 | 66.87 | 0.00 | 0.00 | 0.00 | 7.43 | 66.87 | 0.00 |
| 06/27/2014 | 15:42 | 23:20 | 9.00 | 7.63 | 68.67 | 0.00 | 0.00 | 0.00 | 7.63 | 68.67 | 0.00 |
| 06/26/2014 | 15:51 | 23:20 | 9.00 | 7.48 | 67.32 | 0.00 | 0.00 | 0.00 | 7.48 | 67.32 | 0.00 |
| 06/26/2014 | 15:58 | 23:58 | 9.00 | 8.00 sf | 72.00 | 0.00 | 0.00 | 0.00 | 8.00 | 72.00 | 0.00 |
| 06/21/2014 | 15:43 | 22:55 | 9.00 | 7.20 | 64.80 | 0.00 | 0.00 | 0.00 | 7.20 | 64.80 | 0.00 |
| 06/20/2014 | 15:57 | 23:59 | 9.00 | 8.03 | 72.27 | 0.00 | 0.00 | 0.00 | 8.03 | 72.27 | 0.00 |
| 06/19/2014 | 16:04 | 0:34 | 9.00 | 8.50 | 76.50 | 0.00 | 0.00 | 0.00 | 8.50 | 76.50 | 0.00 |
| 06/18/2014 | 15:46 | 22:19 | 9.00 | 6.55 | 58.95 | 0.00 | 0.00 | 0.00 | 6.55 | 58.95 | 0.00 |
| 06/14/2014 | 15:55 | 23:46 | 9.00 | 7.85 | 70.65 | 0.00 | 0.00 | 0.00 | 7.85 | 70.65 | 0.00 |
| 06/13/2014 | 15:54 | 23:00 | 9.00 | 7.10 | 63.90 | 0.00 | 0.00 | 0.00 | 7.10 | 63.90 | 0.00 |
| 06/07/2014 | 16:52 | 1:00 | 9.00 | 8.14 | 73.26 | 0.00 | 0.00 | 0.00 | 8.14 | 73.26 | 0.00 |
| 06/06/2014 | 16:56 | 23:59 | 9.00 | 7.02 | 63.18 | 0.00 | 0.00 | 0.00 | 7.02 | 63.18 | 0.00 |
| 05/31/2014 | 16:55 | 23:17 | 9.00 | 6.37 | 57.33 | 0.00 | 0.00 | 0.00 | 6.37 | 57.33 | 0.00 |
| 05/30/2014 | 17:00 | 22:42 | 9.00 | 5.70 | 51.30 | 0.00 | 0.00 | 0.00 | 5.70 | 51.30 | 0.00 |
| 05/24/2014 | 17:04 | 22:59 | 9.00 | 5.92 | 53.28 | 0.00 | 0.00 | 0.00 | 5.92 | 53.28 | 0.00 |
| 05/23/2014 | 17:13 | 20:56 | 9.00 | 3.72 | 33.48 | 0.00 | 0.00 | 0.00 | 3.72 | 33.48 | 0.00 |
| 05/17/2014 | 16:17 | 23:04 | 9.00 | 6.78 | 61.02 | 0.00 | 0.00 | 0.00 | 6.78 | 61.02 | 0.00 |

| Date | | Decl Tips | Emp Tippable Sales |
|------|--|-----------|--------------------|
| 08/30/2014 | | 0.00 | 0.00 |
| 08/29/2014 | | 0.00 | 0.00 |
| 08/26/2014 | | 0.00 | 0.00 |
| 08/24/2014 | | 0.00 | 0.00 |
| 08/23/2014 | | 0.00 | 0.00 |



JA EXHIBIT
2-1
Gillund

IN THE DISTRICT COURT OF THE ELEVENTH
JUDICIAL DISTRICT OF THE STATE OF MONTANA
IN AND FOR THE COUNTY OF FLATHEAD

CAUSE NO. DV-17-853D

---

SKYLAR DIXON,

        Plaintiff,



  vs.

FELDER & COMPANY, LLC, d/b/a STILLWATER FISH HOUSE,

       Defendant.

---

DEPOSITION

OF

SKYLAR DIXON

(Taken on Behalf of the Defendant)

Taken at Bliven Law Firm, PC
278 Fourth Avenue, E.N.
Kalispell, Montana
Tuesday, October 30, 2018 - 10:04 a.m.



Reported by Jolene Asa, RPR, and Notary Public
for the State of Montana, Flathead County

**1**

1  IN THE DISTRICT COURT OF THE ELEVENTH
2  JUDICIAL DISTRICT OF THE STATE OF MONTANA
3  IN AND FOR THE COUNTY OF FLATHEAD
4
5  CAUSE NO. DV-17-853D
6
7  SKYLAR DIXON,
8       Plaintiff,
   vs.
9
   FELDER & COMPANY, LLC, d/b/a STILLWATER FISH HOUSE,
10
        Defendant.
11
12
13
14       DEPOSITION
15          OF
16       SKYLAR DIXON
17   (Taken on Behalf of the Defendant)
18
19    Taken at Bliven Law Firm, PC
        278 Fourth Avenue, E.N.
20       Kalispell, Montana
     Tuesday, October 30, 2018 - 10:04 a.m.
21
22
23
24
   Reported by Jolene Asa, RPR, and Notary Public
25   for the State of Montana, Flathead County

**2**

1       APPEARANCES
2
3  APPEARING ON BEHALF OF THE PLAINTIFF:
4     Michael Bliven, Esq.
      Bliven Law Firm, PC
5     278 Fourth Avenue, E.N.
      Kalispell, Montana 59901
6     mike@blivenlawfirm.com
7
   APPEARING ON BEHALF OF THE DEFENDANT:
8
      Dale R. Cockrell, Esq.
9     Moore, Cockrell, Goicoechea & Johnson, PC
      145 Commons Loop, Suite 200
10    P.O. Box 7370
      Kalispell, Montana 59904-0370
11    dcockrell@mcgalaw.com
12
   ALSO PRESENT:
13
      None
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1       S T I P U L A T I O N S
2
3     It was stipulated by and between counsel for the
4  respective parties that the deposition be taken by
5  Jolene Asa, Registered Professional Reporter and
6  Notary Public for the State of Montana, residing in
7  Flathead County, Montana.
8     It was further stipulated and agreed by and
9  between counsel for the respective parties that the
10 deposition be taken at the time and place set out on
11 the caption and pursuant to the Montana Rules
12 of Civil Procedure.
13    It was further stipulated and agreed by and
14 between counsel for the respective parties and the
15 witness that the reading and signing of the deposition
16 would be expressly reserved.
17
18
19
20
21
22
23
24
25

**4**

1       EXAMINATION INDEX
2  EXAMINATION                PAGE
3    BY MR. COCKRELL            5
4
5       EXHIBIT INDEX
6  EXHIBIT  DESCRIPTION        PAGE
7    NONE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1    SKYLAR DIXON,
2 being first duly sworn to tell the truth, the whole
3 truth and nothing but the truth, testified as follows:
4
5    EXAMINATION
6 BY MR. COCKRELL:
7    Q.  Would you state your full name, please?
8    A.  Skylar Dixon.
9    Q.  What's your address?
10    A.  100 Schwegel Spur Road, Whitefish, Montana.
11    Q.  Mr. Bliven probably told you, but the rules
12 for a deposition are pretty easy.  If I ask a question
13 you don't understand, just tell me, and I'll try to
14 straighten it out.  All right?
15    A.  Okay.
16    Q.  You have to answer out loud with "Yes,"
17 "No," whatever the appropriate response is.
18 All right?
19    A.  Uh-huh.
20    Q.  If you happen to say "Uh-huh" or "Huh-uh,"
21 either Mr. Bliven or I might say, Is that a "Yes" or a
22 "No"?  That's just so the court reporter can get it
23 down because she's writing down everything that we
24 say.
25    A.  Okay.

**6**

1    Q.  All right?
2    A.  Yeah.
3    Q.  If you need a break at any time, you just
4 tell me, and we'll take a break.
5    A.  All right.
6    Q.  All right?
7    A.  Thank you.
8    Q.  Mr. Bliven is free to object to any
9 question, but unless he tells you not to answer, you
10 still have to go ahead and answer the question.  Then
11 if need be, the judge will rule on the objection later
12 on.
13    A.  Okay.
14    Q.  All right.  Are you on any kind of
15 medications today that would affect your ability to
16 testify?
17    A.  No.
18    Q.  What kind of medications are you currently
19 on?
20    A.  I'm on an antidepressant.
21    Q.  Do you know what kind?
22    A.  Zoloft and Wellbutrin.
23    Q.  Who prescribes that for you?
24    A.  Dr. Muir.
25    MR. BLIVEN:  M-U-I-R, Muir.

**7**

1 BY MR. COCKRELL:
2    Q.  Thank you.
3    A.  Uh-huh.
4    Q.  I can just kind of tell you what I want to
5 visit a little bit about, Skylar.
6    Do you mind if I call you Skylar?
7    A.  Yeah.  I don't mind at all.
8    Q.  I'm going to visit with you a little bit
9 about your work out at the Stillwater Fish House and
10 what you've been doing since then and about the
11 accident, what kind of treatment, medical treatment
12 you're having, that sort of thing.  Okay?
13    A.  Okay.
14    Q.  I know you went to work out there when you
15 were, what, 15 years old at the time?
16    A.  Yes.
17    Q.  And how long had you worked there before the
18 accident?
19    A.  I worked there for about three months, I
20 believe.
21    Q.  So you'd just started that summer?
22    A.  Yes.
23    Q.  How did you get the job?
24    A.  I can't -- let's see.  The last I recall, it
25 was -- they were just opening, and I gave them a call,

**8**

1 and they were going to schedule an interview, and I
2 got a call from Jake, who was, like, their assistant
3 manager at the time, I think, or -- it was one of the
4 chefs as well.  He said I could come in.
5    We came in, and he hired me, just put me in
6 the system, and from then on.
7    Q.  And where is your home from the restaurant?
8    A.  About eight miles.
9    Q.  Eight miles on out 93 going away from
10 Whitefish?
11    A.  Yes.
12    Q.  And then do you know where Noah Gillund's
13 home is from the restaurant?
14    A.  He lives at the Stillwater dump.  I guess
15 it's the Whitefish dump now or something.  It's a
16 public one.  It used to just be -- it's, like, just
17 before Stillwater.  He's probably about ten miles.
18    Q.  On out 93 further away from Whitefish?
19    A.  Yes.
20    Q.  Past where you live?
21    A.  Yes.
22    Q.  Did you happen to visit with anybody besides
23 Jake, who was maybe assistant manager or chef, when
24 you got hired?
25    A.  Visit with anyone else when I got hired that

**9**

1   day?
2     Q.  Yeah, when you got hired that day.
3     A.  I visited with -- I met Jessie. I met
4   pretty much all the chefs, and then I met the
5   dishwasher who was training me. His name was Kyle,
6   Kyle Krogh, and that's all I believe I can remember.
7     Q.  Did anybody discuss what your hours might
8   be, or did you ask what your hours would be?
9     A.  I was told that from four until close.
10    Q.  Do you remember who told you that?
11    A.  Jake.
12    Q.  Did Noah go to work with you that summer as
13   well?
14    A.  Yeah. I told Jessie -- since there was only
15   me and Kyle as dishwashers, I said I had a couple of
16   friends who would like to work for the summer, and I
17   referred them, and they got -- applied and accepted.
18    Q.  Who else besides Noah?
19    A.  That got hired?
20    Q.  Yeah.
21    A.  Parker Hill.
22    Q.  Parker?
23    A.  Yeah. P-A-R-K-E-R.
24    Q.  And does Parker live in Whitefish?
25    A.  He lives in Olney.

**10**

1    Q.  Did you go to school in Whitefish?
2    A.  Yes.
3    Q.  And did Parker go to school --
4    A.  Uh-huh.
5    Q.  -- in Whitefish?
6    A.  Yes.
7    Q.  And how old was Parker?
8    A.  15.
9    Q.  Did you ask any questions of Jake when he
10   told you that your work hours would be from about
11   four o'clock to close, whether that was okay or
12   whether that would be every day, anything about your
13   schedule?
14    A.  So for about the schedulewise, I didn't
15   really get too much information. He kind of just said
16   I was hired, and he gave me the apron, and I kind of
17   just started doing dishwashing.
18    Q.  Like, that day?
19    A.  Yeah, that day, the exact day he said to
20   come in. He told me it was four to close, and I
21   didn't know when close was, and we got off, like,
22   pretty late that day, and I kind of just went with it.
23    Q.  Do you know when Noah started?
24    A.  Let's see. Probably the beginning of
25   summer, like around June. That's when we all started.

**11**

1    Q.  And that day of the accident, which I've got
2   the record here showing is August 30th, do you
3   remember what you did that day before you went to
4   work?
5    A.  I woke up about twelve p.m. and got ready
6   for work. That was about it.
7    Q.  Was that kind of your typical schedule in
8   the summer, to sleep until eleven or twelve or so?
9    A.  Yeah.
10    Q.  All right. Nothing different that day?
11    A.  No.
12    Q.  All right. And do you know what Noah did
13   before he went to work that day?
14    A.  No, I do not know.
15    Q.  While you were at work, it was just kind of
16   the regular schedule washing dishes?
17    A.  Uh-huh.
18    Q.  Is that a "Yes"?
19    A.  Yes.
20    Q.  You're doing great, by the way.
21         Did you take any breaks or anything?
22    A.  We took a break whenever we were allowed to,
23   like if it wasn't busy or if one of the dishwashers
24   could handle it. So you'd go on, like, a five- or
25   ten-minute break.

**12**

1    Q.  Do you remember how many breaks you got that
2   day?
3    A.  One or two.
4    Q.  Did you ask for any more breaks --
5    A.  No.
6    Q.  -- other than the one or two?
7    A.  No.
8    Q.  Did you tell anybody that you were tired or
9   extra tired that day?
10    A.  No.
11    Q.  Did you have any complaints to anybody about
12   your work hours that day, like there were too many
13   hours or you wanted to be off earlier that day?
14    A.  No, not that day.
15    Q.  Had there been other days where you had
16   asked to be off earlier that you can remember?
17    A.  I tried asking Jake if we could get off a
18   little earlier, or I could, and he said that we can't
19   do that, that we have to work until close because he
20   doesn't have anyone else to cover it.
21    Q.  Do you remember when you did that if it
22   wasn't the day of the work (sic)? I know you said it
23   wasn't that day, but do you remember when you had that
24   discussion with Jake?
25    A.  Probably about two months into it, about in

## 13

1 July.
2 Q. Did you ever bring that up with Jessie, that
3 you --
4 A. No.
5 Q. -- would like to be off earlier?
6 A. No.
7 Q. Do you know whether Jake was still working
8 there when you had the accident --
9 A. Yes.
10 Q. -- with Noah? He was?
11 A. Uh-huh.
12 Q. Did you ask Jake to discuss that with
13 Jessie, that you'd like to get off earlier?
14 A. No. I didn't really know at the time. I
15 was 15 and was kind of shy to ask a lot.
16 Q. Okay. Do you remember whether it was just
17 that one day that you wanted to get off earlier, or
18 was it you wanted to just change your schedule
19 entirely?
20 A. I wanted to speak up about that. I was
21 talking about it at home with my parents, and I was
22 just too shy to ask. It was -- it's almost like,
23 since I was 15, I didn't really know what to do. I
24 was nervous, I guess. It was my first job, and I
25 didn't -- like, it was already hard to ask to take

## 14

1 July 4 off, like July 4th, but -- you know, I couldn't
2 do that unless I had someone to cover me. So I had to
3 ask Noah, and he said he would.
4 Q. And Noah covered you on July 4th?
5 A. Yes.
6 Q. So I'm a little bit confused. When you said
7 that you wanted to take off earlier, was it that you
8 wanted to change your schedule so that you wouldn't be
9 there as late, or was it just a particular day or
10 something that you wanted to be off?
11 A. I mainly wanted to change my schedule to get
12 off a little earlier.
13 Q. Do you know what time you wanted to get off?
14 A. Like, around eleven or ten.
15 Q. When you talked about that to your folks,
16 did they give you any suggestions about visiting with
17 Jessie about changing your schedule or anything?
18 A. I didn't tell them too much. This was
19 towards, like, down in August when I was telling them,
20 I don't really want to -- I wanted to put in my two
21 weeks towards the end of August, but I didn't really
22 want to speak up, I guess, and I was nervous to ask,
23 because, you know, everyone there seemed so nice.
24 It's just, like, as a kid, I don't want to -- it's
25 just hard to explain. I was just nervous to ask,

## 15

1 almost like -- I don't know.
2 Q. Were you planning on working there after
3 school started?
4 A. I guess that's what it pretty much went to.
5 Because it was only for the weekends, and we're, like,
6 Okay, you know. After -- I think on Saturdays we'd
7 work and Sundays.
8 Q. That was your schedule?
9 A. Yeah.
10 Q. Saturdays and Sundays?
11 A. No. This was going to be when school
12 started.
13 Q. Okay.
14 A. My schedule was -- the last I can recall,
15 was four days a week, three to four days a week.
16 Q. And when you were going to work Saturdays
17 and Sundays after school started, did you have that
18 discussion with Jake or Jessie?
19 A. Jessie.
20 Q. With Jessie then?
21 A. Yeah. Uh-huh.
22 Q. Do you remember when you talked with Jessie
23 about what your schedule would be after school
24 started?
25 A. It was kind of, like, a quick discussion. I

## 16

1 think we were all out at the same time on a break, and
2 he brought up if we were going to stay for school, and
3 I didn't really know what to say. I said, You know
4 what? I guess we could. How would we -- would we
5 work after school? I told him Fridays maybe. So we
6 pretty much -- I said I could only work Saturdays,
7 Sundays.
8 Q. Were you still figuring on working the same
9 kind of hours, like from four o'clock, roughly, in the
10 afternoon --
11 A. It would be four to close, yeah.
12 Q. -- to close?
13 A. Yeah.
14 Q. Do you know whether Noah was going to
15 continue working after school started?
16 A. Yeah, he was.
17 Q. Did you ever feel like you were too tired to
18 be there working before the accident?
19 A. Yes. I felt extremely tired.
20 Q. But did you mention that to anybody at work,
21 like a coworker? I know you said you didn't talk
22 about it with Jake or Jessie, but did you tell any of
23 your coworkers that you were really tired?
24 A. Yeah. I told Sully. He was one of the sous
25 chefs there. He's the closest one to the dishwashers.

## 17

1 I told him, and I was letting Noah know that I was
2 pretty tired. It's hard to get to them because Jessie
3 is out on the floor and we're all in the back of the
4 kitchen and he only comes back once in a while to get
5 orders, I guess.
6    Q.   Jessie comes back once in a while to get
7 orders?
8    A.   Yeah.
9    Q.   Sully, do you know what his last name is?
10    A.   No.
11    Q.   Do you how to spell his first name?
12    A.   Sully. S-U-L-L-Y is probably the best I
13 could tell you.
14    Q.   That's all right. I'll figure it out here.
15       Do you remember when you had the discussion
16 with Sully telling him that you were tired?
17    A.   In August, around mid-August.
18    Q.   Did he give you any kind of suggestions
19 about, Bring that up with Jake or Jessie?
20    A.   No. He said, Have a Red Bull.
21    Q.   He said what?
22    A.   Have a Red Bull.
23    Q.   Have a Red Bull?
24    A.   Yeah.
25    Q.   Did you have any discussions with anyone

## 18

1 else besides Sully about being tired?
2    A.   I brought it up with Jake one time that I
3 was getting tired, and he said he couldn't really do
4 nothing. He said, The hours are how it is. I can't
5 change it, and then I started working as a prep cook
6 in the mornings from, like, nine to four or five.
7    Q.   You did?
8    A.   Yeah. I started doing prep, yeah.
9    Q.   When did you start doing that?
10    A.   Late July.
11    Q.   And on those days that you prep cooked, you
12 didn't also act as a dishwasher, though? You just
13 prep cooked those days?
14    A.   I'd prep cook and then dish wash at the end.
15    Q.   Did you always clock in and out every day
16 that you worked?
17    A.   Yeah. If I forgot, Jessie would manually
18 add it in.
19    Q.   Do you know on the day of this accident --
20 do you remember whether you actually clocked in that
21 day or somebody put your time in for you?
22    A.   I clocked in.
23    Q.   The same for clocking out? Do you remember
24 if you were the one who clocked out?
25    A.   Yes.

## 19

1    Q.   When you mentioned that you were tired to
2 Sully or Jake, how were you getting to work those
3 days?
4    A.   My mother would drive me in at four, and
5 then she would usually pick me up.
6    Q.   How often did you ride either to work or
7 from work with Noah?
8    A.   I road with Noah about, I think, a total of
9 three times. He was one of my best friends at the
10 time.
11    Q.   So did you start riding with Noah there in
12 late August before the accident?
13    A.   I rode with him once in June and then, I
14 think, twice in August. Those were times that my mom
15 wasn't able to pick me up. Either it was -- sometimes
16 it was so late that I'd call and she wouldn't answer,
17 so I'd ride home with Noah.
18    Q.   Do you remember that day of the accident
19 whether you tried to call your mom to come give you a
20 ride?
21    A.   Actually, I talked to her about going home
22 with Noah because I was -- it was about close --
23 really, really close to one a.m. when I called her,
24 and she was -- she didn't pick up. I called her
25 again, and she picked up, and I could tell she was

## 20

1 tired, and I was, like, you know, I'll just ride home
2 with Noah. You don't have to pick me up. She
3 insisted she would, and I pretty much said, No.
4 That's okay. Noah can drive me home. We're fine, and
5 she went back to bed.
6    Q.   All right. Did you call her from your cell
7 phone or from a phone there at the restaurant? Do you
8 remember?
9    A.   Phone at the restaurant.
10    Q.   After you clocked out -- the sheet I have
11 shows that you clocked out at twelve-fifty a.m.
12    A.   Uh-huh.
13    Q.   Do you remember exactly how long it was
14 before you called your mom to see if she could come
15 give you a ride?
16    A.   I called her exactly right after I clocked
17 out.
18    Q.   So within a minute or two?
19    A.   Uh-huh.
20    Q.   Is that a "Yes"?
21    A.   Yes. Sorry.
22    Q.   No. You're all right.
23       Had you already discussed with Noah at that
24 point getting a ride with him?
25    A.   Yes.

21

1   Q.  Well, let me back up. Before you called
2 your mom, had you talked with Noah about getting a
3 ride with him --
4   A.  Yes.
5   Q.  -- or did you --
6   A.  Yeah. We -- you know, we were dishwashing
7 for a while, and so we'd talked. I was saying, Why
8 don't I just ride home. So he offered, and I said,
9 yeah.
10   Q.  So when you called your mom, was it more to
11 tell her that you were catching a ride with Noah?
12   A.  I'd say -- well, since I was 15, I was,
13 like -- I just -- I made my, like, own decision. I
14 was, like, All right, Noah. I'm going to just call my
15 mom and let her know, and I said, Hey, Mom, I'm going
16 to ride home with Noah. Like, you don't need to go.
17     It took me two calls to -- two times to call
18 her, and she was tired. I was, like, Mom, just go to
19 bed, and I'll ride home with Noah. He's a good
20 driver. Yeah.
21   Q.  All right. After you talked with your mom,
22 how long did it take you and Noah, then, to get out to
23 your car -- or, to Noah's car? Excuse me.
24   A.  We went out. We double checked the kitchen.
25 I got our clothes out of the lockers, and we talked to

22

1 the assistant manager that night. I think his name
2 was Dan. It's hard to remember his name. He was --
3 he'd just started, like, two weeks before the wreck,
4 and so we didn't really get to know him that much. So
5 he was -- instead of Jessie staying at night, he would
6 start staying at night sometimes, so he was the one
7 who managed that night.
8   Q.  Do you remember whether Jessie was there
9 that night?
10   A.  Yeah. He was. He left about when the chefs
11 left.
12   Q.  Do you remember about what time the chefs
13 leave?
14   A.  Ten to -- ten to eleven, around there,
15 because I think the kitchen closes at ten, and then
16 they, like, pack up a little bit of stuff, and we
17 clean the rest.
18   Q.  After you grabbed your clothes out of -- did
19 you have them in a locker --
20   A.  Yeah.
21   Q.  -- or where did you have them?
22   A.  We had a locker in the far back where the
23 walk-in is.
24   Q.  Did you change into different clothes, or
25 did you just pick them up to grab them and throw them

23

1 in the car?
2   A.  Picked them up and put our coat on, the same
3 clothes we wore.
4   Q.  I know the time sheet we have shows that
5 Noah clocks out at about two minutes after you at
6 twelve fifty-two a.m.
7   A.  Yes.
8   Q.  Does that sound about right?
9   A.  Uh-huh.
10   Q.  Then how long did it take you and Noah,
11 then, after you visited with Dan there for a second,
12 to grab your clothes --
13     MR. BLIVEN: I'm going to object. He didn't
14 say "For a second."
15 BY MR. COCKRELL:
16   Q.  You didn't say "For a second." How long --
17     MR. BLIVEN: He didn't really discuss it.
18 BY MR. COCKRELL:
19   Q.  How long did you visit --
20   A.  We visited with Dan for about ten minutes.
21   Q.  What did you talk about with Dan for
22 ten minutes?
23   A.  We talked about how school was a concern and
24 how our schedule is because he didn't know our
25 schedule at the time, and as far as I can remember, he

24

1 was telling us, like -- because we wanted to get to
2 know him more since he was new there, I think he was
3 just telling us about where he grew up, I guess. It's
4 hard to remember.
5   Q.  Do you remember where he said he grew up?
6   A.  No.
7   Q.  Anybody there while -- was it both you and
8 Noah talking with Dan?
9   A.  Yeah. We sat out on the benches while he
10 had a cigarette.
11   Q.  Anybody there besides just the three of you?
12   A.  No. Just me, Noah and Dan, I'm going to
13 call him. I can't remember his exact name.
14   Q.  That's fine. That's okay.
15   A.  Okay.
16   Q.  So after you and Noah spoke with Dan, had
17 you already grabbed your clothes, or did you have to
18 go back in to grab your clothes?
19   A.  We grabbed our clothes, and then Dan locked
20 up and shut the lights off and all that.
21   Q.  Let me try again. My question wasn't very
22 good.
23     You and Noah and Dan are sitting on a bench
24 talking?
25   A.  Yes.

**25**

1  Q.  Did you already have your clothes, or did
2  you have to go back in the restaurant to grab your
3  clothes?
4  A.  We had our clothes.
5  Q.  All right.  Did you then just go, after that
6  conversation, then, straight to Noah's car, or did you
7  do something else in between?
8  A.  We went to Noah's car.
9  Q.  So what time do you think you and Noah left?
10  A.  Around one, one-oh-five, one-ten.
11  Q.  Okay.  And did you guys then just exit right
12  out of the restaurant parking lot and head away from
13  Whitefish on 93 towards your house?
14  A.  Yes, sir.
15  Q.  Did you stop anyplace in between the
16  restaurant and where the accident happened?
17  A.  No.
18  Q.  Did you take any turnoffs on different roads
19  or anything?
20  A.  No.
21  Q.  Do you remember where the accident was?  You
22  know, there's a road, Beaver Lake, that comes in --
23  A.  Beaver Lake Road.  Yeah.
24  Q.  Was your accident right there, just about
25  the intersection of Beaver Lake Road and 93, or was it

**26**

1  past the Beaver Lake --
2  A.  It was past Beaver Lake Road a little bit.
3  From what I remember, there's a sign just before
4  Beaver Lake, and I remember seeing that before we
5  wrecked, and our car ended up on the left side of the
6  road past Beaver Lake Road.
7  Q.  The highway patrol report shows that Noah
8  went off the right-hand side of the road, then hit a
9  sign, came back on the highway, rolled over, and then
10  you guys end up on the left-hand side?
11  A.  Yes.
12  Q.  Do you remember whether the road was curvy
13  right there where Noah went off the road?
14  A.  I can't remember.
15  Q.  Do you remember approximately how far past
16  the Beaver Lake/Highway 93 intersection the accident
17  was?
18  A.  The last I remember -- if you've been out
19  there, you know the Beaver Lake -- the little fishing
20  sign right there just before Beaver Lake Road?
21  Q.  Yes.
22  A.  That's the last sign I remember, and then
23  the lights of the car pretty much went out.  Yeah.
24  Q.  When you and Noah were driving out there,
25  were you guys listening to the radio, visiting, or

**27**

1  what were you doing?
2  A.  We were having a chat.  We didn't have the
3  radio on.
4  THE REPORTER:  I'm sorry?
5  BY MR. COCKRELL:
6  Q.  Did not have the radio --
7  A.  No, we did not have the radio on.
8  Q.  You were just having a chat.
9  A.  Yeah.
10  Q.  Were you both awake?
11  A.  Yeah.  Just before the wreck, we -- there
12  was, like, three minutes of silence just before.  We
13  kind of were just -- didn't have nothing else to talk
14  about or something.  I was looking out the window.  So
15  that's all.  The last thing I remember is looking
16  forward and the Beaver Lake Road sign, and then the
17  car rolled.
18  Q.  Do you know --
19  A.  It happened so fast, so I can't remember
20  exact details of where exactly we were.  That's all I
21  can remember.  Then my mom says that we were over
22  here.  I'm, like, But I remember the sign, So I don't
23  know how far the car traveled from there.
24  Q.  Okay.  Do you remember whether Noah was
25  speeding or how fast he was driving?

**28**

1  A.  He was going around 45 around the curves and
2  50 on long stretches.
3  Q.  Do you know what caused him to go off the
4  road?
5  A.  No.  Just we -- I don't know.  It wasn't
6  really -- I figured he -- the three minutes of not
7  talking, I think he might have just gotten a little
8  bit sleepy since there was no talking and it was a
9  long stretch.  That's all I could think of since --
10  that's about it, all I can remember.
11  Q.  Did Noah act tired before you guys left the
12  restaurant, like was he sleepy?  Was he yawning or
13  anything?
14  A.  We were yawning, and we had to, like,
15  stretch and all that.  Tired.  It was a pretty busy
16  night.
17  Q.  How long would it be typically from the
18  restaurant to your house?  How long a drive is that?
19  A.  From the restaurant to my house?
20  Q.  To your house, yes.
21  A.  Eight to ten minutes.
22  Q.  And from the restaurant out to where you
23  guys had the accident, about how long is that?
24  A.  About five and a half minutes.
25  Q.  Have you driven it and timed it since the

29

1  accident?
2     A.  Yes, sir.
3     Q.  When did you do that, Skylar?
4     A.  Two weeks ago or about a week ago.  It was
5  around there.
6     Q.  Was that just so that you'd have an idea so
7  that when you got ready to talk to me you'd know about
8  how long it was?
9     A.  Yeah.  We wanted to make sure it was,
10  like -- well, my mom pulled over, and she asked me to
11  time it.  So we timed it, and it took about five and a
12  half minutes.
13     Q.  So did you guys -- to do that timing, did
14  you just back up into the parking lot --
15     A.  Uh-huh.
16     Q.  -- at the restaurant --
17     A.  We pulled in, and then we just pulled out.
18     Q.  Okay.  So you back up in the parking lot,
19  pull out and then just go the regular speed limit --
20     A.  Yes.
21     Q.  -- out there to the accident site?
22     A.  (Witness nodded head.)
23     Q.  And did you and Noah drink anything, any
24  alcohol before --
25     A.  No, sir.

30

1     Q.  Did you drink any alcohol --
2        MR. BLIVEN:  Let him finish the question.
3  BY MR. COCKRELL:
4     Q.  Let me break it up here.  Drink any alcohol
5  while you were working that night at the restaurant?
6     A.  No, sir.
7     Q.  And then after you and Noah got in his car
8  to head home, did you drink any alcohol?
9     A.  No.
10     Q.  Did you guys smoke any pot or anything?
11     A.  No.
12     Q.  Do you know whether Noah had been smoking
13  any pot?
14     A.  I do not know.
15     Q.  When you guys worked at the restaurant
16  there, were you and Noah kind of in the same work
17  area?
18     A.  Uh-huh.
19     Q.  So you would have been able to see if he was
20  exiting -- when you took breaks, did you guys take
21  them at the same time or different times?
22     A.  We took them about five minutes each, so I'd
23  go out and he'd go out.
24     Q.  Because somebody had to be back there?  It
25  was just you two that were the dishwashers?

31

1     A.  Yes.  Right.
2     Q.  All right.  Do you remember, Skylar,
3  whether -- when the accident happened, were you still
4  looking out the window, or had you turned to look back
5  down the road?
6     A.  I was still looking out the window.  The
7  last time -- the reason why I looked forward is
8  because he -- I could hear the gravel, and then I
9  looked forward, and there was the sign, and then from
10  there we screamed, and the car rolled.
11     Q.  Anything else you can remember about what
12  you and Noah did from the time that you guys clocked
13  out to the time you got in the car besides visiting
14  with Dan for roughly ten minutes or so, getting your
15  clothes?  Did you do anything else at all?
16     A.  Like I said before, we double checked the
17  kitchen as we were walking and went outside and
18  stretched.  That's all I can remember.  And talked to
19  Dan.
20     Q.  I think you said you visited with Noah or
21  rode with Noah maybe three times total?
22     A.  Hmm?
23     Q.  You had rode with Noah roughly --
24     A.  Yes.
25     Q.  -- three times total?  Do you remember

32

1  whether he had any problems driving on those other two
2  times?
3     A.  No.  Not at all.
4     Q.  And this time when he was driving, was he
5  going off onto the shoulder or anything, or just this
6  one instance when you guys had the accident?
7     A.  He was going off, like, kind of -- I had to
8  say, Hey, Noah, watch out a little bit.  On Spencer
9  Lake Road, on the long stretch down, he -- on the turn
10  he was kind of going into the gravel a little bit, and
11  I said, Hey, scoot over a little bit.  You know, like,
12  you would say in the car, like, Hey, you know, like my
13  mom does once in a while.  So yeah.
14     Q.  Do you drive now?
15     A.  Yes, sir.
16     Q.  Did you get -- when did you get your
17  driver's license?
18     A.  A year ago this December.
19     Q.  Do you remember whether you were alert
20  enough to make any conversations with the highway
21  patrol or the people who showed up at the accident
22  site before you got put in the ambulance?
23     A.  I didn't get to talk to any of them.  The
24  only people I was talking to was the lady who came to
25  help and the ambulance men that were trying to pull

33

1 the door off. They were just telling me to stay awake
2 because I was pretty tired, I guess, like, trying to
3 sleep, but they wanted to keep me awake.
4  Q.  Do you remember whether you banged your head
5 around in the car?
6  A.  No. My head and my left arm were completely
7 untouched.
8  Q.  And then I know from some of the documents
9 that Mr. Bliven gave me that you had a couple of jobs,
10 one at Pin and Cue and then another at Shopko.
11  A.  Yes.
12  Q.  How long did you -- which one did you have
13 first, Pin and Cue or Shopko?
14  A.  Pin and Cue.
15  Q.  How long did you work there?
16  A.  Two weeks.
17  Q.  Do you remember what two weeks you worked at
18 Pin and Cue?
19  A.  Of the -- like, what month?
20  Q.  Yeah. What year? I mean, how long after
21 this accident?
22  A.  2016 or -- I think it was 2017. Yes. It
23 was 2017. No. I'm sorry. 2016.
24  Q.  Okay.
25  A.  It's on my taxes. I believe it was 2016. I

34

1 worked there in July or June, between those. I worked
2 there for about two weeks and had to stop because of
3 my leg.
4  Q.  And then you said you had to stop because of
5 your leg?
6  A.  Yes.
7  Q.  Okay. I didn't hear you.
8  What were you doing? When you worked at Pin
9 and Cue, what was your job?
10  A.  I was the bowling alley attendant. I would
11 stand up at the front and, you know, assign people to
12 bowling alleys. If a ball got stuck, I would go to
13 the back, get the ball unstuck, and if a machine
14 breaks down, you'd have to kind of repair it, sort of.
15  Q.  Were you in a wheelchair then, when you
16 worked at Pin and Cue?
17  A.  No.
18  Q.  Did you have your prosthetic?
19  A.  I had my prosthetic leg.
20  Q.  Why did you quit?
21  A.  So my prosthetic leg, I was working on it
22 too hard. It wasn't really too much of a sit job, and
23 I'd just got out of therapy with it for the summer. I
24 was -- they allowed me to take the summer off, enjoy
25 it, and I wasn't too ready to have a job, and I put

35

1 too much stress on in.
2  And I get sores, and if you get sores, they
3 just keep breaking and opening, and they can get
4 infected. So you've got to stop wearing the leg, and
5 it hurts. It's pretty awkward, and it hurts a lot
6 when you're walking on it when there's sores.
7  I had to tell the manager there or the --
8 what was his name? I can't remember his name, but I
9 know the owner, Mack. I just -- they kind of just
10 didn't really contact me after that. I told him I had
11 to take a break and stop. I pretty much -- yeah. So
12 I just kind of quit, I guess.
13  Q.  Then when did you go to work at Shopko?
14  A.  I worked at Shopko October 3rd -- about
15 October 1st or around October -- in October, that
16 month. I worked there, and then I had to quit in, I
17 think, about the beginning of January, towards the
18 end.
19  Q.  So you worked there a couple of months?
20  A.  Uh-huh.
21  Q.  Two or three months?
22  A.  Uh-huh.
23  Q.  Do you remember whether that was also in
24 2016, or was that later?
25  A.  That was in 2017.

36

1  Q.  2017?
2  A.  Yes.
3  Q.  And did you tell me Pin and Cue was 2017
4 also?
5  A.  Pin and Cue was 2016. I remember waiting a
6 year after.
7  Q.  Okay. Have you had any other jobs besides
8 the one at Pin and Cue and then at Shopko?
9  A.  I tried working at a fireworks stand just to
10 make a few bucks, and that went all right. It was
11 pretty hot there, and there's no sitting at all. So I
12 had to stand on my leg for a good eight, seven and a
13 half hours, because you get one break, 30-minute
14 break, I believe.
15  Q.  Were you doing that at one of those
16 fireworks stands around Whitefish?
17  A.  Just the one just outside of Whitefish.
18 It's the one that -- the Black Widow one.
19  Q.  The one just past Highway 40?
20  A.  Yes.
21  Q.  And any other jobs besides those three?
22  A.  No.
23  Q.  And do you remember when you did the
24 fireworks stand job?
25  A.  I can't remember what year. My best would

**37**

1  say 2015 or -- no, because I didn't have my leg then,
2  2016.
3      Q.  So did you do the fireworks stand job before
4  Shopko?
5      A.  Yes.
6      Q.  What did you do while you worked at Shopko?
7      A.  I was just a cashier there up at the front.
8      Q.  And when you worked there, were you using
9  your prosthetic leg, or were you in a wheelchair?
10     A.  Wheelchair.
11     Q.  And what caused you to leave that job?
12     A.  I wanted to get back on my leg so -- and to
13  do physical therapy I needed to do -- at least have a
14  whole week open.  So I told them -- I asked them -- I
15  put my two weeks in, did my two weeks and went to
16  physical therapy to get back on my leg because I had
17  my leg fitted for me in about December or January, and
18  it took about a month for them to get the leg back,
19  and during that time, I gained, like, ten pounds, and
20  that ten pounds made a huge difference.  I couldn't
21  get on the leg.
22         I got on at Shopko, and I had pants on, and
23  I sat down, and yeah.  It's -- it didn't really work
24  out.  I had personal issues with customers.
25     Q.  Let me kind of walk through the sequence

**38**

1  here.  The accident is in August, August 31, 2014.
2      A.  Uh-huh.
3      Q.  And I know you were in the hospital for a
4  couple of months.
5      A.  Yes.
6      Q.  Do you remember when you first got fit for
7  the prosthetic leg?
8      A.  I got fit for it probably in 2015, early
9  2015.
10     Q.  Like, in the spring sometime?
11     A.  About spring, and I got my leg in the summer
12  of 2015.
13     Q.  And did you get fit for your leg with the --
14     A.  Northern Care Prosthetics here in Kalispell.
15     Q.  Okay.  And at the time they fit you with the
16  leg, do they kind of go over how to use your leg, how
17  to take it on and off, that sort of thing?
18     A.  Yes.
19     Q.  And how do they go about fitting you for a
20  prosthetic leg?
21     A.  So what they do is they have you -- there's
22  two parallel bars.  You stand up, and they get -- I
23  don't even know what the material is called, but they
24  get that.  It's almost like making a bowl in art class
25  where you get water and you -- it hardens up like that

**39**

1  on the leg.
2         They take it off, and they pretty much put a
3  plastic, like, mold around it, and they ship that over
4  to a company that makes the prosthetic, and they get
5  the whole case over, and it comes back in.
6      Q.  And then once it came back in -- you said it
7  took about a month for them to get it back -- do they
8  then fit it and make sure it fits okay?
9      A.  The month before I got it back, that was
10  in -- that was this year.  I've had --
11     Q.  Let me just kind of walk through the
12  sequence there.  I just want to kind of go through it.
13         You first think you got your prosthetic leg
14  in the spring or early summer of 2015?
15     A.  Uh-huh.
16     Q.  Is that a "Yes"?
17     A.  Yes.  Sorry.
18     Q.  That's all right.
19         And did Northern Care fit you for the leg at
20  that point in time?
21     A.  Yes.
22     Q.  Have you had any kind of weight gain at that
23  point?
24     A.  Yes.
25     Q.  And did you discuss your weight gain with

**40**

1  Northern Care?
2      A.  Yes.
3      Q.  Did they make any changes to your prosthetic
4  as a result?
5      A.  No.  They -- in 2015 I wasn't gaining too
6  much weight.  I was just at a nice, solid 200, 220,
7  and I had my leg.  I got on that, and I went to an
8  amputation -- amputee camp.  That was when I first had
9  it.
10         Since then, the leg was -- a lot of problems
11  with it off and on.  It would get too sore.  Gaining
12  weight from just depression and no lack of motivation,
13  we had to -- I couldn't wear the leg for a little bit
14  and --
15     Q.  When did you go to the amputee camp, and
16  where was it?
17     A.  In Ohio.  I went there 2015, the same year.
18     Q.  In the summer?
19     A.  Yes.  It was in July.
20     Q.  How long of a camp is that?
21     A.  One week.
22     Q.  What did you do there?
23     A.  Just, like -- it's almost like a rehab,
24  pretty much.  You learn a bunch of stuff.  It's just
25  activities, so it's like a camp for -- it's like if

you just had both your legs and you'd do activities,
do whatever, just like that, swimming activities --
a lot of the ones I couldn't do because I wasn't
agile -- I was brand-new on it -- like running and all
that.

Q. Was the purpose of that camp to kind of help
you get used to using a prosthetic leg?

A. It was more of help to cope with it, like
see how other people do with it and how they manage to
get better. Just to be around people that are pretty
much the same instead of, like -- because a lot of
people usually would stare and stuff. When you're
there, it's just like -- it's just nice.

Q. Everybody has got one --

A. Yes.

Q. -- or two --

A. Exactly. Yes.

Q. Have you been to any other camps besides
that one to kind of work on how to use your prosthetic
leg?

A. No. I didn't even want to go the second
year. I had so much weight gain, and I was just
self-conscious. My self-consciousness has risen (sic)
way up, and I just did not want to go because I didn't
want to -- my leg, it really wouldn't -- it didn't

really fit as well, so I was kind of going there with
crutches this time, and it was just -- I don't know.

It was okay. We didn't really -- it wasn't
that, you know, fun. I was kind of depressed at the
time, so --

Q. Once you got fit with your prosthetic leg
with Northern Care, did they have you on any kind of
schedule where you came back to readjust it or make
readjustments to it or how to use it or anything?

A. They had schedules. They had me call if
anything was wrong with it, so we'd just make a
schedule instantly. Other than that, there wasn't
really no, like, schedule. They weren't really
therapy. They just design the leg and get it adjusted
for you, and then you go to PT and stuff and pretty
much, you know, get used to the leg.

Q. All right. Do they assign you to PT and
help you get set up for it?

A. No. They -- like, I think all they do is
just make the leg for you and then -- yeah.

Q. How many times have you been back to
Northern Care once they originally fit you with your
leg there in the spring or summer of 2015? How many
times have you been back?

A. For -- to readjust it, or how many times --

Q. Yeah, to readjust it, or anytime, for
anything.

A. From 2015 to now?

Q. To now, yeah.

A. At least 20 times.

Q. And what were the purposes of those roughly
20 times back?

A. The 2015 was having to -- because the leg we
had was a Rheo knee, and it had a memory on how you
walk.

Q. I'm sorry. I apologize. You said it was a
what?

A. A Rheo knee.

Q. A Rheo knee.

A. That's the company that makes it, and it
memorizes how you walk, and we had to go back there a
couple times to calibrate it and to make sure it's --
it's got, like, a memory of how I walk and, you know,
to resist the weight. Like, if I lean on it, it won't
collapse. So I had to go back there a few times for
that, about five times.

And after that, we -- I would go back for
issues that it was starting to hurt, and I just didn't
realize at the time I was just gaining weight
passively and just -- and then he would --

Pretty much around 2016, 2017 I realized --
you know, I showed him -- because I had a bunch of
bruises and marks and scars from the leg, from sores
and stuff, and he said, Yeah. This is definitely
because of the weight. So we got the new leg
assigned. This was when -- during Shopko.

We got the new leg assigned, and it fit, and
then I couldn't wear it -- since I was working, I
didn't -- I tried it two times when I worked. One
time I fell on it. The second time I was sitting, and
customers were, like, Wow, you're pretty lazy. You're
not doing nothing, because they couldn't see I had a
prosthetic leg.

So I kind of got pretty depressed about
that. I had to just go home that day. I was just sad
about that. I was just, like, Wow. It's just screwed
up how people can just do that.

I stopped wearing the leg for that period,
for about two months, and I gained a few pounds,
about, I think it was, 10 to 20. I went back into
Doug's because I wanted to get back on the leg, and he
told me they can't adjust the new leg so I have to
lose the weight, and that's what I'm doing now.

Q. So how much do you weigh now, Skylar?

A. I weigh 350.

45

1   Q.  350?
2   A.  Uh-huh.
3   Q.  That's a "Yes"?
4   A.  Yes. Sorry.
5   Q.  Has Doug -- is it Doug Jack?
6   A.  Yes.
7   Q.  Has Doug told you how much weight you need
8 to lose?
9   A.  The last time I seen him I weighed 340, and
10 I needed to lose 20 pounds, so now I need to lose 30.
11   Q.  All right. Did he give you any kind of
12 schedule or any activities on how to lose the weight?
13   A.  Yes.
14   Q.  What are you supposed to do?
15   A.  He referred me to Dr. Zeider. She's the
16 one -- I've already known her. She was the one who
17 had to approve to get the prosthetic leg, and she
18 referred me to Journey to Wellness, and Doug was
19 telling me about that, that she wanted me to try
20 Journey to Wellness.
21     She gave me a referral because the only way
22 to get into that is by a doctor's referral, and I went
23 to orientation, and it went well. It pretty much
24 helps -- there's so many resources. Like, there's
25 cooking classes, and it's not just for weight.

46

1 There's classes that you can pick. So there's weight
2 training. They teach you how to shop at -- like, what
3 to buy, what to avoid and stuff. We went to that
4 Wednesday.
5     Yeah. Journey to Wellness is going pretty
6 good. I just started doing it.
7   Q.  When did you start?
8   A.  Two weeks ago.
9   Q.  And where is Journey to Wellness?
10   A.  Summit, at The Summit in Kalispell, Montana.
11   Q.  At The Summit in Kalispell?
12   A.  Yes.
13   Q.  Who do you work with over there?
14   A.  My mentor is Jude.
15   Q.  Jude?
16   A.  Yes. I don't know his last name.
17   Q.  Is there a schedule that you go every day?
18   A.  You can pick any time you want to go.
19 There's a schedule of events, I guess you could say.
20 Like, there's pickleball on Mondays, which I plan on
21 going. My mentor does the pickleball. There's basic
22 training and -- basic training like training for
23 rookies. So I plan on going to a lot of those.
24   Q.  Do you go every day? How many times have
25 you been in the last two weeks?

47

1   A.  I've been in there twice in the last two
2 weeks. Jude had me set up a schedule. The last --
3 the first week was just scheduling and orientation.
4 This is the second week now. I was going Monday, but
5 I had appointments Monday. I was going to go do
6 pickleball this week. Then Wednesday and Thursday and
7 all that, that's, like, yoga and stuff, so -- but you
8 can go in just to do whatever you want because they
9 give you a pass.
10   Q.  Has Jude set up any kind of program of
11 activities for you to do on this Journey to Wellness?
12   A.  What they -- their thing is, they don't like
13 to tell you what to do. They ask you what you want to
14 do and your goals, and I pretty much -- he helped me
15 figure out what to do. Like, he said, Try out basic
16 training. You could -- you know, pickleball, I asked
17 him what that was. You just pretty much ask, What are
18 these? What are these? He'd let you know.
19     We made a goal. Like, I will come in at
20 least once a week, and that's a two-week goal.
21 There's a one-month goal, which is a -- you know, you
22 make the goals. I can't remember exactly. I think I
23 made a goal to -- because there's an eating healthier
24 one. There's a nutritionist there that you can see.
25 Then they've got a three-month goal and a one-year

48

1 goal.
2     It's only a three-month program. The
3 one-year goal is to see how you're doing at one year.
4   Q.  It's a checkup, basically, at one year?
5   A.  Yes.
6   Q.  Is it a written outline of what your goals
7 are?
8   A.  Yeah.
9   Q.  And you have to fill that out, or do they
10 fill it out for you?
11   A.  I filled it out.
12   Q.  What kind of activities did you identify
13 besides pickleball?
14   A.  Like, the basic training, which is machines.
15 You work on machines, and there's, like, a big old
16 course they assign you to, like, to see what you can
17 do on the machines. Like, I can't really do, like,
18 certain machines that involve both legs or something,
19 and since I'm not as mobile right now, I'm stuck with,
20 like, sitting machines almost.
21     And then the training for rookies is a
22 cardio class, which I can do, but, like, with machines
23 that -- to get your heart rate up, mainly, like, bike
24 machines, treadmills. Obviously, I can't do the
25 treadmill, but, like, the sitting down biking ones.

**49**

1  You just get your heart rate up, and it's just really
2  good cardio for you.
3      Q.  When you're doing the sitting down biking
4  one, are you doing it with one leg, or do you have on
5  your prosthetic?
6      A.  One leg. I can't fit into the prosthetic
7  currently.
8      Q.  All right. And then on the other
9  machines -- you said sit-down machines -- are those
10  upper body for weightlifting?
11      A.  For basic training, yes. Like your core,
12  your upper body, pretty much about those, but not just
13  those machines. Like, there's ones that work out your
14  legs like -- some of those I can fit one leg in, but
15  yeah.
16      Q.  How do you get down there? Do you drive
17  yourself, or does somebody drive you?
18      A.  We only have two cars right now, so it's
19  kind of -- you know, I've got to --
20      Q.  So hit and miss?
21      A.  Yes. I can go down there whenever we
22  usually go down. We have a lot of appointments, so we
23  can usually go down there quite a bit. I went down
24  there when we picked up my cousin, my little cousin.
25  She's three. I worked out for about an hour.

**50**

1      Q.  And you've been twice, you said, since this
2  started at Journey to Wellness?
3      A.  Yes.
4      Q.  As a part of your goal, does it pick up, the
5  schedule, to more than once a week?
6      A.  Yes.
7      Q.  And what are you supposed to be, if you can
8  remember, at the end of three months, how many times?
9      A.  Our goal was to eat healthier. Like, we saw
10  the nutritionist. She showed us, like, what to look
11  out for and stuff. Then another one would be to be on
12  the leg before the end of November and to be -- to
13  lose weight. We didn't set a goal for exactly what,
14  just to lose weight. Pretty much just overall self-
15  confidence up, like, good.
16      Q.  Do you think it's helping you --
17      A.  Yes.
18      Q.  -- self-confidencewise?
19      A.  Yes.
20      Q.  Is there another appointment scheduled with
21  the nutritionist to see how you're doing or for him or
22  her -- I don't know which it is -- to make
23  recommendations?
24      A.  We get one free session with her, so we're
25  going to probably make that around in the middle, see

**51**

1  how we're doing, or we can see her any time. We've
2  just got to give her a call, and whenever she's
3  available.
4      Q.  Does anybody go with you from home to these
5  sessions at Journey to Wellness, or are you just by
6  yourself?
7      A.  Usually my mom.
8      Q.  Are you having any other kind of treatment?
9  Do you do physical therapy, for example, right now?
10      A.  We stopped physical therapy to do Journey to
11  Wellness because physical therapy was getting -- with
12  the timing and all that and my mom working, it didn't
13  work out, so --
14      Q.  Where were you doing PT?
15      A.  At -- right where my -- right where Dr. Muir
16  is, my -- I don't know the exact place. I think it's
17  called Northern Sports Center, Sports and Center or
18  something like that. It's right behind the Whitefish
19  hospital.
20      Q.  How long were you doing physical therapy
21  before you quit?
22      A.  I did that for about, I would say, three
23  months, maybe.
24      Q.  So that would have been roughly this summer,
25  early fall?

**52**

1      A.  Uh-huh.
2      Q.  And after the accident, between the time of
3  the accident and this summer, early fall, have you had
4  physical therapy anyplace else besides --
5      A.  Yes.
6      Q.  -- behind the Whitefish hospital? Where
7  else?
8      A.  I did physical therapy for two years at
9  The Wave. That was where we pretty much got from
10  being a fish up to land, because we started out in the
11  water. My muscles were really weak at the time. We
12  gradually went up to there, up to getting up on land,
13  technically, and yeah. They helped out a lot, a lot.
14      Q.  So do you mean by getting up on land you
15  would have been on crutches and all that,
16      A.  Yes. Yes. And on crutches and all that,
17  because I was so weak I couldn't do nothing. They had
18  to work my muscles to get stronger in the water.
19      Q.  Has anybody, like Dr. Muir or Dr. Zeider,
20  prescribed any physical therapy to go along with your
21  work at Journey to Wellness?
22      A.  No. I don't think Dr. Muir -- I think he
23  can refer -- like, tell me about it, but I don't think
24  he can, like, assign me to it, like, give them a note.
25  I have had -- like, Dr. Erickson, who is my family

53

1 doctor, he's the one who allowed me to do physical
2 therapy at The Wave and all that.
3    Q.   Is that Dr. Erickson in Whitefish?
4    A.   Yes.  And then I did about a year of
5 physical therapy at The Summit.  This was when I was
6 also -- I had -- this is when, like, school was a
7 thing too.  We'd go to physical therapy at The Wave,
8 and then we'd go to The Summit, who is -- I worked
9 with Beth Gunlikson.  She specializes in prosthetics,
10 actually, so it was pretty cool.  She actually knew
11 what she was doing, and she helped a lot.
12    Q.   Was Beth Gunlikson at The Summit or
13 The Wave?
14    A.   Summit.
15    Q.   So were you doing The Summit and The Wave at
16 the same time?
17    A.   Yes.  Not on the same day, but during the
18 same time, yes.
19    Q.   Same time period.  And how long did you do
20 both The Wave and The Summit?
21    A.   I did The Summit, if I remember exactly,
22 about a year.
23    Q.   Do you remember which year you were at
24 The Summit?
25    A.   I want to say 2016.

54

1    Q.   And did you say that you did The Wave
2 roughly two years?
3    A.   Yes.
4    Q.   So did you do The Wave 2016 and 2017, or do
5 you remember when you did it?
6    A.   2015 to almost 2017 or around there.
7    Q.   Okay.  That's fine.  What did you do between
8 after you had finished up at The Wave and just
9 starting this Journey to Wellness?  Were you in
10 physical therapy or --
11    A.   So when I stopped doing it at The Wave and
12 The Summit -- it all kind of went downhill when, for
13 the summer of -- it's so hard to remember.  I can't
14 remember exactly when this all was.  2015 I was at
15 The Wave.  I'm trying to just jog my memory.
16    Q.   That's all right.
17    A.   I stopped doing The Wave at the end of 2016
18 or just beginning of 2017, and then from then on --
19 because Beth also wanted me to go in for the summer of
20 2016.  So I didn't have no physical therapy that whole
21 summer, and I was actually doing really good on my
22 leg.  I was on my leg for two weeks consecutively,
23 like on it every single morning.  I threw the
24 wheelchair out, you know, got on the leg every day,
25 and then just got hit with depression.

55

1    Q.   Would you be on your leg all day long?
2    A.   Yes.
3    Q.   And so physically-wise, what have you done
4 after you finished up at The Wave in late '16 or early
5 '17 until now?
6    A.   We -- for the leg, like, for that summer, I
7 was on it for a lot.  Physically, we went swimming
8 a lot, and then from then on, I kind of just got
9 depressed and didn't want to do nothing, and I didn't
10 really have much support for, like, physical
11 therapywise, because in Whitefish I stopped there
12 because they -- the carer there noticed I was getting
13 depressed more, and she wanted me to go to Pathways,
14 and I was just, like -- I didn't want to do that.
15    Q.   Who was that person?
16    A.   Kim.
17    Q.   Kim --
18    A.   I can't remember her last name, but yeah.
19 She wanted me to head Pathways or something because I
20 didn't want to do therapy that one day, and I kind of
21 just -- you know, kind of just stopped.  I found --
22 and then I was still going with Beth, though, because
23 Beth was always, like -- she was always supportive
24 about it, and yeah.  She was actually the therapist
25 who showed me how to run for the first time.

56

1    Q.   Do you see Beth at all now?
2    A.   No.
3    Q.   And where did Beth work?
4    A.   Summit.
5    Q.   Summit?
6    A.   Uh-huh.
7    Q.   As part of your Journey to Wellness program,
8 are you able to schedule appointments with her, or do
9 you know?
10    A.   I probably could.  We'd have to see with
11 Medicaid to redo that.  But it was almost like a
12 graduation, I would say, from physical therapy with
13 her, and then -- yeah.  Then I just kind of, like --
14 we should have -- she thought it would be best to have
15 the summer off, and we kind of just, like, stopped
16 from then on.
17       So if we probably would have stayed -- if
18 she would have called back -- or we should have
19 called, you know.  I don't know.  I just kind of lost
20 motivation.
21    Q.   Do you know why Kim was recommending
22 Pathways?  Because I thought it was a substance abuse
23 place where you --
24    A.   They help with depression --
25    Q.   Okay.

57

1    A.  -- and, like, suicidal thoughts and stuff.
2    Q.  Have you been to actually see anybody for
3  your depression?
4    A.  Yes. That's Dr. Muir and Heidi. They're in
5  the same office. He referred me to her. She's a
6  counselor.
7    Q.  And how often do you go to see Dr. Muir?
8    A.  I see Dr. Muir every one month.
9    Q.  Do you remember when the last time you saw
10  him was?
11    A.  Three weeks ago.
12    Q.  So is your next appointment scheduled with
13  him already?
14    A.  Yes.
15    Q.  Do you know when it's scheduled for?
16    A.  November 14th or something, you know, around
17  there.
18    Q.  Does he do anything for you besides
19  prescribe the medication? Does he have any kind of
20  therapy, or is it a therapy session with --
21    A.  That's what I'm seeing Heidi for now.
22    Q.  All right. And where is Heidi located? Is
23  she in his office?
24    A.  Yeah. She's in the same building. Yeah.
25    Q.  Have they discussed with you any kind of

58

1  schedule on how long you might be with them seeking
2  treatment?
3    A.  I've been with Dr. Muir for almost three
4  years now, and I've been with Heidi -- I just started
5  this year -- for about -- I've seen her for about, I
6  would say, two months now. I see her -- I was seeing
7  her every -- once a week, and it was getting a lot
8  better, and since once a week was kind of, like, too
9  little, we kind of just bumped it out to every two
10  weeks. So I'm seeing her this week, I believe,
11  Thursday.
12    Q.  Like, tomorrow?
13    A.  Is today Wednesday?
14    Q.  I think it is.
15    A.  No. It's Tuesday.
16    Q.  It's Tuesday. All right. Two days from
17  now?
18    A.  Yes.
19    Q.  All right. And do you have any other
20  appointments scheduled with her besides two days from
21  now?
22    A.  With anybody?
23    Q.  With Heidi.
24    A.  No.
25    Q.  Do you have any appointments scheduled with

59

1  anybody else besides Heidi this week?
2    A.  Dentist.
3    Q.  Okay. So what do you do on a typical day?
4  What's your typical day like?
5    A.  Recently it's just been the same thing over
6  and over, and I'm trying to just get rid of it. I
7  just play video games, and I want to get better at
8  that. Not better at that, but get better from it. I
9        I went camping recently, this weekend.
10  Well, last weekend. I just got back from that, and
11  that was actually pretty nice, and I --
12    Q.  Where did you go camping?
13    A.  Up to -- towards Graves Creek, past Graves
14  Creek a little bit, like about five miles from Eureka.
15    Q.  Overnight camping?
16    A.  Yes. Went Friday and came back Sunday.
17    Q.  Who did you go with?
18    A.  My really, really -- by best friend, Skye
19  Major. He wanted to get me out of the house.
20    Q.  What time do you typically get up in the
21  morning?
22    A.  Nine, ten.
23    Q.  And are you able to shower yourself or bathe
24  yourself?
25    A.  Yes.

60

1    Q.  Fix your own meals?
2    A.  Uh-huh.
3    Q.  Is that a "Yes"?
4    A.  Yes.
5    Q.  All right. And then how long do you
6  typically play video games during the day?
7    A.  Up to eight hours.
8    Q.  And do your folks ever suggest to you to do
9  something besides play video games?
10    A.  Yes.
11    Q.  I can imagine.
12    A.  My dad wants -- we're trying to get --
13  because I can't really do much right now, and there's
14  nothing really for me -- I can't go out to the woods
15  or anything in the wheelchair or anything, so that's
16  why we're doing this Journey of Wellness, and we're
17  going there quite a bit. We've had a lot of
18  appointments in the last week or two.
19    Q.  I thought you'd just been to Journey to
20  Wellness twice.
21    A.  Yes. The one appointment was for the
22  grocery store, and the second one for was Jude, and
23  then now we've got -- it was this week, but they have
24  appointments this week.
25    Q.  So how many appointments and with whom do

### 61

you have them this week? I know you mentioned with
Heidi on Thursday.

A. Uh-huh.

Q. Do you have another one with Journey to
Wellness this week, an appointment with it?

A. We were going to do Monday, ten to twelve,
for pickleball.

Q. You were going to or you did?

A. We were going -- well, we couldn't because
we had an appointment with Michael.

Q. All right. And pickleball, what is that?

A. It's like badminton mixed with tennis.

Q. So do you play that from your wheelchair?

A. Uh-huh.

Q. Is that a "Yes"?

A. Yes.

Q. And how long -- have you done it many times,
played pickleball?

A. In school.

Q. But since you've been with Journey to
Wellness, have you done it --

A. No.

Q. -- more than once?

A. No. I haven't done it yet.

Q. You have not done it yet?

### 62

A. No.

Q. So what else do you do in a typical day
after you get up, eat and play video games?

A. If we're -- whatever scheduled appointment
we have or if my dad wants to go out and ride
four-wheeler or something.

Q. Do you ever go ride four-wheelers with your
dad?

A. Yes. He wants to -- that's his way of
wanting to help me out.

Q. Get you outside?

A. Uh-huh.

Q. How often do you and your dad ride
four-wheelers?

A. Not too often. Like, once a month, two,
three times.

Q. When is the last time you can remember doing
it with your dad?

A. Last week.

Q. And how long do you ride?

A. All day.

Q. All day?

A. Uh-huh.

Q. That's a "Yes"?

A. Yes.

### 63

1  Q. Do you ever drive it, or are you always just
2  a passenger?
3  A. I drive it.
4  Q. Do you have your own four-wheeler or --
5  A. Yes.
6  Q. Do you ever go four-wheeling by yourself, or
7  is somebody always with you?
8  A. I'll go four-wheeling by myself once in a
9  while.
10  Q. How often do you go by yourself?
11  A. Not too often. Maybe once a month by
12  myself.
13  Q. Has any doctor said not to go by yourself
14  four-wheeling?
15  A. Dr. Muir. One time I had a really, really
16  bad time, and I wanted to -- yeah. It was a bad
17  night, and I went out on my four-wheeler and came back
18  at, like, ten.
19  Q. Ten at night?
20  A. Yes.
21  Q. Do you do anything besides play video games
22  and four wheel for recreation?
23  A. Yes. We will go hunting on seasonal, or if
24  it's summer, we'll go fishing, or this year they went
25  to Oregon, and I stayed at the house to help, because

### 64

1  my mom was going to hire someone, and I was, like --
2  you know, I wasn't feeling it because I'm
3  self-conscious. I don't want to family to see me.
4  You know, it's bad. So yeah.
5  Q. When is the last time you've gone out
6  fishing?
7  A. The last time. I can't go -- I wouldn't
8  want to go alone, so the last time I went fishing was
9  in September when we went salmon snagging.
10  Q. When you went what?
11  A. Salmon snagging.
12  Q. Where did you do that?
13  A. Towards Eureka. We go there every year.
14  Q. Are you doing that from your wheelchair?
15  A. Yes.
16  Q. Besides fishing occasionally, hunting
17  some -- do you hunt from your wheelchair?
18  A. Yeah. Well, from my four-wheeler.
19  Q. From your four-wheeler?
20  A. Uh-huh.
21  Q. Is that rifle hunting?
22  A. Uh-huh.
23  Q. Is that "Yes"?
24  A. Yes.
25  Q. Besides fishing, hunting periodically,

1 four-wheeling periodically, playing video games, do
2 you do anything else recreationwise?
3    A.  I'll go to town with my mom. I mean,
4 whatever she can do --
5    Q.  Just running errands and stuff?
6    A.  Yeah.
7    Q.  Now, if I understood from your written
8 discovery responses, you quit high school after the
9 accident?
10    A.  Uh-huh. Well, not exactly after. I quit
11 when I was going into a senior, so, like, 2016, late
12 2016, just before school ended.
13    Q.  Why did you quit?
14    A.  So since the wreck, I was held back at
15 school for a year and a half, at least. I didn't go
16 back until 2016, when I finally got done with, like,
17 rehab and all that, and I had all this homework and
18 all this stuff. I was behind, and I was on medication
19 like gabapentin and Valium, and it made me very
20 sleepy. So I could only do half days, and sometimes
21 I'd just get knocked out, and, you know, a teacher
22 would have to wake me up once in awhile.
23    I had to go to the independent school
24 because the regular school -- I was too self-
25 conscious, and it was just stressful. So I -- we did

1 the independent school, and that's -- you can do
2 that -- it's online, and then they've got, like, an
3 English class right there, and everything is pretty
4 much in that one building.
5    I did that for a year and a half to two, and
6 it just became so bad because I was only having half
7 days, and I was getting so far behind, and I had
8 therapy. So right at twelve I'd go to therapy, and it
9 got so bad, and I was just so far behind, and we had
10 an appointment with the school, and they said it would
11 probably be best if we could go to get our GED, and I
12 said, Okay.
13    So I'm working on getting my GED right after
14 Journey of Wellness because I want to get back on my
15 leg and do that.
16    Q.  Do you remember how far through school you'd
17 made it? Like, through your sophomore year or junior
18 year?
19    A.  I made it to, like, my junior year.
20    Q.  And have you enrolled in anyplace to work on
21 your GED?
22    A.  FCCC -- or FVCC.
23    Q.  FVCC?
24    A.  Yeah.
25    Q.  Have you already enrolled there, or is that

1 just you're planning to?
2    A.  We enrolled there once, and I couldn't make
3 it because my leg was not working, and we didn't have
4 the wheelchair because I was just standing on my leg,
5 and so from then on, then she said, When you're ready,
6 give us a call.
7    We told them, Well, we're doing this Journey
8 to Wellness. I should be back on my leg -- because I
9 want to get -- this leg is my high priority right now.
10 I want to get back on that so I can start doing
11 everything I could again and be motivated and get off
12 my butt.
13    Q.  Do you know what all you have to do to
14 complete your GED?
15    A.  I take the -- a course that pretty much sets
16 you to where they think you're at, and from then on
17 they have you take tests and all that, and, like, you
18 need to get, like, 40 hours in a week to do it. So
19 I'm going to be doing that and taking classes, math,
20 whatever it says I need to do, and then after that, I
21 think it's about 40 hours a week.
22    My sister did it. She's been on -- that's a
23 whole other story, but she did it, and she had to do
24 40 hours a week for about a month, I think, something
25 like that, and she stopped doing it.

1    So I plan on doing that, and once that's
2 done, then you take a big old test and pass your GED,
3 and then you can go to college.
4    Q.  Where are you planning -- are you planning
5 on going to college?
6    A.  Yes.
7    Q.  What do you plan on doing at --
8    A.  Graphic designer.
9    Q.  Graphic designer?
10    A.  Uh-huh.
11    Q.  Where would you do that?
12    A.  Right here, actually, here at FCC (sic),
13 because they have a really, really good course I keep
14 hearing about. A lot of people are recommending it.
15 Like, it's just really good, I was surprised. I'm,
16 like, Wow. Graphic design here? So I'm going to try
17 that out.
18    Q.  What were your grades like in high school
19 before you had the accident?
20    A.  From the last I can remember, Cs all of the
21 way to As.
22    Q.  So if I've got this right, you're currently
23 doing Journey to Wellness?
24    A.  Uh-huh.
25    Q.  You also see Dr. Muir and Heidi?

## 69

1   A.  Yes.
2   Q.  Anybody else, either physical therapywise,
3 medicationwise, that you're seeing besides Dr. Muir
4 and Heidi and the physical -- the physical activities,
5 Journey to Wellness? Anybody currently besides those
6 two groups?
7   A.  No.
8   Q.  Have you discussed this accident at all with
9 Noah?
10   A.  Yes. We've been -- he hasn't really ever
11 really talked to me since the wreck. A lot of people
12 are telling me it's just guilt because we were best
13 friends since second grade, and ever since the wreck,
14 we kind of -- we just don't really talk anymore, and
15 I've -- we've -- he wants to hang out more. He's been
16 trying to contact me. I've been trying to contact
17 him, but I'm so busy now, and he's busy, so --
18   Q.  So Noah still lives around here?
19   A.  Yes. He lives at the same place.
20   Q.  Where he was at the time of the accident?
21   A.  Uh-huh.
22   Q.  Do you hang out with any friends?
23   A.  Once in awhile. My best friend, Skye,
24 that's, like, my only one right now.
25   Q.  That was Skye Major?

## 70

1   A.  Yeah. He wanted to take me camping. They
2 just want to -- if I ever need a place to stay, go
3 ahead and stay there. If you're getting, you know --
4 because I live so far out of town, we can't really
5 just drive straight there because it's, like, a good
6 35-mile, 40-mile drive to Kalispell, so I can't really
7 go every single time to The Summit. So he was
8 offering me to stay there, but I don't got a car. My
9 dad just fixed the red truck, so I might be able to
10 start going more, more freely and get better at this.
11   Q.  Do you have any appointments scheduled with
12 Northern Care to refit you with another leg or refit
13 you with your current leg?
14   A.  So they don't want to -- they want to refit
15 me with my current leg, because my second leg -- they
16 don't want to do that since it's still brand-new, and
17 Medicaid or whoever doesn't -- you know, won't do that
18 since they just got this new leg.
19   Q.  So how many legs have you had? I know you
20 mentioned the first one.
21   A.  I've had two. Yes, two.
22   Q.  So the leg that you currently have, is that
23 what you're calling your new leg?
24   A.  Yes.
25   Q.  And you've got both of them from Northern

## 71

1 Care?
2   A.  Yes.
3   Q.  Do you remember approximately when the last
4 time you and Noah visited with or tried to reach each
5 other?
6   A.  The last time I can remember was sometime in
7 June 2017.
8   Q.  Do you remember seeing this Mark Schwager,
9 it looks like, about a year, year and a half ago?
10   A.  Mark Schwager.
11   Q.  Mark Schwager with Rocky Mountain
12 Counseling, did you ever see him?
13   A.  I can't remember.
14   Q.  It says he would have met with you on
15 March 20th, 2017 at his office. This is a guy who is
16 kind of talking to you about what you might do, what
17 you're planning on doing.
18   A.  I don't remember Mark Schwager. I mean, it
19 might jog my memory if I see it a little bit, if you
20 don't mind.
21   Q.  Yeah. You bet.
22   A.  Was this Rocky Mountain -- do you know where
23 it was at? Do you know where it's located?
24   Q.  Someplace in Kalispell.
25   A.  I can't remember. This is last year too.

## 72

1   Q.  That's all right.
2     Who lives at home with you besides your mom
3 and dad?
4   A.  Me and my mom and dad and my sister now.
5   Q.  Is your sister younger or older than you?
6   A.  Older.
7   Q.  How much older is your sister?
8   A.  One year.
9   Q.  And I know before we started, Skylar, your
10 attorney gave me what's called this amended statement
11 of damages. I don't know if you've even had a chance
12 to look at it or not.
13     Before you start talking, don't tell me what
14 you talked about with your attorney.
15   A.  Okay.
16   Q.  One of the things it shows on here, Skylar,
17 is future medical expenses of $425,000. Do you know
18 what would go into that?
19   A.  Definitely my prosthetic leg and any type of
20 surgeries that may have been from this. I've had a
21 couple surgeries since this accident.
22   Q.  Since you got out of the hospital
23 originally?
24   A.  (Witness nodded head.)
25   Q.  I know you had seven or eight surgeries

73

1  while you were in the hospital.
2      A.  Uh-huh.
3      Q.  But you've had some since then?
4      A.  Uh-huh.
5      Q.  Is that a "Yes"?
6      A.  Yes.
7      Q.  Where did you have those?
8      A.  I had one that was, like, a leftover stitch,
9  staple in my left leg, and they had to do surgery to
10  take that out because it was starting to become a big
11  old -- I don't know -- like, infected area. Yeah. I
12  couldn't wear the leg at all for that. This is when I
13  was working at Whitefish Therapy when I discovered the
14  stitch.
15      Q.  Who did that surgery? Was it in Whitefish
16  or Kalispell?
17      A.  Kalispell. I think it was Dr. Zeider. I
18  don't think it was her. It was probably -- I can't
19  remember exactly, but I know Dr. Zeider was the one
20  who got that scheduled.
21      Q.  Did you have to spend the night in the
22  hospital for that surgery?
23      A.  No.
24      Q.  And then you said you'd had a couple of
25  them.

74

1      A.  Uh-huh.
2      Q.  What other surgery do you remember since you
3  got checked out of the hospital originally?
4      A.  So we had a recent surgery about six months
5  ago that was with Dr. Means, and he -- this was mainly
6  from -- like, between the leg and, like, up at -- I'm
7  trying to show myself, but it's between the leg and
8  the thigh, like up in this area or something. It was
9  an infected area from when I was wearing the leg too
10  much, like sweat and stuff and sores.
11      He -- it turned into a big abscess, and
12  Dr. Means had to -- it was so infected that, like, it
13  was -- I can't remember what exactly he said. He was
14  explaining that it was spreading. Like, it could
15  have, like, really caused a bad infection, like dead
16  tissue and all that. So they had to do surgery
17  literally the next morning.
18      Q.  Was that a situation where you had to stay
19  in the hospital overnight, or was that an outpatient
20  surgery?
21      A.  That was outpatient, and they gave me drinks
22  to go do a CT scan and all that.
23      Q.  Other than those two, can you remember any
24  other surgeries since you got out of the hospital?
25      A.  No.

75

1      Q.  Do you know if any doctor is recommending
2  any surgery in the future?
3      A.  Yes. One doctor. I can't -- I think Doug
4  was talking about it. There's a surgery to make it
5  easier for -- to walk on your leg. They put a
6  permanent metal rod in your leg, and you can -- pretty
7  much it's like the leg is always with you instead of
8  having to have a suction one on and all that. So they
9  have recommended that definitely.
10      Q.  Do you know who that doctor was?
11      A.  No. One of the -- Doug was talking about
12  it, and then I talked to Matthew, who was one of the
13  prosthetists there, and he was --
14      Q.  At Doug's office?
15      A.  Yes.
16      Q.  Do you know whether that surgery would have
17  been here in Kalispell, or were you going to have to
18  go away for --
19      A.  I would have to go somewhere for it.
20      Q.  Did you ever get to the point of setting up
21  any kind of preliminary meeting with that doctor about
22  how to do that surgery or when it might happen?
23      A.  I was thinking about it to see -- I wanted
24  to schedule to see how it is, and if it's, like -- I
25  didn't know if it was permanent at the time, and I was

76

1  told that it was permanent, and so it's obviously,
2  like, something that would help you definitely in the
3  future. So I'm not too sure.
4      Q.  Do you know where you'd have to go for that?
5  Did you get that far along to find that out?
6      A.  I think only, like, a few places do it.
7  Maybe Seattle. I'm not sure. There's, like, certain
8  doctors who specialize in that, so yeah. Because I
9  know one of the patients there at Doug's was also
10  doing that, so I'm -- he actually lives up near
11  Lupfer, near me, and he was actually one of the people
12  who helped me through this, so -- because he can kind
13  of relate to me.
14      Q.  Was there any discussion about whether you
15  had to lose weight to be able to do that surgery or
16  anything like that?
17      A.  I don't remember. No. I would say, no.
18      Q.  Do you have any plans on trying to get an
19  appointment with whoever this doctor may be to do this
20  surgery to install the permanent rod?
21      A.  Yes. Yes.
22      Q.  Have you taken notes on where that doctor
23  might be? Do you have his name?
24      A.  He's somewhere, I think, in -- right by
25  The Summit, I think. It's, like, in the same office

77

1 as -- the last name is, like, Rizzolo. I've seen him
2 a few times. He's -- I can't remember his name. It's
3 Rizzolo or something.
4     Q.   Rizzolo?
5     A.   Yeah.
6     Q.   Steve Rizzolo?
7     A.   I think so.
8     Q.   Have you actually been to see him yet, or
9 just that would be who might do the surgery for you?
10     A.   I think I seen him a long time ago, like
11 around 2015. I can't remember what I seen him for,
12 but I remember going into the office a couple times.
13     Q.   Any other kind of surgeries that you're
14 thinking that you may have to have done here because
15 of your leg?
16     A.   Not that I know of. My right knee, I was
17 going to see Dr. Erickson soon about that. It's
18 pretty much, like, any pressure I put on it is,
19 like -- it feels like it's just pulling out, like it's
20 pulled or something, because I had surgery on my right
21 knee, and that's been hurting a lot when I'm, like,
22 using force on it, especially during camp when I was
23 doing that, so I need to go see him. I told my
24 Journey to Wellness mentor about that, and he said to
25 go check it out with the doctor.

78

1     Q.   Have you scheduled an appointment with
2 Dr. Erickson or anybody to look at your right knee?
3     A.   You can go in for, like, a walk-in for him,
4 so I've just got to do that.
5     Q.   Do you have a plan on when you're going to
6 go in to see him or do a walk-in?
7     A.   Within the next couple weeks, at least.
8     Q.   When you were out camping -- and I may have
9 asked you, and if I did, I apologize. When you were
10 out camping, were you in your wheelchair?
11     A.   Yes.
12     Q.   Did you use your prosthetic leg at all?
13     A.   No. It won't fit.
14     Q.   All right. Are you able to help out around
15 the house, like help do dishes?
16     A.   Uh-huh. Yes.
17     Q.   Can you make your own bed?
18     A.   Yes. Well, sort of. I've got to -- it's
19 weird.
20     Q.   Are you able to dress yourself?
21     A.   Uh-huh.
22     Q.   That's a "Yes"?
23     A.   Yes.
24     Q.   The people at Journey to Wellness, do they
25 give you any kind of home activities to do

79

1 exercisewise?
2     A.   No.
3     Q.   The physical therapists, the last time that
4 you saw them, did they give you any kind of home
5 activities, any exercises to do?
6     A.   Yes.
7     Q.   What kind of things did they recommend?
8     A.   Stuff that I'm able to do. Like, he gave me
9 a rubber band to use on my right leg, wear on my left,
10 like, for resistance, so I can just at least work it
11 out. I did that when I -- like, you just lay down on
12 the floor or something for that.
13     Q.   So you kind of lift it up with a rubber
14 band, move it around?
15     A.   Uh-huh. Yeah.
16     Q.   Are you able to lift your left leg up at all
17 by yourself?
18     A.   Uh-huh. Yes.
19     Q.   Anything else besides using the rubber band
20 there to kind of exercise your legs?
21     A.   Like, he showed me a bed stretch, because my
22 right shoulder or my right arm, where my surgery was
23 done, when I stretch it out, it gets sore. Like, if I
24 do a bench press, I was always telling my therapist
25 about that. Like, usually every time it hurts, like,

80

1 if I move it or something, and he was -- he showed me
2 a stretch to kind of do that. You sit on the corner
3 of the bed and lay out your arm so you're pretty much
4 stretching it.
5     That didn't really help. I guess it's
6 something else, so --
7     Q.   Any other exercises the physical therapists
8 have given you to do?
9     A.   Sit to stands, which I did on the back
10 of the bench of our couch. You just do, like, squats.
11     Q.   So do you the squats on one leg?
12     A.   Uh-huh.
13     Q.   How many do you do?
14     A.   Ten, and then we're making it up every --
15 once in a while, you know, when we got stronger.
16     Q.   How often do you do squats now?
17     A.   Pretty much never.
18     Q.   Do you remember the last time you did
19 squats?
20     A.   About a month ago.
21     Q.   Any other exercises you can think of that
22 the physical therapists prescribed for you?
23     A.   No. Just -- just, like, basic stuff that
24 I'm able to do, like the band and the sit to stands
25 and working on that and then --

**81**

1    Q.   How often do you do an exercise with the
2  band that they gave you?
3    A.   I can pretty much do it any time. Like, two
4  days ago I did the stretching band in my chair just to
5  do something.
6    Q.   How long do you do those when you're doing
7  the band stretching?
8    A.   15 minutes with a band and then, like,
9  15 minutes on the other side.
10    Q.   I think that's all I have for now, Skylar.
11      Your attorney and I talked about, if I need
12  to, I might follow up, but right now I'm not sure that
13  I would.
14      Anything else you can think of about -- that
15  I haven't discussed with you about how your accident
16  is affecting your daily life now?
17    A.   I can go on and on about that.
18    Q.   Why don't you fill me in a little bit.
19    A.   I can't -- what I was able to do that I
20  can't do now? Like, I can't really -- you know,
21  hunting is a pain in the butt. Like, when I was in
22  camping, it's muddy. I wasn't able to get around as
23  much. I kind of felt, like, outcast a little bit.
24      I can't run. I can't do -- go out -- we
25  always went out -- like, one week before the accident,

**82**

1  me, Noah and my brother went out four-wheeling. We
2  went berry picking. I used to -- I wasn't as -- when
3  I played video games, I would probably only do it,
4  like, two hours a day when I was that age, because I
5  wasn't really much into that. Not as much.
6      And we'd go outside. In winter we'd go
7  sledding, skiing. I can't spear fish anymore. I sort
8  of can, but I can't really swim as much. I've only
9  got, like, one leg, really, for pushing power. I have
10  to get a fin for that one, but Medicaid doesn't cover
11  that.
12      I'm self-conscious. I mean, my weight. You
13  know, I can't really -- I can't, like, use stick
14  shifts. I had to sell one of my four-wheelers because
15  of this. Like, I saved when I was working at the Fish
16  House for this one four-wheeler. It was a clutch. I
17  can't use the clutch no more because it was with the
18  left leg.
19      A lot. I can't really -- there's so much.
20  I played baseball. I was going to do football that
21  year, sophomore, and so much more up ahead. So I
22  can't really do much of that anymore.
23    Q.   Anything else?
24    A.   Just socializing. It's gone down. Like, my
25  depression -- I've lost so many friends with all this.

**83**

1  Yeah.
2    Q.   Has Dr. Muir recommended that you try to
3  become more active socially, like recommend that you
4  do particular things?
5    A.   He hasn't really recommended much of that.
6  No. Not really. I mean, yeah. Just -- I had, you
7  know -- like, you know, my friends want to hang out,
8  but I don't -- I can't do much, so I kind of just
9  ignore it. Like, Noah wants to hang out more, and I
10  said we could, but I can't really do much. Parker
11  doesn't really talk to me no more.
12    Q.   Who is Parker? What's his last name?
13    A.   Parker Hill. He was my best friend since
14  second grade too.
15      Yeah. Just a lot of -- it's kind of -- it
16  sucks when people, like -- yeah. I don't know. It's
17  a lot.
18      MR. COCKRELL: All right. I think that's
19  all I've got.
20      THE WITNESS: Okay.
21      MR. COCKRELL: Thanks. I really appreciate
22  your time coming in and visiting with me. Thanks a
23  lot.
24      THE REPORTER: Michael, do you want
25  signature on this?

**84**

1      MR. BLIVEN: It's not necessary. I do want
2  a copy.
3      MR. COCKRELL: Why don't we have him read it
4  and sign it. Just send it to Mike.
5      MR. BLIVEN: As I understand the read-and-
6  sign rule, this is not -- in other words, this is what
7  I said. In other words, I don't abuse that rule. In
8  other words, he's not going to change anything. He
9  may have forgotten something. He may have meant to
10  say something different, but if you follow me -- in
11  other words, that's what I was saying.
12      But yeah. He'll read and sign it, but I
13  guess what I'm saying is, if you want him to read and
14  sign, he's just reading and signing to, That's what I
15  said, as opposed to, Oh, no. I meant something else.
16  That's my understanding of the rule.
17      So if you want -- I mean, he'll read and
18  sign it and say, Yeah, that's what I said. If you
19  want him to make substantive changes, if he wanted to
20  make any, I just want to make sure we're on the same
21  page about what the purpose is.
22  BY MR. COCKRELL:
23    Q.   Here is the rule on reading and signing,
24  Skylar. What that means is, the court reporter is
25  going to type up everything that we discussed here

85

1  today. She'll send a copy of it to your attorney, and
2  then he can give it to you. You need to read over it,
3  make sure your answers are accurate. So if you said
4  something wrong, then there will be a correction page
5  on there, and you just write down, Page X, whatever it
6  happens to be, line whatever. Answer was "Yes."
7  Meant to say "No." Something like that.
8      A.  Okay.
9      Q.  If you did make any substantive changes,
10  like you wanted to completely change an answer here,
11  then that gives me the right to come back and say, I
12  want to ask about that. Otherwise, the purpose of it
13  is just to read through it, make sure it's accurate.
14  Like, if she got a misspelling wrong of somebody's
15  name or something, you could correct that, that sort
16  of thing.
17      A.  Okay.
18      (Whereupon, the Deposition of SKYLAR DIXON
19  was concluded at 11:39 a.m., and signature was
20  reserved.)
21
22
23
24
25

86

1          REPORTER'S CERTIFICATE
2  State of Montana  )
3  County of Flathead )
4      I, Jolene Asa, Registered Professional Reporter
5  and Notary Public for the State of Montana, residing
6  in Kalispell, Montana, do hereby certify:
7      THAT I did report the foregoing matter at the
8  time and place stated in the above-entitled matter
9  after having duly sworn SKYLAR DIXON; and
10      THAT the foregoing pages constitute a true and
11  accurate transcription of the testimony of SKYLAR
12  DIXON that was taken in shorthand by me and reduced to
13  writing under my direction to the best of my ability;
14  and
15      THAT I am not an attorney nor counsel of any of
16  the parties, nor a relative or employee of any
17  attorney or counsel connected with the action, nor
18  financially interested in the action.
19      IN WITNESS WHEREOF, I have hereunto subscribed my
20  name and affixed my seal on this ___ day of
21  _____, ___.
22
23
24
25          _____
            JOLENE ASA, RPR

87

1          CORRECTION PAGE
2  PAGE LINE    CORRECTION
3
4
5
6
7
8
9
10
11
12
13
14
15      I have read the foregoing testimony and
16  believe the same to be true, except for the
17  corrections noted above.
18      DATED this ___ day of _____,
19  ___.
20
21
22          _____
23  SKYLAR DIXON
24  SKYLAR DIXON vs. FELDER & COMPANY, LLC
25  DV-17-853D

CORRECTION PAGE

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 27 | 14 | something. I believe Noah fell asleep. I was looking out the window. |
| 28 | 9 | ~~ten stretch.~~ He most likely fell asleep during the long stretch before the beaver lake road as it was about 3 mins of silence before the wreck he was silent. |
| 29 | 9 | Yeah, I was confused that a 30 min time gap was brought up, I knew we talked for 10mins atleast with Dan. So I wanted to see how long this would take. We.. |
| 30 | 14 | I ~~do not~~ know Noah was not smoking pot. He knew it was illegal, he wouldn't do it at work or otherwise and I was around him at work and after work. |

I have read the foregoing testimony and
believe the same to be true, except for the
corrections noted above.

DATED this _12_ day of _November_ ,
_2018_ .

_Skylar Dixon_
SKYLAR DIXON

SKYLAR DIXON vs. FELDER & COMPANY, LLC

DV-17-853D

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394, Kalispell, MT 59903-0394 - (406)752-5751

2  PAGE LINE   CORRECTION

3   36    5    Pin and Cue was 2017

4

5

6

7  71   25    I remember seeing Mr. Schwage

8              he evaluated my work abilitie

9

10

11

12

13

14

15        I have read the foregoing testimony and

16   believe the same to be true, except for the

17   corrections noted above.

18        DATED this 12 day of November ,

19   2018.

20

21

22   Skylar Dixon

23   SKYLAR DIXON

24   SKYLAR DIXON vs. FELDER & COMPANY, LLC

25   DV-17-853D

**A**

**a.m** 1:20 19:23
20:11 23:6 85:19
**ability** 6:15 86:13
**able** 19:15 30:19
56:8 59:23 70:9
76:15 78:14,20
79:8,16 80:24
81:19,22
**above-entitled** 86:8
**abscess** 74:11
**abuse** 56:22 84:7
**accepted** 9:17
**accident** 7:11,18
11:1 13:8 16:18
18:19 19:12,18
25:16,21,24 26:16
28:23 29:1,21
31:3 32:6,21
33:21 38:1 52:2,3
65:9 68:19 69:8
69:20 72:21 81:15
81:25
**accurate** 85:3,13
86:11
**act** 18:12 28:11
**action** 86:17,18
**active** 83:3
**activities** 40:25 41:1
41:2 45:12 47:11
48:12 69:4 78:25
79:5
**add** 18:18
**address** 5:9
**adjust** 44:22
**adjusted** 42:14
**affect** 6:15
**affixed** 86:20
**afternoon** 16:10
**age** 82:4
**agile** 41:4
**ago** 29:4,4 32:18
46:8 57:11 71:9
74:5 77:10 80:20
81:4
**agreed** 3:8,13
**ahead** 6:10 70:3
82:21

**alcohol** 29:24 30:1,4
30:8
**alert** 32:19
**alley** 34:10
**alleys** 34:12
**allowed** 11:22 34:24
53:1
**ambulance** 32:22
32:25
**amended** 72:10
**amputation** 40:8
**amputee** 40:8,15
**answer** 5:16 6:9,10
19:16 85:6,10
**answers** 85:3
**antidepressant** 6:20
**anybody** 8:22 9:7
12:8,11 16:20
24:7,11 51:4
52:19 57:2 58:22
59:1 69:2,5 78:2
**anymore** 69:14 82:7
82:22
**anyplace** 25:15 52:4
66:20
**anytime** 43:1
**apologize** 43:11
78:9
**APPEARING** 2:3,7
**applied** 9:17
**appointment** 50:20
57:12 60:21 61:5
61:10 62:4 66:10
76:19 78:1
**appointments** 47:5
49:22 56:8 58:20
58:25 60:18,24,25
70:11
**appreciate** 83:21
**appropriate** 5:17
**approve** 45:17
**approximately**
26:15 71:3
**apron** 10:16
**area** 30:17 73:11
74:8,9
**arm** 33:6 79:22 80:3
**art** 38:24

**Asa** 1:24 3:5 86:4
86:25
**asked** 12:16 29:10
37:14 47:16 78:9
**asking** 12:17
**assign** 34:11 42:17
48:16 52:24
**assigned** 44:6,7
**assistant** 8:2,23
22:1
**attendant** 34:10
**attorney** 72:10,14
81:11 85:1 86:15
86:17
**August** 11:2 14:19
14:21 17:17 19:12
19:14 38:1,1
**available** 51:3
**Avenue** 1:19 2:5
**avoid** 46:3
**awake** 27:10 33:1,3
**awhile** 65:22 69:23
**awkward** 35:5

**B**

**back** 17:3,4,6 20:5
21:1 22:22 24:18
25:2 26:9 29:14
29:18 30:24 31:4
34:13 37:12,16,18
39:5,6,7,9 42:8,21
42:24 43:7,16,20
43:22 44:20,21
56:18 59:10,16
63:17 65:14,16
66:14 67:8,10
80:9 85:11
**bad** 63:16,16 64:4
66:6,9 74:15
**badminton** 61:12
**ball** 34:12,13
**band** 79:9,14,19
80:24 81:2,4,7,8
**banged** 33:4
**bars** 38:22
**baseball** 82:20
**basic** 46:21,22
47:15 48:14 49:11

80:23
**basically** 48:4
**bathe** 59:23
**Beaver** 25:22,23,25
26:1,2,4,6,16,19
26:20 27:16
**bed** 20:5 21:19
78:17 79:21 80:3
**beginning** 10:24
35:17 54:18
**Behalf** 1:17 2:3,7
**believe** 7:20 9:6
33:25 36:14 58:10
87:16
**bench** 24:23 79:24
80:10
**benches** 24:9
**berry** 82:2
**best** 17:12 19:9
36:25 56:14 59:18
66:11 69:12,23
83:13 86:13
**bet** 71:21
**Beth** 53:9,12 54:19
55:22,23 56:1,3
**better** 41:10 58:8
59:7,8,8 70:10
**big** 48:15 68:2
73:10 74:11
**bike** 48:23
**biking** 48:25 49:3
**bit** 7:5,8 14:6 22:16
26:2 28:8 32:8,10
32:11 40:13 49:23
59:14 60:17 71:19
81:18,23
**Black** 36:18
**Bliven** 1:19 2:4,4
5:11,21 6:8,25
23:13,17 30:2
33:9 84:1,5
**body** 49:10,12
**bowl** 38:24
**bowling** 34:10,12
**Box** 2:10
**brand-new** 41:4
70:16
**break** 6:3,4 11:22

11:25 16:1 30:4
35:11 36:13,14
**breaking** 35:3
**breaks** 11:21 12:1,4
30:20 34:14
**bring** 13:2 17:19
**brother** 82:1
**brought** 16:2 18:2
**bruises** 44:3
**bucks** 36:10
**building** 57:24 66:4
**Bull** 17:20,22,23
**bumped** 58:9
**bunch** 40:24 44:2
**busy** 11:23 28:15
69:17,17
**butt** 67:12 81:21
**buy** 46:3

**C**

**C** 2:1
**calibrate** 43:17
**call** 7:6,25 8:2 19:16
19:19 20:6 21:14
21:17 24:13 42:10
51:2 67:6
**called** 19:23,24
20:14,16 21:1,10
38:23 51:17 56:18
56:19 72:10
**calling** 70:23
**calls** 21:17
**camp** 40:8,15,20,25
41:6 77:22
**camping** 59:9,12,15
70:1 78:8,10
81:22
**camps** 41:18
**caption** 3:11
**car** 21:23,23 23:1
25:6,8 26:5,23
27:17,23 30:7
31:10,13 32:12
33:5 70:8
**cardio** 48:22 49:2
**Care** 38:14 39:19
40:1 42:7,22
70:12 71:1

carer 55:12
cars 49:18
case 39:5
cashier 37:7
catching 21:11
CAUSE 1:5
caused 28:3 37:11 74:15
cell 20:6
Center 51:17,17
certain 48:18 76:7
CERTIFICATE 86:1
certify 86:6
chair 81:4
chance 72:11
change 13:18 14:8 14:11 18:5 22:24 84:8 85:10
changes 40:3 84:19 85:9
changing 14:17
chat 27:2,8
check 77:25
checked 21:24 31:16 74:3
checkup 48:4
chef 8:23
chefs 8:4 9:4 16:25 22:10,12
cigarette 24:10
Civil 3:12
class 38:24 48:22 66:3
classes 45:25 46:1 67:19
clean 22:17
clock 18:15
clocked 18:20,22,24 20:10,11,16 31:12
clocking 18:23
clocks 23:5
close 9:9 10:11,20 10:21 12:19 16:11 16:12 19:22,23
closes 22:15
closest 16:25
clothes 21:25 22:18

22:24 23:3,12 24:17,18,19 25:1,3 25:4 31:15
clutch 82:16,17
coat 23:2
Cockrell 2:8,9 4:3 5:6 7:1 23:15,18 27:5 30:3 83:18 83:21 84:3,22
collapse 43:20
college 68:3,5
come 8:4 10:20 19:19 20:14 47:19 85:11
comes 17:4,6 25:22 39:5
coming 83:22
Commons 2:9
company 1:9 39:4 43:15 87:24
complaints 12:11
complete 67:14
completely 33:6 85:10
concern 23:23
concluded 85:19
confidence 50:15
confused 14:6
connected 86:10
conscious 65:25
consecutively 54:22
constitute 86:10
contact 35:10 69:16 69:16
continue 16:15
conversation 25:6
conversations 32:20
cook 18:5,14
cooked 18:11,13
cooking 45:25
cool 53:10
cope 41:8
copy 84:2 85:1
core 49:11
corner 80:2
correct 85:15
correction 85:4 87:1,2

corrections 87:17
couch 80:10
counsel 3:3,9,14 86:15,17
Counseling 71:12
counselor 57:6
County 1:3,25 3:7 86:3
couple 9:15 33:9 35:19 38:4 43:17 72:21 73:24 77:12 78:7
course 48:16 67:15 68:13
court 1:1 5:22 84:24
cousin 49:24,24
cover 12:20 14:2 82:10
covered 14:4
coworker 16:21
coworkers 16:23
Creek 59:13,14
crutches 42:2 52:16
Cs 68:20
CT 74:22
Cue 33:10,13,14,18 34:9,16 36:3,5,8
current 70:13,15
currently 6:18 49:7 68:22 69:5 70:22
curves 28:1
curvy 26:12
customers 37:24 44:11

D

d/b/a 1:9
dad 60:12 62:5,8,13 62:18 70:9 72:3,4
daily 81:16
Dale 2:8
damages 72:11
Dan 22:2 23:11,20 23:21 24:8,12,16 24:19,23 31:14,19
DATED 87:18
day 9:1,2 10:12,18 10:19,22 11:1,3

11:10,13 12:2,9,12 12:13,14,22,23 13:17 14:9 18:15 18:19,21 19:18 44:15 46:17,24 53:17 54:24 55:1 55:20 59:3,4 60:6 62:2,21,22 82:4 86:20 87:18
days 12:15 15:15,15 18:11,13 19:3 58:16,20 65:20 66:7 81:4
dcockrell@megal... 2:11
dead 74:15
December 32:18 37:17
decision 21:13
Defendant 1:10,17 2:7
definitely 44:4 72:19 75:9 76:2
Dentist 59:2
deposition 1:14 3:4 3:10,15 5:12 85:18
depressed 42:4
depression 40:12 54:25 56:24 57:3 82:25
DESCRIPTION 4:6
design 42:14 68:16
designer 68:8,9
details 27:20
difference 37:20
different 11:10 22:24 25:18 30:21 84:10
direction 86:13
discovered 73:13
discovery 65:8
discuss 9:7 13:12 23:17 39:25
discussed 20:23 57:25 69:8 81:15

84:25
discussion 12:24 15:18,25 17:15 76:14
discussions 17:25
dish 18:14
dishes 11:16 78:15
dishwasher 9:5 18:12
dishwashers 9:15 11:23 16:25 30:25
dishwashing 10:17 21:6
DISTRICT 1:1,2
Dixon 1:6,16 5:1,8 85:18 86:9,12 87:23,24
doctor 53:1 63:13 75:1,3,10,21 76:19 76:22 77:25
doctor's 45:22
doctors 76:8
documents 33:8
doing 7:10 10:17 11:20 18:8,9 27:1 34:8 36:15 44:12 44:23 46:6 48:3 49:3,4 50:21 51:1 51:14,20 53:11,15 54:11,17,21 60:16 62:17 64:14 67:7 67:10,19,25 68:1,7 68:23 71:17 76:10 77:23 81:6
door 33:1
double 21:24 31:16
Doug 45:5,5,7,18 75:3,11
Doug's 44:21 75:14 76:9
downhill 54:12
Dr 6:24 45:15 51:15 52:19,19,22,25 53:3 57:4,7,8 58:3 63:15 68:25 69:3 73:17,19 74:5,12 77:17 78:2 83:2
dress 78:20

drink 29:23 30:1,4 30:8
drinks 74:21
drive 19:4 20:4 28:18 32:14 49:16 49:17 63:1,3 70:5 70:6
driven 28:25
driver 21:20
driver's 32:17
driving 26:24 27:25 32:1,4
duly 5:2 86:9
dump 8:14,15
DV-17-853D 1:5 87:25

**E**

E 2:1,1
E.N 1:19 2:5
earlier 12:13,16,18 13:5,13,17 14:7,12
early 38:8 39:14 51:25 52:3 55:4
easier 75:5
easy 5:12
eat 50:9 62:3
eating 47:23
eight 8:8,9 28:21 36:12 60:7 72:25
either 5:21 19:6,15 69:2
eleven 11:8 14:14 22:14
ELEVENTH 1:1
employee 86:16
ended 26:5 65:12
English 66:3
enjoy 34:24
enrolled 66:20,25 67:2
entirely 13:19
Erickson 52:25 53:3 77:17 78:2
errands 65:5
especially 77:22
Esq 2:4,8
Eureka 59:14 64:13

events 46:19
Everybody 41:14
exact 10:19 24:13 27:20 51:16
exactly 20:13,16 27:20 41:17 47:22 50:13 53:21 54:14 65:10 73:19 74:13
EXAMINATION 4:1,2 5:5
example 51:9
Excuse 21:23
exercise 79:20 81:1
exercises 79:5 80:7 80:21
exercisewise 79:1
EXHIBIT 4:5,6
exit 25:11
exiting 30:20
expenses 72:17
explain 14:25
explaining 74:14
expressly 3:16
extra 12:9
extremely 16:19

**F**

fall 51:25 52:3
family 52:25 64:3
far 22:22 23:25 26:15 27:23 66:7 66:9,16 70:4 76:5
fast 27:19,25
FCC 68:12
FCCC 66:22
feel 16:17
feeling 64:2
feels 77:19
FELDER 1:9 87:24
fell 44:10
felt 16:19 81:23
fifty-two 23:6
figure 17:14 47:15
figured 28:6
figuring 16:8
fill 48:9,10 81:18
filled 48:11
fin 82:10

finally 65:16
financially 86:18
find 76:5
fine 20:4 24:14 54:7
finish 30:2
finished 54:8 55:4
fireworks 36:9,16 36:24 37:3
Firm 1:19 2:4
first 5:2 13:24 17:11 33:13 38:6 39:13 40:8 47:3 55:25 70:20
fish 1:9 7:9 52:10 82:7,15
fishing 26:19 63:24 64:6,8,16,25
fit 38:6,8,13,15 39:8 39:19 42:1,6,22 44:7 49:6,14 78:13
fits 39:8
fitted 37:17
fitting 38:19
five 18:6 28:24 29:11 30:22 43:21 59:14
five- 11:24
Fix 60:1
fixed 70:9
Flathead 1:3,25 3:7 86:3
floor 17:3 79:12
folks 14:15 60:8
follow 81:12 84:10
follows 5:3
football 82:20
force 77:22
foregoing 86:7,10 87:15
forgot 18:17
forgotten 84:9
forward 27:16 31:7 31:9
found 55:21
four 9:9 10:11,20 15:15,15 16:9,11 18:6 19:4 63:22

four-wheeler 62:6 63:4,17 64:18,19 82:16
four-wheelers 62:7 62:14 82:14
four-wheeling 63:6 63:8,14 65:1 82:1
Fourth 1:19 2:5
free 6:8 50:24
freely 70:10
Friday 59:16
Fridays 16:5
friend 59:18 69:23 83:13
friends 9:16 19:9 69:13,22 82:25 83:7
front 34:11 37:7
full 5:7
fun 42:4
further 3:8,13 8:18
future 72:17 75:2 76:3
FVCC 66:22,23

**G**

gabapentin 65:19
gain 39:22,25 41:22
gained 37:19 44:19
gaining 40:5,11 43:24
games 59:7 60:6,9 62:3 63:21 65:1 82:3
GED 66:11,13,21 67:14 68:2
getting 18:3 19:2 20:24 21:2 31:14 51:11 52:12,14 55:12 58:7 66:7 66:13 70:3
Gillund's 8:12
give 14:16 17:18 19:19 20:15 45:11 47:9 51:2 52:24 67:6 78:25 79:4 85:2
given 80:8

gives 85:11
go 6:10 9:12 10:1,3 11:24 21:16,18 24:18 25:2,5 28:3 29:19 30:23,23 34:12 35:13 38:16 38:19 39:12 40:15 41:21,24 42:15 43:16,20,22 44:15 46:17,18,24 47:5,8 49:21,22,23 51:4 52:20 53:7,8 54:19 55:13 57:7 59:12,17 60:14 62:5,7 63:6,8,10 63:13,23,24 64:7,8 64:13 65:3,15,23 66:8,11 68:3 70:2 70:7 72:18 74:22 75:18,19 76:4 77:23,25 78:3,6 81:17,24 82:6,6 goal 47:19,20,21,23 47:25 48:1,3 50:4 50:9,13
goals 47:14,22 48:6
Goicoechea 2:9
going 7:8 8:1,9 15:11,16 16:2,14 19:21 21:14,15 23:13 24:12 28:1 32:5,7,10 42:1 46:5,21,23 47:4,5 50:25 55:22 60:17 61:6,8,9 64:1 65:11 67:19 68:5 68:16 70:10 75:17 77:12,17 78:5 82:20 84:8,25
good 21:19 24:22 36:12 46:6 49:2 50:15 54:21 68:13 61:15 70:5
gotten 28:7
grab 22:25 23:12 24:18 25:2
grabbed 22:18 24:17,19

4

grade 69:13 83:14
grades 68:18
gradually 52:12
graduation 56:12
Graphic 68:8,9,16
gravel 31:8 32:10
Graves 59:13,13
great 11:20
grew 24:3,5
grocery 60:22
groups 69:6
guess 8:14 13:24
  14:22 15:4 16:4
  17:5 24:3 33:2
  35:12 46:19 80:5
  84:13
guilt 69:12
Gunliksom 53:9,12
guy 71:15
guys 25:11 26:10,25
  28:11,23 29:13
  30:10,15,20 31:12
  32:6

**H**
half 28:24 29:12
  36:13 65:15,20
  66:5,6 71:9
handle 11:24
hang 69:15,22 83:7
  83:9
happen 5:20 8:22
  75:22
happened 25:16
  27:19 31:3
happens 85:6
hard 13:25 14:25
  17:2 22:2 24:4
  34:22 54:13
hardens 38:25
he'll 84:12,17
head 25:12 29:22
  30:8 33:4,6 55:19
  72:24
healthier 47:23 50:9
hear 31:8 34:7
hearing 68:14
heart 48:23 49:1

Heidi 57:4,21,22
  58:4,23 59:1 61:2
  68:25 69:4
held 65:14
help 32:25 41:6,8
  42:18 56:24 62:10
  63:25 76:2 78:14
  78:15 80:5
helped 47:14 52:13
  53:11 76:12
helping 50:16
helps 45:24
hereunto 86:19
Hey 21:15 32:8,11
  32:12
high 65:8 67:9
  68:18
highway 26:7,9
  32:20 36:19
Hill 9:21 83:13
hire 64:1
hired 8:5,24,25 9:2
  9:19 10:16
hit 26:8 49:20 54:25
Hmm 31:22
home 8:7,13 13:21
  19:17,21 20:1,4
  21:8,16,19 30:8
  44:15 51:4 72:2
  78:25 79:4
homework 65:17
hospital 38:3 51:19
  52:6 72:22 73:1
  73:22 74:3,19,24
hot 36:11
hour 49:25
hours 9:7,8 10:10
  12:12,13 16:9
  18:4 36:13 60:7
  67:18,21,24 82:4
house 1:9 7:9 25:13
  28:18,19,20 59:19
  63:25 78:15 82:16
huge 37:20
Huh-uh 5:20
hunt 64:17
hunting 63:23
  64:16,21,25 81:21

hurt 43:23
hurting 77:21
hurts 35:5,5 79:25

**I**
idea 29:6
identify 48:12
ignore 83:9
imagine 60:11
independent 65:23
  66:1
INDEX 4:1,5
infected 35:4 73:11
  74:9,12
infection 74:15
information 10:15
insisted 20:3
install 76:20
instance 32:6
instantly 42:12
interested 86:18
intersection 25:25
  26:16
interview 8:1
involve 48:18
issues 37:24 43:23

**J**
Jack 45:5
Jake 8:2,23 9:11
  10:9 12:17,24
  13:7,12 15:18
  16:22 17:19 18:2
  19:2
January 35:17
  37:17
Jessie 9:3,14 13:2
  13:13 14:17 15:18
  15:19,20,22 16:22
  17:2,6,19 18:17
  22:5,8
job 7:23 13:24 34:9
  34:22,25 36:24
  37:3,11
jobs 33:9 36:7,21
jog 54:15 71:19
Johnson 2:9
Jolene 1:24 3:5 86:4

86:25
Journey 45:18,20
  46:5,9 47:11 50:2
  51:5,10 52:21
  54:9 56:7 60:16
  60:19 61:4,20
  66:14 67:7 68:23
  69:5 77:24 78:24
Jude 46:14,15 47:2
  47:10 60:22
judge 6:11
JUDICIAL 1:2
July 13:1 14:1,1,4
  18:10 34:1 40:19
June 10:25 19:13
  34:1 71:7
junior 66:17,19

**K**
Kalispell 1:20 2:5
  2:10 38:14 46:10
  46:11 70:6 71:24
  73:16,17 75:17
  86:6
keep 33:3 35:3
  68:13
kid 14:24
Kim 55:16,17 56:21
kind 6:14,18,21 7:4
  7:11 10:15,16,22
  11:7,15 13:15
  15:25 16:9 17:18
  27:13 30:16 32:7
  32:10 34:14 35:9
  35:12 37:25 38:16
  39:11,12,22 41:6
  41:19 42:1,4,7
  44:14 45:11 47:10
  48:12 49:19 51:8
  54:12 55:8,20,21
  56:13,15,19 57:19
  57:25 58:8,9
  69:14 71:16 75:21
  76:12 77:13 78:25
  79:4,7,13,20 80:2
  81:23 83:8,15
kitchen 17:4 21:24
  22:15 31:17

knee 43:9,13,14
  77:16,21 78:2
knew 53:10
knocked 65:21
know 6:21 7:14
  8:12 10:21,23
  11:12,14 12:22
  13:7,14,23 14:1,13
  14:23 15:1,6 16:3
  16:3,14,21 17:1,9
  18:19 20:1 21:6
  21:15 22:4 23:4
  23:24 24:2 25:22
  26:19 27:18,23
  28:3,5 29:7 30:12
  30:14 32:11,12
  33:8 34:11 35:9
  38:3,23 42:2,4,16
  43:18 44:2 46:16
  47:16,18,21 49:19
  50:22 51:16 54:24
  55:21 56:9,19,19
  56:21 57:15,16
  61:1 64:2,4 65:21
  67:13 70:3,17,19
  71:22,23 72:9,11
  72:17,25 73:11,19
  75:1,10,16,25 76:4
  76:9 77:16 80:15
  81:20 82:13 83:7
  83:7,16
known 45:16
Krogh 9:6
Kyle 9:5,6,15

**L**
L 3:1
lack 40:12
lady 32:24
Lake 25:22,23,25
  26:1,2,4,6,19,20
  27:16 32:9
Lake/Highway
  26:16
land 52:10,12,14
late 10:22 14:9
  18:10 19:12,16
  55:4 65:11

Law 1:19 2:4
lay 79:11 80:3
lazy 44:11
lean 43:19
learn 40:24
leave 22:13 37:11
left 22:10,11 25:9
    26:5 28:11 33:6
    73:9 79:9,16
    82:18
left-hand 26:10
leftover 73:8
leg 34:3,5,19,21
    35:4 36:12 37:1,9
    37:12,16,17,18,21
    38:7,11,13,16,16
    38:20 39:1,13,19
    40:7,10,13 41:7,20
    41:25 42:6,14,16
    42:20,23 43:8
    44:3,5,7,13,18,21
    44:22 45:17 49:4
    49:6,14 50:12
    52:15 54:22,22,24
    55:1,6 66:15 67:3
    67:4,8,9 70:12,13
    70:15,15,18,22,23
    72:19 73:9,12
    74:6,7,9 75:5,6,7
    77:15 78:12 79:9
    79:16 80:11 82:9
    82:18
legs 41:1 48:18
    49:14 70:19 79:20
let's 7:24 10:24
letting 17:1
license 32:17
life 81:16
lift 79:13,16
lights 24:20 26:23
limit 29:19
line 85:6 87:2
listening 26:25
literally 74:17
little 7:5,8 12:18
    14:6,12 22:16
    26:2,19 28:7 32:8
    32:10,11 40:13

49:24 58:9 59:14
    71:19 81:18,23
live 8:20 9:24 70:4
lives 8:14 9:25
    69:18,19 72:2
    76:10
LLC 1:9 87:24
located 57:22 71:23
locked 24:19
locker 22:19,22
lockers 21:25
long 7:17 20:13
    21:22 23:10,16,19
    28:2,9,17,18,23
    29:8 32:9 33:12
    33:15,20 40:20
    51:20 53:19 55:1
    58:1 60:5 61:17
    62:20 77:10 81:6
look 31:4 50:10
    72:12 78:2
looked 31:7,9
looking 27:14,15
    31:4,6
looks 71:9
Loop 2:9
lose 44:23 45:8,10
    45:10,12 50:13,14
    76:15
lost 56:19 82:25
lot 13:15 25:12
    29:14,18 35:5
    40:10 41:3,11
    46:23 49:22 52:13
    52:13 53:11 55:7
    55:8 58:7 60:17
    68:14 69:11 77:21
    82:19 83:15,17,23
loud 5:16
Lupfer 76:11

## M

M-U-I-R 6:25
machine 34:13
machines 48:14,15
    48:17,18,20,22,24
    49:9,9,13
Mack 35:9

Major 59:19 69:25
making 38:24 80:14
manage 41:9
managed 22:7
manager 8:3,23
    22:1 35:7
manually 18:17
March 71:15
Mark 71:8,10,11,18
marks 44:3
material 38:23
math 67:19
matter 86:7,8
Matthew 75:12
meals 60:1
mean 33:20 52:14
    65:3 71:18 82:12
    83:6 84:17
means 74:5,12
    84:24
meant 84:9,15 85:7
Medicaid 56:11
    70:17 82:10
medical 7:11 72:17
medication 57:19
    65:18
medications 6:15,18
medicationwise
    69:3
meeting 75:21
memorizes 43:16
memory 43:9,18
    54:15 71:19
men 32:25
mention 16:20
mentioned 19:1
    61:1 70:20
mentor 46:14,21
    77:24
met 9:3,3,4 71:14
metal 75:6
Michael 2:4 61:10
    83:24
mid-August 17:17
middle 50:25
Mike 84:4
mike@blivenlawf...
    2:6

miles 8:8,9,17 59:14
mind 7:6,7 71:20
minute 20:18
minutes 23:5,20,22
    27:12 28:6,21,24
    29:12 30:22 31:14
    81:8,9
misspelling 85:14
mixed 61:12
mobile 48:19
mold 39:3
mom 19:14,19
    20:14 21:2,10,15
    21:15,18,21 27:21
    29:10 32:13 51:7
    51:12 64:1 65:3
    72:2,4
Monday 47:4,5 61:6
Mondays 46:20
Montana 1:2,20,25
    2:5,10 3:6,7,11
    5:10 46:10 86:2,5
    86:6
month 33:19 35:16
    37:18 39:7,9 57:8
    62:15 63:11 67:24
    80:20
months 7:19 12:25
    35:19,21 38:4
    44:19 50:8 51:23
    58:6 74:4
Moore 2:9
morning 54:23
    59:21 74:17
mornings 18:6
mother 19:4
motivated 67:11
motivation 40:12
    56:20
Mountain 71:11,22
move 79:14 80:1
muddy 81:22
Muir 6:24,25 51:15
    52:19,22 57:4,7,8
    58:3 63:15 68:25
    69:3 83:2
muscles 52:11,18

## N

N 2:1 3:1
name 5:7 9:5 17:9
    17:11 22:1,2
    24:13 35:8,8
    46:16 55:18 76:23
    77:1,2 83:12
    85:15 86:20
near 76:10,11
necessary 84:1
need 6:3,11 21:16
    45:7,10 67:18,20
    70:2 77:23 81:11
    85:2
needed 37:13 45:10
nervous 13:24
    14:22,25
never 80:17
new 24:2 44:5,7,22
    70:18,23
nice 14:23 40:6
    41:13 59:11
night 22:1,5,6,7,9
    28:16 30:5 63:17
    63:19 73:21
nine 18:6 59:22
Noah 8:12 9:12,18
    10:23 11:12 13:10
    14:3,4 16:14 17:1
    19:7,8,11,17,22
    20:2,4,23 21:2,11
    21:14,16,19,22
    23:5,10 24:8,12,16
    24:23 25:9 26:7
    26:13,24 27:24
    28:11 29:23 30:7
    30:12,16 31:12,20
    31:21,23 32:8
    69:9,18 71:4 82:1
    82:3
Noah's 21:23 25:6,8
nodded 29:22 72:24
Northern 38:14
    39:19 40:1 42:7
    42:22 51:17 70:12
    70:25
Notary 1:24 3:6
    86:5

note 52:24
noted 87:17
notes 76:22
noticed 55:12
November 50:12
  57:16
nutritionist 47:24
  50:10,21

**O**

O 3:1
o'clock 10:11 16:9
object 6:8 23:13
objection 6:11
obviously 48:24
  76:1
occasionally 64:16
October 1:20 35:14
  35:15,15,15
offered 21:8
offering 70:8
office 57:5,23 71:15
  75:14 76:25 77:12
Oh 84:15
Ohio 40:17
okay 5:15,25 6:13
  7:12,13 10:11
  13:16 15:6,13
  20:4 24:14,15
  25:11 27:24 29:18
  33:24 34:7 36:7
  38:15 39:8 42:3
  54:7 56:25 59:3
  66:12 72:15 83:20
  85:8,17
old 7:15 10:7 48:15
  68:2 73:11
older 72:5,6,7
Olney 9:25
once 17:4,6 19:13
  32:13 39:6 42:6
  42:22 47:20 50:5
  58:7,8 61:23
  62:15 63:8,11
  65:22 67:2 68:1
  69:23 80:15
one-month 47:21
one-oh-five 25:10

one-ten 25:10
one-year 47:25 48:3
ones 41:3 48:25
  49:13
online 66:2
open 37:14
opening 7:25 35:3
opposed 84:15
orders 17:5,7
Oregon 63:25
orientation 45:23
  47:3
originally 42:22
  72:23 74:3
outcast 81:23
outline 48:6
outpatient 74:19,21
outside 31:17 36:17
  62:11 82:6
overall 50:14
overnight 59:15
  74:19
owner 35:9

**P**

P 2:1,1 3:1
P-A-R-K-E-R 9:23
p.m 11:5
P.O 2:10
pack 22:16
page 4:2,6 84:21
  85:4,5 87:1,2
pages 86:10
pain 81:21
pants 37:22
parallel 38:22
parents 13:21
Parker 9:21,22,24
  10:3,7 83:10,12,13
parking 25:12
  29:14,18
part 50:4 56:7
particular 14:9 83:4
parties 3:4,9,14
  86:16
pass 47:9 68:2
passenger 63:2
passively 43:25

Pathways 55:13,19
  56:22
patients 76:9
patrol 26:7 32:21
PC 1:19 2:4,9
people 32:21,24
  34:11 41:9,10,12
  44:17 68:14 69:11
  76:11 78:24 83:16
period 44:18 53:19
periodically 64:25
  65:1
permanent 75:6,25
  76:1,20
person 55:15
personal 37:24
phone 20:7,7,9
physical 37:13,16
  51:9,10,11,20 52:4
  52:8,20 53:1,5,7
  54:10,20 55:10
  56:12 69:2,4,4
  79:3 80:7,22
Physically 55:7
physically-wise
  55:3
pick 19:5,15,24
  20:2 22:25 46:1
  46:18 50:4
picked 19:25 23:2
  49:24
picking 82:2
pickleball 46:20,21
  47:6,16 48:13
  61:7,11,18
Pin 33:10,13,14,18
  34:8,16 36:3,5,8
place 3:10 51:16
  56:23 69:19 70:2
  86:8
places 76:6
Plaintiff 1:7 2:3
plan 46:20,23 68:1
  68:7 78:5
planning 15:2 67:1
  68:4,4 71:17
plans 76:18
plastic 39:3

play 59:7 60:6,9
  61:13 62:3 63:21
played 61:18 82:3
  82:20
playing 65:1
please 5:7
point 20:24 39:20
  39:23 75:20
pot 30:10,13
pounds 37:19,20
  44:19 45:10
power 82:9
preliminary 75:21
prep 18:5,8,11,13
  18:14
prescribe 57:19
prescribed 52:20
  80:22
prescribes 6:23
PRESENT 2:12
press 79:24
pressure 77:18
pretty 5:12 9:4
  10:22 15:4 16:6
  17:2 20:3 26:23
  28:15 33:2 35:5
  35:11 36:11 39:2
  40:24 41:10 42:15
  44:1,11,14 45:23
  46:5 47:14,17
  49:12 50:14 52:9
  53:10 59:11 66:3
  67:15 75:6 77:18
  80:3,17 81:3
priority 67:9
probably 5:11 8:17
  10:24 12:25 17:12
  38:8 50:25 56:10
  56:17 66:11 73:18
  82:3
problems 32:1
  40:10
Procedure 3:12
Professional 3:5
  86:4
program 47:10 48:2
  56:7
prosthetic 34:18,19

  34:21 37:9 38:7
  38:20 39:4,13
  40:3 41:7,19 42:6
  44:13 45:17 49:5
  49:6 72:19 78:12
prosthetics 38:14
  53:9
prosthetists 75:13
PT 42:15,17 51:14
public 1:24 3:6 8:16
  86:5
pull 29:19 32:25
pulled 29:10,17,17
  77:20
pulling 77:19
purpose 41:6 84:21
  85:12
purposes 43:6
pursuant 3:11
pushing 82:9
put 8:5 14:20 18:21
  23:2 32:22 34:25
  37:15 39:2 75:5
  77:18

**Q**

question 5:12 6:9
  6:10 24:21 30:2
questions 10:9
quick 15:25
quit 34:20 35:12,16
  51:21 65:8,10,13
quite 49:23 60:17

**R**

R 2:1,8
radio 26:25 27:3,6,7
rate 48:23 49:1
reach 71:4
read 84:3,12,13,17
  85:2,13 87:15
read-and- 84:5
reading 3:15 84:14
  84:23
readjust 42:8,25
  43:1
readjustments 42:9
ready 11:5 29:7

34:25 67:5
realize 43:24
realized 44:1
really 10:15 13:14
13:23 14:20,21
16:3,23 18:3
19:23,23 22:4
23:17 28:6 34:22
35:10 37:23 41:25
42:1,3,13,13 48:17
49:1 52:11 54:21
55:10 59:18,18
60:13,14 63:15,15
68:13,13,15 69:10
69:11,14 70:4,6
74:15 80:5 81:20
82:5,8,9,13,19,22
83:5,6,10,11,21
reason 31:7
recall 7:24 15:14
recommend 79:7
83:3
recommendations
50:23
recommended 75:9
83:2,5
recommending
56:21 68:14 75:1
record 11:2
recreation 63:22
recreationwise 65:2
red 17:20,22,23
70:9
redo 56:11
reduced 86:12
refer 52:23
referral 45:21,22
referred 9:17 45:15
45:18 57:5
refit 70:12,12,14
Registered 3:5 86:4
regular 11:16 29:19
65:24
rehab 40:23 65:17
relate 76:13
relative 86:16
remember 9:6,10
11:3 12:1,16,21,23

13:16 15:22 17:15
18:20,23 19:18
20:8,13 22:2,8,12
23:25 24:4,5,13
25:21 26:3,4,12,14
26:15,18,22 27:15
27:19,21,22,24
28:10 31:2,11,18
31:25 32:19 33:4
33:17 35:8,23
36:5,23,25 38:6
47:22 50:8 53:21
53:23 54:5,13,14
55:18 57:9 62:17
66:16 68:20 71:3
71:6,8,13,18,25
73:19 74:2,13,23
76:17 77:2,11,12
80:18
repair 34:14
report 26:7 86:7
Reported 1:24
reporter 3:5 5:22
27:4 83:24 84:24
86:4
REPORTER'S
86:1
reserved 3:16 85:20
residing 3:6 86:5
resist 43:19
resistance 79:10
resources 45:24
respective 3:4,9,14
response 5:17
responses 65:8
rest 22:17
restaurant 8:7,13
20:7,9 25:2,12,16
28:12,18,19,22
29:16 30:5,15
result 40:4
Rheo 43:9,13,14
rid 59:6
ride 19:6,17,20 20:1
20:15,24 21:3,8,11
21:16,19 62:5,7,13
62:20
riding 19:11

rifle 64:21
right 5:14,18 6:1,5
6:6,14 11:10,12
17:14 20:6,16,22
21:14,21 23:8
25:5,11,24 26:13
26:20 31:1,2
36:10 39:18 42:17
45:11 48:19 49:8
49:18 51:9,15,15
51:18 54:16 57:22
58:16,19 60:5,13
61:11 66:3,8,13
67:9 68:12,22
69:24 72:1 76:24
77:16,20 78:2,14
79:9,22,22 81:12
83:18 85:11
right-hand 26:8
rised 41:23
Rizzolo 77:1,3,4,6
road 5:10 19:8
25:22,23,25 26:2,6
26:6,8,12,13,20
27:16 28:4 31:5
32:9
roads 25:18
Rocky 71:11,22
rod 75:6 76:20
rode 19:13 31:21,23
rolled 26:9 27:17
31:10
rookies 46:23 48:21
roughly 16:9 31:14
31:23 43:6 51:24
54:2
RPR 1:24 86:25
rubber 79:9,13,19
rule 6:11 84:6,7,16
84:23
rules 3:11 5:11
run 55:25 81:24
running 41:4 65:5

_____ S _____
S 2:1 3:1,1
S-U-L-L-Y 17:12
sad 44:15

salmon 64:9,11
sat 24:9 37:23
Saturdays 15:6,10
15:16 16:6
saved 82:15
saw 50:9 57:9 79:4
saying 21:7 84:11
84:13
says 27:21 67:20
71:14
scan 74:22
scars 44:3
schedule 8:1 10:13
11:7,16 13:18
14:8,11,17 15:8,14
15:23 23:24,25
42:8,12,13 45:12
46:17,19 47:2
50:5 56:8 58:1
75:24
scheduled 50:20
57:12,15 58:20,25
62:4 70:11 73:20
78:1
schedules 42:10
schedulewise 10:14
scheduling 47:3
school 10:1,3 15:3
15:11,17,23 16:2,5
16:15 23:23 53:6
61:19 65:8,12,15
65:23,24 66:1,10
66:16 68:18
Schwager 71:8,10
71:11,18
Schwegel 5:10
scoot 32:11
screamed 31:10
screwed 44:16
seal 86:20
seasonal 63:23
Seattle 76:7
second 23:11,14,16
41:21 44:10 47:4
60:22 69:13 70:15
83:14
see 7:24 10:24 20:14
30:19 41:9 44:12

47:24 48:3,16
50:21,25 51:1
56:1,10 57:2,7,8
58:6 64:3 68:25
71:12,19 75:23,24
77:8,17,23 78:6
seeing 26:4 57:21
58:6,10 69:3 71:8
seeking 58:1
seen 45:9 58:5 77:1
77:10,11
self- 50:14 65:24
self-confidencewise
50:18
self-conscious 41:23
64:3 82:12
self-consciousness
41:23
sell 82:14
send 84:4 85:1
senior 65:11
September 64:9
sequence 37:25
39:12
session 50:24 57:20
sessions 51:5
set 3:10 42:18 47:2
47:10 50:13
sets 67:15
setting 75:20
seven 36:12 72:25
She'll 85:1
sheet 20:10 23:4
shifts 82:14
ship 39:3
shop 46:2
Shopko 33:10,13
35:13,14 36:8
37:4,6,22 44:6
shorthand 86:13
shoulder 32:5 79:22
show 74:7
showed 32:21 44:2
50:10 55:25 79:21
80:1
shower 59:23
showing 11:2
shows 20:11 23:4

26:7 72:16
shut 24:20
shy 13:15,22
sic 12:22 41:23
68:12
side 26:5,8,10 81:9
sign 26:3,9,20,22
27:16,22 31:9
84:4,6,12,14,18
signature 83:25
85:19
signing 3:15 84:14
84:23
silence 27:12
single 54:23 70:7
sir 25:14 29:2,25
30:6 32:15
sister 67:22 72:4,5,7
sit 34:22 80:2,9,24
sit-down 49:9
site 29:21 32:22
sitting 24:23 36:11
44:10 48:20,25
49:3
situation 74:18
six 74:4
skiing 82:7
Skye 59:18 69:23,25
Skylar 1:6,16 5:1,8
7:5,6 29:3 31:2
44:24 72:9,16
81:10 84:24 85:18
86:9,11 87:23,24
sledding 82:7
sleep 11:8 33:3
sleepy 28:8,12
65:20
smoke 30:10
smoking 30:12
snagging 64:9,11
socializing 82:24
socially 83:3
solid 40:6
somebody 18:21
30:24 49:17 63:7
somebody's 85:14
Someplace 71:24
soon 77:17

sophomore 66:17
82:21
sore 40:11 79:23
sores 35:2,2,6 44:3
74:10
sorry 20:21 27:4
33:23 39:17 43:11
45:4
sort 7:12 34:14
38:17 78:18 82:7
85:15
sound 23:8
sous 16:24
speak 13:20 14:22
spear 82:7
specialize 76:8
specializes 53:9
speed 29:19
speeding 27:25
spell 17:11
Spencer 32:8
spend 73:21
spoke 24:16
Sports 51:17,17
spreading 74:14
spring 38:10,11
39:14 42:23
Spur 5:10
squats 80:10,11,16
80:19
stand 34:11 36:9,12
36:24 37:3 38:22
standing 67:4
stands 36:16 80:9
80:24
staple 73:9
stare 41:12
start 18:9 19:11
22:6 46:7 67:10
70:10 72:13
started 7:21 10:17
10:23,25 15:3,12
15:17,24 16:15
18:5,8 22:3 46:6
50:2 52:10 58:4
72:9
starting 43:23 54:9
73:10

state 1:2,25 3:6 5:7
86:2,5
stated 86:8
statement 72:10
stay 16:2 33:1 70:2
70:3,8 74:18
stayed 56:17 63:25
staying 22:5,6
Steve 77:6
stick 82:13
Stillwater 1:9 7:9
8:14,17
stipulated 3:3,8,13
stitch 73:8,14
stop 25:15 34:2,4
35:4,11
stopped 44:18
51:10 54:11,17
55:11,21 56:15
67:25
store 60:22
story 67:23
straight 25:6 70:5
straighten 5:14
stress 35:1
stressful 65:25
stretch 28:9,15 32:9
79:21,23 80:2
stretched 31:18
stretches 28:2
stretching 80:4 81:4
81:7
stronger 52:18
80:15
stuck 34:12 48:19
stuff 22:16 40:24
41:12 42:15 44:4
46:3 47:7 50:11
57:1 65:5,18
74:10 79:8 80:23
subscribed 86:19
substance 56:22
substantive 84:19
85:9
sucks 83:16
suction 75:8
suggest 60:8
suggestions 14:16

17:18
suicidal 57:1
Suite 2:9
Sully 16:24 17:9,12
17:16 18:1 19:2
summer 7:21 9:12
9:16 10:25 11:8
34:23,24 38:11
39:14 40:18 42:23
51:24 52:3 54:13
54:19,21 55:6
56:15 63:24
Summit 46:10,10
46:11 53:5,8,12,14
53:15,20,21,24
54:12 56:4,5 70:7
76:25
Sunday 59:16
Sundays 15:7,10,17
16:7
support 55:10
supportive 55:23
supposed 45:14
50:7
sure 29:9 39:8
43:17 76:3,7
81:12 84:20 85:3
85:13
surgeries 72:20,21
72:25 74:24 77:13
surgery 73:9,15,22
74:2,4,16,20 75:2
75:4,16,22 76:15
76:20 77:9,20
79:22
surprised 68:15
sweat 74:10
swim 82:8
swimming 41:2
55:7
sworn 5:2 86:9
system 8:6

| T |
| --- |

T 3:1,1
take 6:4 11:21
13:25 14:7 21:22
23:10 25:18 30:20

34:24 35:11 38:17
39:2 67:15,17
68:2 70:1 73:10
taken 1:17,19 3:4
3:10 76:22 86:12
talk 16:21 23:21
27:13 29:7 32:23
69:14 83:11
talked 14:15 15:22
19:21 21:2,7,21,25
23:23 31:18 69:11
72:14 75:12 81:11
talking 13:21 24:8
24:24 28:7,8
32:24 71:16 72:13
75:4,11
taxes 33:25
teach 46:2
teacher 65:21
technically 52:13
tell 5:2,13 6:4 7:4
12:8 14:18 16:22
17:13 19:25 21:11
35:7 36:3 47:13
52:23 72:13
telling 14:19 17:16
24:1,3 33:1 45:19
69:12 79:24
tells 6:9
ten 8:17 14:14
22:14,14,15 23:20
23:22 28:21 31:14
37:19,20 59:22
61:6 63:18,19
80:14
ten-minute 11:25
tennis 61:12
test 68:2
testified 5:3
testify 6:16
testimony 86:11
87:15
tests 67:17
Thank 6:7 7:2
Thanks 83:21,22
therapist 55:24
79:24
therapists 79:3 80:7

80:22
therapy 34:23 37:13
  37:16 42:14 51:9
  51:10,11,20 52:4,8
  52:20 53:2,5,7
  54:10,20 55:20
  56:12 57:20,20
  66:8,8 73:13
therapywise 55:11
  69:2
thigh 74:8
thing 7:12 27:15
  38:17 47:12 53:7
  59:5 85:16
things 72:16 79:7
  83:4
think 8:3 15:6 16:1
  19:8,14 22:1,15
  24:2 25:9 28:7,9
  31:20 33:22 35:17
  39:13 42:19 44:20
  47:22 50:16 51:16
  52:22,22,23 58:14
  67:16,21,24 73:17
  73:18 75:3 76:6
  76:24,25 77:7,10
  80:21 81:10,14
  83:18
thinking 75:23
  77:14
thought 56:14,22
  60:19
thoughts 57:1
three 7:19 15:15
  19:9 24:11 27:12
  28:6 31:21,25
  35:21 36:21 49:25
  50:8 51:22 57:11
  58:3 62:16
three-month 47:25
  48:2
threw 54:23
throw 22:25
Thursday 47:6
  58:11 61:2
time 3:10 6:3 7:15
  8:3 13:14 14:13
  16:1 18:2,21

19:10 22:12 23:4
  23:25 25:9 29:11
  30:21 31:7,12,13
  32:4 37:19 38:15
  39:20 42:2,5
  43:24 44:10,10
  45:9 46:18 51:1
  52:2,11 53:16,18
  53:19 55:25 57:9
  59:20 62:17 63:15
  63:16 64:5,7,8
  69:20 70:7 71:4,6
  75:25 77:10 79:3
  79:25 80:18 81:3
  83:22 86:8
timed 28:25 29:11
times 19:9,14 21:17
  30:21 31:21,25
  32:2 42:21,24,25
  43:5,7,17,20,21
  44:9 46:24 50:8
  61:17 62:16 77:2
  77:12
timing 29:13 51:12
tired 12:8,9 16:17
  16:19,23 17:2,16
  18:1,3 19:1 20:1
  21:18 28:11,15
  33:2
tissue 74:16
today 6:15 58:13
  85:1
told 5:11 9:9,10,14
  10:10,20 16:5,24
  17:1 35:10 37:14
  44:22 45:7 67:7
  76:1 77:23
tomorrow 58:12
total 19:8 31:21,25
town 65:3 70:4
training 9:5 46:2,22
  46:22,22 47:16
  48:14,21 49:11
transcription 86:11
traveled 27:23
treadmill 48:25
treadmills 48:24
treatment 7:11,11

51:8 58:2
tried 12:17 19:19
  36:9 44:9 71:4
truck 70:9
true 86:10 87:16
truth 5:2,3,3
try 5:13 24:21 45:19
  47:15 68:16 83:2
trying 32:25 33:2
  54:15 59:6 60:12
  69:16,16 74:7
  76:18
Tuesday 1:20 58:15
  58:16
turn 32:9
turned 31:4 74:11
turnoffs 25:18
twelve 11:5,8 23:6
  61:6 66:8
twelve-fifty 20:11
twice 19:14 47:1
  50:1 60:20
two 12:3,6,25 14:20
  20:18 21:17,17
  22:3 23:5 29:4
  30:25 32:1 33:16
  33:17 34:2 35:21
  37:15,15 38:22
  41:16 44:9,19
  46:8,25 47:1
  49:18 52:8 54:2
  54:22 58:6,9,16,20
  60:18 62:15 66:5
  69:6 70:21,21
  74:23 81:3 82:4
two-week 47:20
type 72:19 84:25
typical 11:7 59:3,4
  62:2
typically 28:17
  59:20 60:6

U

U 3:1
Uh-huh 5:19,20 7:3
  10:4 11:17 13:11
  15:21 20:12,19
  23:9 29:15 30:18

35:20,22 38:2
  39:15 45:2 52:1
  56:6 60:2 61:3,14
  62:12,23 64:20,22
  65:10 68:10,24
  69:21 73:2,4 74:1
  78:16,21 79:15,18
  80:12
understand 5:13
  84:5
understanding
  84:16
understood 65:7
unstuck 34:13
untouched 33:7
upper 49:10,12
use 38:16 41:19
  42:9 78:12 79:9
  82:13,17
usually 19:5 41:12
  49:22,23 51:7
  79:25

V

Valium 65:19
video 59:7 60:6,9
  62:3 63:21 65:1
  82:3
visit 7:5,8 8:22,25
  23:19
visited 9:3 23:11,20
  31:20 71:4
visiting 14:16 26:25
  31:13 83:22
vs 1:8 87:24

W

waiting 36:5
wake 65:22
walk 37:25 39:11
  43:10,16,18 75:5
walk-in 22:23 78:3
  78:6
walking 31:17 35:6
want 7:4 14:20,22
  14:24 39:12 41:21
  41:24,25 46:18
  47:8,13 53:25

55:9,14,20 59:7
  64:3,8 66:14 67:9
  67:10 70:2,14,14
  70:16 83:7,24
  84:1,13,17,19,20
  85:12
wanted 12:13 13:17
  13:18,20 14:7,8,10
  14:11,13,20 24:1
  29:9 33:3 37:12
  44:21 45:19 54:19
  55:13,19 59:19
  63:16 70:1 75:23
  84:19 85:10
wanting 62:10
wants 60:12 62:5,9
  69:15 83:9
wash 18:14
washing 11:16
wasn't 11:23 12:22
  12:23 19:15 24:21
  28:5 34:22,25
  40:5 41:3 42:3,12
  64:2 81:22 82:2,5
watch 32:8
water 38:25 52:11
  52:18
Wave 52:9 53:2,7
  53:13,15,20 54:1,4
  54:8,11,15,17 55:4
way 11:20 41:24
  45:21 62:9 68:21
we'll 6:4 63:24
we're 15:5 17:3
  20:4 50:24 51:1
  60:12,16,16 62:4
  67:7 80:14 84:20
we've 51:1 60:17,23
  69:10,15
weak 52:11,17
wear 40:13 44:8
  73:12 79:9
wearing 35:4 44:18
  74:9
Wednesday 46:4
  47:6 58:13
week 15:15,15 29:4
  37:14 40:21 47:3

47:4,6,20 50:5
58:7,8,10 59:1
60:18,23,24 61:1,5
62:19 67:18,21,24
81:25
weekend 59:9,10
weekends 15:5
weeks 14:21 22:3
29:4 33:16,17
34:2 37:15,15
46:8,25 47:2
54:22 57:11 58:10
78:7
weigh 44:24,25
weighed 45:9
weight 39:22,25
40:6,12 41:22
43:19,24 44:5,23
45:7,12,25 46:1
50:13,14 76:15
82:12
weightlifting 49:10
weird 78:19
Wellbutrin 6:22
Wellness 45:18,20
46:5,9 47:11 50:2
51:5,11 52:21
54:9 56:7 60:16
60:20 61:5,21
66:14 67:8 68:23
69:5 77:24 78:24
went 7:14 10:22
11:3,13 15:4 20:5
21:24 25:8 26:8
26:13,23 31:17
36:10 37:15 40:7
40:17 44:20 45:22
45:23 46:3 49:23
52:12 54:12 55:7
59:9,16 63:17,24
64:8,9,10 81:25
82:1,2
weren't 42:13
wheel 63:22
wheelchair 34:15
37:9,10 54:24
60:15 61:13 64:14
64:17 67:4 78:10

WHEREOF 86:19
Whitefish 5:10 8:10
8:15,18 9:24 10:1
10:5 25:13 36:16
36:17 51:18 52:6
53:3 55:11 73:13
73:15
Widow 36:18
window 27:14 31:4
31:6
winter 82:6
witness 3:15 29:22
72:24 83:20 86:19
woke 11:5
woods 60:14
words 84:6,7,8,11
wore 23:3
work 7:9,14 9:12,16
10:10 11:4,6,13,15
12:12,19,22 15:7
15:16 16:5,6,20
19:2,6,7 30:16
33:15 35:13 37:23
41:19 46:13 48:15
49:13 51:13 52:18
52:21 56:3 66:20
79:10
worked 7:17,19
18:16 30:15 33:17
34:1,1,8,16 35:14
35:16,19 37:6,8
44:9 49:25 53:8
working 13:7 15:2
16:8,15,18 18:5
30:5 34:21 36:9
44:8 51:12 66:13
67:3 73:13 80:25
82:15
wouldn't 14:8 19:16
41:25 64:7
Wow 44:11,16
68:16
wreck 22:3 27:11
65:14 69:11,13
wrecked 26:5
write 85:5
writing 5:23 86:13
written 48:6 65:7

wrong 42:11 85:4
85:14

__ X __

X 85:5

__ Y __

yawning 28:12,14
yeah 6:2 7:7 9:2,14
9:20,23 10:19
11:9 15:9,21
16:11,13,16,24
17:8,24 18:8,8,17
21:6,9,20 22:10,20
24:9 25:23 26:23
27:9,11 29:9
32:13 33:20 35:11
37:23 42:20 43:1
43:4 44:4 46:5
48:8 49:15 52:13
55:18,24 56:13
57:24,24 63:16
64:4,18 65:6
66:24 70:1 71:21
73:11 76:8 77:5
79:15 83:1,6,15,16
84:12,18
year 32:18 33:20
36:6,25 39:10
40:17 41:22 48:3
48:4 53:4,22,23
58:5 63:24 64:13
65:15 66:5,17,18
66:19 71:9,9,25
72:8 82:21
years 7:15 52:8 54:2
58:4
yoga 47:7
younger 72:5

__ Z __

Zeider 45:15 52:19
73:17,19
Zoloft 6:22

__ 0 __

__ 1 __

10 44:20

10:04 1:20
100 5:10
11:39 85:19
145 2:9
14th 57:16
15 7:15 10:8 13:15
13:23 21:12 81:8
81:9
16 55:4
17 55:5
1st 35:15

__ 2 __

20 43:5,7 44:20
45:10
200 2:9 40:6
2014 38:1
2015 37:1 38:8,9,12
39:14 40:5,17
42:23 43:3,8 54:6
54:14 77:11
2016 33:22,23,25
35:24 36:5 37:2
44:1 53:25 54:4
54:17,20 65:11,12
65:16
2017 33:22,23 35:25
36:1,3 44:1 54:4,6
54:18 71:7,15
2018 1:20
20th 71:15
220 40:6
278 1:19 2:5

__ 3 __

30 1:20 45:10
30-minute 36:13
30th 11:2
31 38:1
340 45:9
35-mile 70:6
350 44:25 45:1
3rd 35:14

__ 4 __

4 14:1
40 36:19 67:18,21
67:24

40-mile 70:6
425,000 72:17
45 28:1
4th 14:1,4

__ 5 __

5 4:3
50 28:2
59901 2:5
59904-0370 2:10

__ 6 __

__ 7 __

7370 2:10

__ 8 __

__ 9 __

93 8:9,18 25:13,25
26:16

# MONTANA VEHICLE CRASH REPORT

Montana Highway Patrol
2550 PROSPECT AVE
HELENA, MT 59620



| Crash Number | Reporting Agency | | Reporting Agency Case Number | Reporting Agency CAD Number | ORI |
|---|---|---|---|---|---|
| 50066605-01 | MONTANA HIGHWAY PATROL | | | MHP14CAD120346 | MTMHP0000 |

## CRASH IDENTIFIERS

| County of Crash | City | Crash Date/Time | Reported Date/Time | Dispatched Date/Time |
|---|---|---|---|---|
| FLATHEAD (07) | NOT IN CITY LIMITS () | 08/31/2014 01:15 AM | 08/31/2014 01:20 AM | 08/31/2014 01:20 AM |

| On Scene Date/Time | Cleared Scene Date/Time | Complete Date/Time | Reason (if Investigation Not Complete) | Source of Information |
|---|---|---|---|---|
| 08/31/2014 01:57 AM | 08/31/2014 03:22 AM | 08/31/2014 04:42 AM | | MONTANA HIGHWAY PATROL |

## ROADWAY INFORMATION

| Roadway Description for Location of Occurrence | | | Latitude | Longitude |
|---|---|---|---|---|
| MM135.1 US93 | ☐ Notify MDOT | | 48.42289945 | -114.46451381 |
| Intersecting Roadway Description for Location of Occurrence | Distance / Direction to Crash Location | | Roadway Blocked | Roadway Cleared Date/Time |
| | | | ☒ Blocked | 8/31/2014 3:05:45 AM |

| Part of National Highway System | Roadway Functional Class Type | Roadway Functional Class Detail | |
|---|---|---|---|
| YES | RURAL | PRINCIPAL ARTERIAL-OTHER | |

| Roadway Access Control | Type of Shoulder | Roadway Lighting | Roadway Bikeway Facility | Signed Bicycle Route |
|---|---|---|---|---|
| NO ACCESS CONTROL | UNPAVED | NO LIGHTING | NONE | NOT APPLICABLE |

| Traffic Control Type at Intersection | Mainline Number of Lanes at Intersection | Side Road Number of Lanes at Intersection |
|---|---|---|
| | | |

## CRASH INFORMATION

| Light Condition | Weather Condition | Roadway Surface Condition | Roadway Surface Composition | Manner of Crash Collision / Impact | Crash Pictures Taken |
|---|---|---|---|---|---|
| DARK-NOT LIGHTED | CLEAR | DRY | BLACKTOP | SINGLE VEHICLE CRASH ONLY | ☒ |

| First Harmful Event Type | First Harmful Event Detail | Location Of First Harmful Event Relative To The Trafficway |
|---|---|---|
| COLLISION WITH FIXED OBJECT | TRAFFIC SIGN SUPPORT | ROADSIDE RIGHT |

| First Harmful Event's Relation to Junction | Is First Harmful Event within Interchange Area | Type of Intersection |
|---|---|---|
| NON-JUNCTION | NO | NOT AT INTERSECTION |

| Contributing Circumstances: Environment | Contributing Circumstances: Environment | Contributing Circumstances: Environment |
|---|---|---|
| NONE | NONE | NONE |

| Contributing Circumstances: Road | Contributing Circumstances: Road | Contributing Circumstances: Road |
|---|---|---|
| NONE | NONE | NONE |

| School Bus Related | Work Zone Related | Crash Location in Work Zone |
|---|---|---|
| NO | | |

## VEHICLE V01

| ▶ V01 | Motor Vehicle Type | | State | License Number | Registration Expires | ☐ Permanent Registration | VIN |
|---|---|---|---|---|---|---|---|
| | MOTOR VEHICLE IN TRANSPORT | | MT | 7C74851 | 2/28/2015 | | 2FMZA5141WBD59749 |

| Year | Make | Model | Style | Color | Body Type Category |
|---|---|---|---|---|---|
| 1998 | FORD (FORD) | WIN | VAN | MAR | PASSENGER VAN |

| Special Function of Motor Vehicle in Transport | Emergency Motor Vehicle Use | Type of Bus Use |
|---|---|---|
| NO SPECIAL FUNCTION | NO | NOT A BUS |

| Owner First Name | Owner Middle Name | Owner Last Name | Owner Suffix | Owner Business (if not Person) | | |
|---|---|---|---|---|---|---|
| CYNTHIA | TOMSHECK | GILLUND | | | | |

| Address | Address Other | City | State | Zip Code |
|---|---|---|---|---|
| 6068 Wislin Dr | | Whitefish | MT | 59937 |

| Owner Phone Number | Owner Phone Number (other) | Insurance Company | Insurance Policy Number | Insurance Broker or Agent |
|---|---|---|---|---|
| 408-862-5039 | | PROGRESSIVE | 900916703 | |

| Vehicle Removal | Vehicle Towed By | Wrecker Selection Method |
|---|---|---|
| TOWED DUE TO DISABLING DAMAGE | OHS | ROTATION |

| Direction of Travel Before Crash | Estimated Speed: | Posted 70 | Roadway Type | Total Lanes 2 | Roadway Horizontal Alignment | Roadway Grade |
|---|---|---|---|---|---|---|
| NORTHBOUND | | | UNDIVIDED HIGHWAY | | STRAIGHT | LEVEL |

| Trafficway Description | Traffic Control Device Type | Working Properly |
|---|---|---|
| TWO-WAY NOT DIVIDED | NO CONTROLS | |

| Roadway Description for Vehicle Travel |
|---|
| MM135.1 US93 |

| Vehicle Maneuver Action (by this vehicle) | Hit & Run (by this vehicle) | Damage Extent (for this vehicle) | Damage Estimate |
|---|---|---|---|
| MOVEMENTS ESSENTIALLY STRAIGHT AHEAD | NO DID NOT LEAVE SCENE. | DISABLING DAMAGE | |

| 1st Sequence of Events Type (this vehicle) | 1st Sequence of Events Detail (this vehicle) |
|---|---|
| NON-COLLISION | RAN OFF ROADWAY RIGHT |

| 2nd Sequence of Events Type (this vehicle) | 2nd Sequence of Events Detail (this vehicle) |
|---|---|
| COLLISION WITH FIXED OBJECT | TRAFFIC SIGN SUPPORT |

| 3rd Sequence of Events Type (this vehicle) | 3rd Sequence of Events Detail (this vehicle) |
|---|---|
| NON-COLLISION | OVERTURN/ROLLOVER |

| 4th Sequence of Events Type (this vehicle) | 4th Sequence of Events Detail (this vehicle) |
|---|---|
| UNKNOWN | |

| Most Harmful Event Type (this vehicle) | Most Harmful Event Detail (this vehicle) |
|---|---|
| NON-COLLISION | OVERTURN/ROLLOVER |

| Contributing Circumstances 1 (this vehicle) | Contributing Circumstances 2 (this vehicle) |
|---|---|
| NONE | NONE |

Area of Initial Impact
- ☐ Non Collision
- ☐ Top
- ☐ Undercarriage
- ☐ Unknown

Most Damaged Area
- ☒ Non Collision
- ☐ Top
- ☐ Undercarriage
- ☐ Unknown

EXHIBIT 4 — GILLUND — PENGAD 800-631-6989

| Occupant Type | Person Name (First Middle Last Suffix) | Injury Status |
|---|---|---|
| DRIVER | NOAH MORGAN GILLUND | INCAPACITATING INJURY |
| PASSENGER | SKYLER LEE DIXON | INCAPACITATING INJURY |

## DRIVER V01

| ▶ | Person Type | NAW | Vehicle# V01 | Person Type Detail | | | | |
|---|---|---|---|---|---|---|---|---|
| | DRIVER | | V01 | | | | | |

| First Name | Middle Name | Last Name | Suffix | Date of Birth | Age | Sex |
|---|---|---|---|---|---|---|
| NOAH | MORGAN | GILLUND | | 08/19/1998 | 16 | M |

| Crash Number 50066805-01 | Reporting Agency MONTANA HIGHWAY PATROL | | Reporting Agency Case Number | Reporting Agency CAD Number MHP14CAD120340 | ORI MTMHP000D |
|---|---|---|---|---|---|

| Address 6006 WHISTLIN DR | Address Other | | | City WHITEFISH | State MT | Zip Code 59937 |
|---|---|---|---|---|---|---|

| Phone Number (other) 406-862-5939 | | Condition at Time of Crash APPARENTLY NORMAL | | | |
|---|---|---|---|---|---|

| Driver License Number 0801519984119 | Class D | Expires 08/19/2010 | State MT | Jurisdiction 02 | Type NON-CDL DRIVER'S LICENSE | | Status VALID LICENSE |
|---|---|---|---|---|---|---|---|

| Commercial Motor Vehicle Endorsements NONE/NOT APPLICABLE | | ☐ Recommend Driver ReExam |
|---|---|---|

| Drivers License Restrictions 1 OUTSIDE MIRROR | Drivers License Restrictions 2 GDL RESTRICTION | Drivers License Restrictions 3 NONE |
|---|---|---|

| Driver Distracted By OTHER INSIDE THE VEHICLE | Driver Vision Obstructions VISION NOT OBSCURED |
|---|---|

| Driver Actions at Time of Crash 1 (based on judgement of investigation officer) DROVE IN DISTRACTED, INATTENTIVE OR CARELESS MANNER | Driver Actions at Time of Crash 2 (based on judgement of investigation officer) RAN OFF ROADWAY |
|---|---|

| Driver Actions at Time of Crash 3 (based on judgement of investigation officer) OVER-CORRECTING/OVER-STEERING | Driver Actions at Time of Crash 4 (based on judgement of investigation officer) NO CONTRIBUTING ACTION |
|---|---|

| Motor Vehicle Seating Position: Row FRONT | Motor Vehicle Seating Position: Seat LEFT | Motor Vehicle Seating Position: Other NOT APPLICABLE | | ☐ Seating Position Unknown |
|---|---|---|---|---|

| Restraint Systems SHOULDER AND LAP BELT USED | Helmet Use |
|---|---|

| Air Bag Deployed NOT DEPLOYED | Ejection NOT EJECTED |
|---|---|

| Trapped Extrication TRAPPED & EXTRICATED | |
|---|---|

| Injury Severity Level Type INCAPACITATING INJURY | Injury Severity Level Detail | Primary or Most Obvious of Body Area Injured During Crash HEAD |
|---|---|---|

| Source of Transport to Medical Facility EMS AIR | EMS Agency Name or ID ALERT | EMS Run Number 08/31/2014 | Medical Facility Transported To KRMC |
|---|---|---|---|

| Injury Description (Type of Injury inflicted to Primary or Most Obvious Body Area Injured during crash. Can come from EMS / Hospital records). Facial fractures |
|---|

| Law Enforcement Suspected Alcohol Use NO | Alcohol Test Type | Alcohol Tested TEST NOT GIVEN | Alcohol Test Results |
|---|---|---|---|

| Law Enforcement Suspected Drug Use NO | Drug Test Type | Drug Tested TEST NOT GIVEN | Drug Test Results |
|---|---|---|---|

| Violation Type Issued NOTICE TO APPEAR AND COMPLAINT | Number 610 A506804 E | Violation Description 61-8-302(1) [2] CARELESS DRIVING INVOLVING DEATH OR SERIOUS BODILY INJURY - MCA 61-8-716 |
|---|---|---|

## PASSENGER V01

| ▶ Person Type PASSENGER | NMN | Vehicle# V01 | Person Type Detail | | | | | |
|---|---|---|---|---|---|---|---|---|

| First Name SKYLER | Middle Name LEE | | Last Name DIXON | | Suffix | Date of Birth 02/16/1999 | Age 15 | Sex M |
|---|---|---|---|---|---|---|---|---|

| Address 6026 HWY 93 N | Address Other | | | City WHITEFISH | State MT | Zip Code 59937 |
|---|---|---|---|---|---|---|

| Phone Number (other) 406-862-3984 | | Condition at Time of Crash APPARENTLY NORMAL | | | |
|---|---|---|---|---|---|

| Motor Vehicle Seating Position: Row FRONT | Motor Vehicle Seating Position: Seat RIGHT | Motor Vehicle Seating Position: Other NOT APPLICABLE | | ☐ Seating Position Unknown |
|---|---|---|---|---|

| Restraint Systems SHOULDER AND LAP BELT USED | Helmet Use |
|---|---|

| Air Bag Deployed NOT DEPLOYED | Ejection NOT EJECTED |
|---|---|

| Trapped Extrication TRAPPED & EXTRICATED | |
|---|---|

| Injury Severity Level Type INCAPACITATING INJURY | Injury Severity Level Detail | Primary or Most Obvious of Body Area Injured During Crash ABDOMEN AND PELVIS |
|---|---|---|

| Source of Transport to Medical Facility EMS GROUND | EMS Agency Name or ID WHITEFISH AMBULANCE | EMS Run Number 08/31/2014 | Medical Facility Transported To KRMC |
|---|---|---|---|

| Injury Description (Type of Injury inflicted to Primary or Most Obvious Body Area Injured during crash. Can come from EMS / Hospital records). Broken pelvis |
|---|

| Law Enforcement Suspected Alcohol Use NO | Alcohol Test Type | Alcohol Tested TEST NOT GIVEN | Alcohol Test Results |
|---|---|---|---|

| Law Enforcement Suspected Drug Use NO | Drug Test Type | Drug Tested TEST NOT GIVEN | Drug Test Results |
|---|---|---|---|

## NARRATIVE: 50066805

Vehicle 1 was traveling northbound on US93. At approximately the 135 mile marker, Vehicle 1 ran off the right side of the roadway. Vehicle 1 traveled down the burrow pit and the front bumper hit a road sign support, knocking it down. Vehicle 1 over-corrected in the burrow pit causing it to roll out of the pit and across the Highway. Vehicle 1 came to rest off the left side of the Highway on its roof. The driver's arm was pinned under the vehicle and the passenger's legs were pinned on the inside of the vehicle.

## REPORTING OFFICER / SUPERVISOR APPROVAL

| Reporting Officer | | | Approving Supervisor | | | Case Identifier 50066805-01 |
|---|---|---|---|---|---|---|
| ID Number 1993 | Rank TROOPER | Name BRIAN THORNE | ID Number 1690 | Rank SGT | Name JAMES SANDERSON | |
| Signature | | | Signature | | | |

DIAGRAM OF ACCIDENT



DRIVER COPY



**Applied Cognitive Sciences**
Human Factors
Engineering

A CONSULTING GROUP

November 3, 2018

Michael Bliven
Bliven Law Firm, P.C., Trial Lawyers
278 Fourth Avenue East North
Kalispell, Montana 59901

<div align="center">

**RE: Dixon v Felder & Co.**

</div>

Dear Mr. Bliven:

As you requested, I have reviewed the initial file material your office provided me in the above referenced matter wherein Mr. Dixon was severely injured as a passenger in a vehicle that lost control and rolled-over on the highway. Based on this information, my training, experience, and expertise, I conducted a human factors engineering analysis of this incident. This report summarizes my findings and opinions to date, along with their underlying foundation and/or supporting analyses.

This report is based on the information that has been made available to me to date; thus, I reserve the right to further expand and/or amend my opinions and their bases if additional information relevant to my area of expertise becomes available.

**Description of Incident**

On August 31, 2014, Mr. Dixon and Mr. Gillund worked at Stillwater Fish House, hereafter referred to as Stillwater, from approximately 4pm until 1:00am. Note that Mr. Dixon and Mr. Gillund worked these late afternoon to early morning hours regularly in the days, weeks, and months leading to the accident. Upon finishing work, Mr. Dixon left with Mr. Gillund as a passenger in his 1998 Ford Winstar van. The weather was clear and the road conditions were dry. At approximately 1:15am, Mr. Dixon and Mr. Gillund were traveling Northbound on US93 when the van ran off the right side of the road, down a burrow pit, hitting a road sign with the front bumper. The vehicle appeared to be overcorrected, causing it to roll across the highway, coming to a stop on its roof on the left side of the highway. As a result of this incident, Mr. Dixon suffered a variety of severe injuries.

In the area of the accident, US93 is a two-way, undivided highway with a posted speed limit of 70 MPH. The highway near the accident is level and has a straight horizontal alignment. At the time of the accident, it was dark and, according to the Montana Highway Patrol crash report, the nearby highway was without roadway lighting. Mr. Dixon was 15 years of age at the time of the incident. Mr. Gillund, the

10501 South Lambs Lane • Mica, WA 99023 • 509-624-3714 telephone



driver, had just turned 16 years of age in mid-August and maintained a driver's
license with a Graduated Drivers Licensing Restriction on the day of the incident.

**Opinions**
  1. The continuous, long and late night/early morning working hours that lead
     to Mr. Dixon's vehicular accident were an extremely hazardous condition
     that created an unreasonable risk of harm to any adolescent who was
     exposed to such employment at Stillwater; this hazardous condition was
     an underlying cause of Mr. Dixon's vehicular accident and subsequent
     injuries.

  2. The reason that this hazard existed, as well as the reason it was not
     mitigated, was due to deficiencies in Stillwater's safety and risk
     management program; such deficiencies were another of the underlying
     causes of Mr. Dixon's vehicular accident and subsequent injuries.

**Violation of Standards**
The practice of employing adolescents for long shifts and into late hours (i.e. such as
the practices by Stillwater) creates extremely dangerous and hazardous conditions. In
fact, these conditions violated a number of legal standards enacted to protect
adolescent educational opportunities as well as their health and wellbeing.

The Fair Labor Standards Act (FLSA) was passed in 1938 as the first meaningful
legislation to protect adolescents against hazardous working conditions. The act
continues to be a part of Federal Law, mandating adolescent working hours be
restricted by age (29 CFR 570.35). Adolescents 14 and 15 years of age are limited to
the following times of days and hours:
  - outside school hours;
  - no more than 3 hours on a school day, including Fridays;
  - no more than 8 hours on a nonschool day; (i.e. such as was the case for this
    incident).
  - no more than 18 hours during a week when school is in session;
  - no more than 40 hours during a week when school is not in session;
  - between 7 a.m. and 7 p.m.—except between June 1 and Labor day when the
    evening hour is extended to 9 p.m (i.e. such as was the case for this incident).
Furthermore, the state of Montana passed the Montana Child Labor Standards Act of
1993, to parallel, but not supersede the federal child labor laws. In other words, the
Montana Child Labor Standards Act of 1993 mandates the same limitations for
adolescents aged 14 and 15 as those above.

As with child labor, scientists and regulators alike, have recognized the hazards
associated with adolescent driving. In a 2008 report to Congress, the National
Highway Traffic Safety Administration (NHTSA) stressed the importance of
implementing programs such as "laws and sanctions, licensing programs, and
educational programs" to reduce teen driver accidents, including a Graduated Driver

Licensing program[1]. In accordance with the NHTSA, the state of Montana enacted the Graduated Driver Licensing (GDL) law (MCA 61.5.132-135) which incorporates a three-step program. Adolescents maintaining a license with a GDL restriction (i.e. such as Mr. Gillund) are bound by the following conditions[2]:

- Seat belt use required.
- Curfew from 11pm to 5am, unless travel is for school, church, work, or farm-related activities.
- Limited passengers: 1 passenger for the 1st 6 months; up to 3 passengers for the 2nd 6 months. Others allowed as passengers if they are family members or the teen is supervised by a licensed adult driver.

## Literature Support for Standards

Unsurprisingly, the laws and guidelines unanimously aim to prevent adolescents from working/driving well into the night hours. It is well recognized that the human sleep/wake cycle largely follows the daylight and darkness of a 24hr day. Human sleep and wakefulness are controlled by two main systems, circadian and homeostatic timing systems.[3] In short, the circadian timing system, commonly referred to as circadian rhythm, regulates hormone release so that humans experience wakefulness during daylight hours and sleepiness during dark hours. The homeostatic timing system is characterized by alterations in brain waves which cause an increased pressure to sleep the longer one is awake. Simply, we naturally experience sleepiness during the night and early morning hours and become sleepier the longer we are awake. Shift work which requires employees to work when they would normally be sleeping (i.e. such as the work required by Stillwater), is well studied and has been shown to desynchronize circadian rhythms and lead to sleepiness.[5] Furthermore, it has long been recognized and understood that adolescents in their teenage years often fail to obtain adequate sleep, even when they are bound by predetermined schedules (i.e., school starting time).[4] Over time, sleep loss accumulates, resulting in an increased need for sleep and therefore, sleepiness.[5]

The physiological evidence that sleepiness is highly influenced by time of day and inadequate sleep and that teenagers are prone to sleepiness due to poor sleep schedules are supported by many, many publications and reports. In particular, teenagers have been found to be especially susceptible to drowsy driving accidents. For example, increasing teenager average sleep time has been associated with a decreasing their risk for vehicular accidents.[6] In a study by the AAA Foundation for Traffic Safety in 2018, teen drivers accounted for 26% of all drowsy driving

[1] Compton, R. P., & Ellison-Potter, P. (2008). *Teen driver crashes: A report to congress* (No. DOT-HS-811-005). United States. National Highway Traffic Safety Administration.
[2] (2017). GDL: Graduated Driver Licensing in Montana. Montana Office of Public Instruction.
[3] Crowley, S. J., Acebo, C., & Carskadon, M. A. (2007). Sleep, circadian rhythms, and delayed phase in adolescence. *Sleep medicine, 8*(6), 602-612.
[4] Carskadon, M. A. (2011). Sleep in adolescents: the perfect storm. *Pediatric Clinics, 58*(3), 637-647.
[5] Mullins, H. M., Cortina, J. M., Drake, C. L., & Dalal, R. S. (2014). Sleepiness at work: A review and framework of how the physiology of sleepiness impacts the workplace. *Journal of Applied Psychology, 99*(6), 1096.
[6] Danner, F., & Phillips, B. (2008). Adolescent sleep, school start times, and teen motor vehicle crashes. *Journal of Clinical Sleep Medicine, 4*(06), 533-535.

accidents, and over 50% of all drowsy driving accidents occurred during dark hours.[7] Administration of GDL restrictions, such as those recommended by the NHTSA which incorporate a night/early morning driving restriction and which are legally mandated in Montana, have proven to reduce teen vehicular accidents by up to 30%.[1]

The point to be made is that teenagers who are required to work long, late night/early morning shifts on a continuous basis are especially susceptible to the feelings of sleepiness. Furthermore, teenagers driving during the late night and early morning hours (i.e., as required by Stillwater) is a well-documented hazardous condition. Teenage drivers and employees are prohibited by law from conditions (i.e., prolonged and late work hours, late driving, etc.) which encourage drowsy driving to protect their health and well-being as well as those they share the road with.

**Risk Management**
In order to ensure the safety of their patrons, the Defendants must employ some type of rudimentary risk management program.[8] To be effective at minimizing the potential harm to people, any risk management program must be comprised of five basic components: Hazard Analysis, Plan Development, Plan Implementation, Plan Evaluation, and Documentation.[9,10] Each of these components are briefly discussed below.

*Hazard Analysis*
A hazard analysis is a systematic methodology for evaluating what specific tasks must be performed, by what individuals, and under what environmental conditions in order to identify specific hazards associated with those tasks. In this case, the relevant components of the hazard analysis would consist of adolescent employees, working various hours at a restaurant (i.e. Stillwater).
Any rudimentary safety/risk management program on the part of the Defendants should have identified the hazards associated with adolescent employees working extended hours (i.e. beyond 8 hours) well into the night/early morning (i.e. 1:00am). In this case, Stillwater knew or should have known of the hazardous conditions created by such employment as federal and state child labor laws were established long before the incident in 2014. Furthermore, Stillwater clearly realized the importance of providing employment conditions conducive to health and safety as evidenced by their extensive "Employee Safety & Injury Prevention Program" (see discussion below).

*Plan Development*
Once specific hazards have been identified, the next step in an effective safety and risk management program is to then develop a plan to mitigate those hazards.

When generating or creating a plan to control a known hazard (i.e., adolescents working prolonged hours, adolescents working late hours, etc.), the safety and human factors profession uses a three-level hierarchical process often referred to as the Safety

---

[7] Owens, J. M., Dingus, T. A., Guo, F., Fang, Y., Perez, M., McClafferty, J., & Tefft, B. (2018). Prevalence of Drowsy-Driving Crashes: Estimates from a Large-Scale Naturalistic Driving Study.
[8] Accident Prevention Manual for Business & Industry, Administrative Programs, 13th Edition. 2009. National Safety Council.
[9] ISO 31000 Risk management – Principles and guidelines. 2009.
[10] Brauer, R. (2006). Safety and Health for Engineers.

Hierarchy.[11] The first tier or the best alternative is "Safety by Design". That is, either eliminate the hazard or remove the user from the vicinity of the hazard. In this case, Safety by Design would have mandated that adolescent employees were employed under the guidelines provided by state and federal law (i.e., not working more than 8 hours and/or hours into the late night/early morning). If Safety by Design is not possible or feasible, which it was, the second-best alternative is "Guarding" or providing a barrier between the user and the potential hazard (i.e. such as ensuring the adolescent was driven home by a responsible adult).

One should **only** resort to a lesser effective level (i.e. choose Guarding over Safety by Design), if and only if it is not possible to implement the more effective level. The final tier is "Persuasion Control", using warnings, training, documented safety sweeps or other types of human intervention to ensure user safety. One should only resort to Persuasion Control as a "last resort" as it is known to be so limited in its effectiveness. In this case, Persuasion Control could have been implemented by educating supervisors on child labor laws and training them to ensure the laws are properly followed.

Here again, Stillwater did develop such a plan that was consistent with all levels of the Safety Hierarchy; the Employee Safety & Injury Prevention Program is replete with examples, including the following:

- Stillwater's "Management Safety Policy Statement" states:
    - "This company is responsible and will make every effort to comply with all safety and health regulations established by federal, state, and other local regulatory agencies."
        - Clearly, Stillwater understood the importance of following federal and state laws to eliminate or remove employees from hazardous conditions, Safety by Design.
    - "It is our absolute conviction that we have the responsibility to provide a safe and healthful work environment for our entire staff."
    - "Management and all supervisors of this company will lead by example, reflecting the established commitment to safety and health within this company."

- Stillwater establishes supervisory personnel as well as a safety committee to train and guide employees on safety and health and enforce safety policies. (i.e., Persuasion)

- Employees are to undergo initial safety training as well as "regular, refresher and ongoing employee training".

- Employee surveys are to be dispersed regularly to "identify, correct, and control" hazardous conditions.

- Hazardous conditions are to be controlled by "eliminating the cause of the hazard at the source" (i.e., Safety by Design). If a hazard cannot be eliminated, it is to be controlled through engineering controls, administrative controls, and work practice controls to protect the employees from the hazard (i.e., Guarding).

---

[11] Green, M. (2013). Safety Hierarchy: Design vs. Warnings.

In short, Stillwater's Employee Safety and Injury Prevention Program reiterates the criticality to maintain employment conditions which are conducive to employee health, safety, and well-being. This is not to suggest that Stillwater should have implemented any other level of the Safety Hierarchy besides Safety by Design (i.e., following the state and federal laws). In this case, Safety by Design could have and should have been implemented by simply following federal and state laws, a procedure Stillwater distinctly identified as of utmost importance in their own safety policy.

*Plan Implementation*
Once a proper plan has been developed, the next step in an effective safety and risk management program is to properly implement the plan which includes effectively communicating the plan up and down the chain of command, ensuring the infrastructure is in place for the execution of the plan, and ensuring enforcement of the plan. Enforcement is a critical element; imagine the chaos that would ensue on our roadways if traffic laws were not enforced.

In this case, Implementation is where the breakdown in the safety and risk management program of Stillwater first occurred. That is, as discussed above, the plan Stillwater developed to protect their employees was to, among many, many other safety measures, follow federal and state laws (i.e., Safety by Design). However, rather than enforcing state and federal laws as planned, Stillwater exercised blatant disregard for federal and state child labor laws. In fact, an FLSA investigation revealed that around the time of the subject incident, Stillwater employed five, 14 and 15-year-olds, including Mr. Dixon and Mr. Gillund, in violation of time/hour child labor laws, for a total of 235 occurrences. Even if one assumes Stillwater did not fully understand the hazards associated with continuously overworking teen employees well into the night/early morning, it is clear they chose to ignore state and federal child labor laws as they were unable to provide Department of Labor investigators accurate birth dates for adolescent employees (i.e. Stillwater reported Mr. Dixon's birthday as 2/16/1989 when his actual birthday is 2/16/1999.). Such heinous disregard for the law and Stillwater's own safety program resulted in the hazard that was the underlying root cause of this incident and ultimately Mr. Dixon's injuries.

*Plan Evaluation*
The purpose of this component is to determine the effectiveness of the chosen plan for controlling the identified hazard. The evaluation process is essential to ensure that the chosen plan is effectively controlling the identified hazard and is not introducing any new hazards. Even the most modest evaluation of the safety plan and business practices of the Defendants (i.e., failing to implement Safety by Design, failing to follow their own safety program, and so forth) would have identified the hazardous conditions that led to Mr. Dixon's injuries.

*Documentation*
The final component in an effective risk management program is to document the safety process, including the plan, its implementation, and evaluation. Documentation is mandatory to provide the infrastructure for controlling risks. It is also essential to ensure that there is accountability for the implementation and enforcement of the plan. Again,

Stillwater incorporated plans for documentation in their extensive Employee Safety and Injury Prevention Program; albeit, Stillwater obviously failed to implement their own safety program.

*Summary*
Based on my review of the material provided, Stillwater recognized the need to provide an employment conducive to employee health and safety. In this case, Stillwater instilled confidence in their employees through their "Management Safety Policy Statement" which distinctly promised to follow federal and state laws as well as to take responsibility for providing an employment conducive to safety and health. However, Stillwater exercised blatant disregard for state and federal child labor laws and their own safety and risk management program, as well as the safety and well-being of their teenage employees. The failure of Stillwater to implement and/or enforce their safety and risk management program ultimately created the conditions that led to Mr. Dixon's incident (i.e., failing to follow federal and state child labor laws). Such failures by Stillwater were the underlying cause of Mr. Dixon's incident and subsequent injuries.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Joellen Gill, M.S., CHFP, CXLT, CSP
President



Applied **Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

November 27, 2018

Michael Bliven
Bliven Law Firm, P.C., Trial Lawyers
278 Fourth Avenue East North
Kalispell, Montana 59901

<p style="text-align:center"><strong>RE: Dixon v Felder & Co.<br>Supplemental Report</strong></p>

Dear Mr. Bliven:

Since the time of my initial report dated November 3, 2018, in the Dixon v Felder & Co. matter, I've had the opportunity to review Mr. Skylar Dixon's Deposition. The purpose of this report is to supplement my initial opinions and their underlying bases. In short, this new material does not alter any of my three original opinions as expressed in my November 3, 2018 report. Notwithstanding, it does provide additional foundation/bases for those opinions. Some of the more salient examples are discussed below.

Mr. Skylar Dixon's deposition reaffirms the opinions from my initial report. For example, Mr. Skylar Dixon testified that:

1. When he was hired, he was told he would work from 4:00 pm until close; however, he did not know when close was (page 10).
2. He asked if he could be let off earlier and was told by a coworker, who had been working there longer than he, that they have to work until close because there were no other workers to cover the shift (pages 12-13).
3. As a 15-year-old, he was too "nervous" and "shy" to ask his superiors if he could be let off at an earlier time (pages 13-14).
4. He was "extremely tired," and when he told his coworkers about his tiredness, they told him to "have a Redbull," and that "the hours are how it is" (pages 17-18).
5. In late July, he started "working as a prep cook in the mornings from, like, nine to four or five (page 18).
6. He had ridden with Noah, the driver at the time of the subject incident, home from work prior to the incident. Mr. Skylar Dixon stated "sometimes it was so late that I'd call and she wouldn't answer, so I'd ride home with Noah" and that his mom was tired when he called her on the night of the incident (pages 19-21).
7. He and Noah were chatting in the vehicle on the way home until about 3 minutes before the incident in which there was silence (pages 26-27).
8. "We were yawning, and we had to, like, stretch and all that. Tired. It was a pretty busy night" (page 28).

---

10501 South Lambs Lane • Mica, WA 99023 • 509-624-3714 telephone



JA EXHIBIT
6
Gillund

9. He believes "Noah fell asleep" (Correction to page 27).
10. Noah "was kind of going into the gravel a little bit, and I said, Hey, scoot over a little bit" (page 30).

Additionally, during Mr. Skylar Dixon's deposition, there is some discussion concerning the time period between he and Mr. Noah Gillund clocking out and the time of the incident. Mr. Dixon testified that he and Mr. Gillund clocked out around 12:50 am (page 23), after which he and Noah "double checked the kitchen" (page 21), and he, Skylar, got their clothes from the lockers (page 21). Following, they talked with the assistant manager, "Dan", for at least 10 minutes before leaving in Noah's vehicle (Correction to page 29). Furthermore, Mr. Skylar Dixon testified that neither he nor Mr. Gillund consumed alcohol or smoked "pot" (page 29-30 & Correction to page 30).

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Joellen Gill, M.S., CHFP, CXLT, CSP
President

2



**Applied Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

December 3, 2018

Michael Bliven
Bliven Law Firm, P.C., Trial Lawyers
278 Fourth Avenue East North
Kalispell, Montana 59901

**RE: Dixon v Felder & Co.**
**Second Supplemental Report**

Dear Mr. Bliven:

Since the time of my initial report dated November 3, 2018, in the Dixon v Felder & Co.
matter, and my Supplemental report, I've had the opportunity to review Defendant Felder
& Company's Second Supplemental Responses to Plaintiff's Combined First Discovery
Requests to Defendant Felder/Stillwater Fish House. In short, this new material does not
alter any of my original opinions as expressed in my November 3, 2018 report.

There are factual disputes in this newest material that I cannot resolve. Specifically, the
driver Mr. Gillund states, among other things, that he did not fall asleep during the drive
when this accident occurred, nor was he tired. In addition, Mr. Gillund "did not feel
Skyler was distracting him when the accident occurred"; yet he goes on "he feels like he
got distracted talking to Skyler". Such directly contradicting statements indicate that Mr.
Gillund is confused about the events of the crash as would be expected following a head
injury. Independent of his memory regarding the accident, his actions are certainly
consistent with falling asleep.

Furthermore, independent of Mr. Gillund's memory of this accident, the actions of
Stillwater as described in detail in my initial report in this matter unquestionably place
Mr. Gillund and Mr. Dixon at great risk of harm. Clearly, structuring work hours as
Stillwater did creates a significant hazard for 16 year old Mr. Gillund and 15 year old Mr.
Dixon as they travel home in the early morning hours after working long shifts.

Please let me know if you have any questions or if I can be of any further assistance. I
look forward to continuing to work with you on this matter.

Sincerely,

10501 South Lambs Lane • Mica, WA 99023 • 509-624-3714 telephone



EXHIBIT
7

Joellen Gill, M.S., CHFP, CXLT, CSP
President



Welcome new employee!

On behalf of your colleagues, we welcome you to Stillwater Fish House and wish you every success here.

We believe that each employee contributes directly to Stillwater Fish House's growth and success, and we hope you will take pride in being a member of our team.

This handbook was developed to describe some of the expectations of our employees and to outline the policies, programs, and benefits available to eligible employees. As a new employee you should familiarize yourself with the contents of the employee handbook as soon as possible, for it will answer many questions about employment with Stillwater Fish House.

We hope that your experience here will be challenging, enjoyable, and rewarding. Again, welcome!


Sincerely,

Jesse Felder, Owner



Dan Vogel, General Manager



1

SFH 00337

What is Stillwater Fish House?

Stillwater Fish House is an upscale yet informal seafood restaurant whose core values express the highest possible quality, excellent value and a unique high-energy Montana dining experience. Showcasing strictly selected ocean and freshwater seafood as well as superior quality red meat, game and vegetarian compositions the menu is driven by daily specials with urban style innovation.

Located 2 1/2 miles North of the Whitefish, Montana Bridge on U.S. Highway 93 Stillwater Fish House stands at the Southern end of the Stillwater region featuring the Stillwater State Forest, Stillwater River and the Talley Lake Ranger District of the Flathead National Forest. The Stillwater area is home to a wide range of outdoor adventure activities including Cat Skiing, Dog Sled tours, Bar W Guest Ranch, Stillwater Mountain Lodge and the Rebecca Farms Equestrian Center. The restaurant lays within easy access to downtown Whitefish as well as Whitefish Mountain Resort and Glacier National Park. The facility is sited on the primary highway from Calgary and Edmonton, Alberta and the Banff/ Cranbrook area of British Columbia.

Stillwater Fish House is organized along two divisions: Front-of-the-House and Back-of-the-House, which generally correspond to customer service and production job duties. FoH positions include Servers and Assistants whose essential duties are defined as the service and entertainment of the guest. These positions report directly to the General Manager though, depending on business volume, may be directed by a mid-management position whose primary responsibilities are to run the Front Desk. BoH positions include Kitchen Manager, Assistant Kitchen Manager, Line Cook, Prep Cook and Dishwasher assignments. Upper Management is comprised of Jesse Felder, Owner and Dan Vogel, General Manager

Stillwater Fish House maintains a strictly professional work environment. All employees are considered highly valuable team members and everyone is expected to perform at their highest levels of skill, attitude and contribution. While the structure of authority is clearly defined suggestions, concepts and solutions may be offered upward in the command channel at any time. Stillwater Fish House team members are empowered in many ways to assure the satisfaction of our guests. Any actions that involve discounting, comps or have financial ramifications require final approval of the direct supervisor in command. Employees are strongly encouraged to continually improve their professional skills and knowledge. Many opportunities to learn and explore product knowledge, service tactics etc are provided by the company. Other individual efforts are encouraged and can be supported, given proper application and appropriate planning, by the management team.

2

SFH 00338

INTRODUCTORY STATEMENT

This handbook is designed to acquaint you with Stillwater Fish House and provide you with information about working conditions, employee benefits, and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by Stillwater Fish House to benefit employees. One of our objectives is to provide a work environment that is conducive to both personal and professional growth.

No employee handbook can anticipate every circumstance or question about policy. As Training continues to grow, the need may arise and Training reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time, as it deems appropriate, in its sole and absolute discretion. Employees will, of course, be notified of such changes to the handbook as they occur.

3

EMPLOYEE ACKNOWLEDGEMENT FORM

The employee handbook describes important information about Stillwater Fish House, and I understand that I should consult the General Manager regarding any questions not answered in the handbook.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of Training has the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

EMPLOYEE'S NAME (printed): _____

EMPLOYEE'S SIGNATURE: _____

DATE: _____

4

SFH 00340

## CUSTOMER RELATIONS

Stillwater Fish House Guests are our organization's most valuable assets. Every employee represents Stillwater Fish House to our guests and the public. The way we do our jobs presents an image of our entire organization. Guests judge all of us by how they are treated with each employee contact. Therefore, one of our first business priorities is to assist any guest or potential guest. Nothing is more important than being courteous, friendly, helpful, and prompt in the attention you give to our valued guests.

Stillwater Fish House will provide customer relations and services training to all employees with extensive guests contact. Stillwater Fish House guests who wish to lodge specific comments or complaints should be directed to the General Manager or on-duty Front-of-the-House supervisor for appropriate action. Our personal contact with the public, our manners on the telephone, and the communications we send to customers are a reflection not only of ourselves, but also of the professionalism of Stillwater Fish House. Positive customer relations not only enhance the public's perception or image of SFH, but also pay off in greater customer loyalty and increased sales and profit.

Guest Contact Standards for all FOH Stillwater Fish House employees:

1.   In all instances and events SFH guests are treated with utmost respect and attention.
2.   All guests arriving on the SFH premise will be greeted within 2 minutes of arrival or seating
3.   Whenever possible we will call our guests by their given names
4.   We will attempt to accommodate each and every guest request. If the request is beyond a FOH positions authority they must immediately, without any delay, relay the request to the GM or shift supervisor.
5.   All SFH FOH personnel are selected for their professional skills and knowledge. You are expected to acquire, practice, verbalize and apply these skills and knowledge to the satisfaction of the guest. These areas of expertise include overall food (especially regarding our fish, other proteins and general preparations) knowledge, wine and craft beer knowledge, and historical information about the area and current event information about the Flathead Valley. Additionally, because of the quality levels expected by this organization, you are to demonstrate the regular ability to anticipate a guests disposition before a negative problem is obvious.
6.   At no time will a FOH position argue or become combative with a guest. If such tensions arise you must alert your supervisor as soon as possible.
7.   SFH seeks and welcomes all types of guest comments. Please refer your guests to the on-table comment cards, on-line review sites such as Trip Advisor and Yelp and especially encourage them to speak directly to the supervisor on duty.
8.   All tables served by SFH will be greeted, welcomed and thanked by the supervisor on duty.

SFH 00341

## Nature of Employment
Effective Date: 3/5/2012
Revision Date:


Employment with Stillwater Fish House is voluntarily entered into, and the employee is free to resign at will at any time, with or without cause. Similarly, Stillwater Fish House may terminate the employment relationship at will at any time, with or without notice or cause, so long as there is no violation of applicable federal or state law.

Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Stillwater Fish House and any of its employees. The provisions of the handbook have been developed at the discretion of management and, except for its policy of employment-at-will, may be amended or cancelled at any time, at Stillwater Fish House's sole discretion.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of the chief executive officer of Stillwater Fish House.


## 102 Employee Relations
Effective Date: 3/5/2012
Revision Date:


Stillwater Fish House believes that the work conditions, wages, and benefits it offers to its employees are competitive with those offered by other employers in this area and in this industry. If employees have concerns about work conditions or compensation, they are strongly encouraged to voice these concerns openly and directly to their supervisors.

Our experience has shown that when employees deal openly and directly with supervisors, the work environment can be excellent, communications can be clear, and attitudes can be positive. We believe that Stillwater Fish House amply demonstrates its commitment to employees by responding effectively to employee concerns.

If and when employees examine the option of representation by individuals outside SFH, however, we strongly encourage careful consideration of such related issues as regular deductions from paychecks for representation fees, the potential for outside interference with supervisory relationships, and the commitment to comply with directions from third parties.

SFH 00342

## 103 Equal Employment Opportunity
Effective Date: 3/5/2012
Revision Date:


In order to provide equal employment and advancement opportunities to all individuals, employment decisions at Stillwater Fish House will be based on merit, qualifications, and abilities. SFH does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law.

Stillwater Fish House will make reasonable accommodations for qualified individuals with known disabilities unless doing so would result in an undue hardship. This policy governs all aspects of employment, including selection, job assignment, compensation, discipline, termination, and access to benefits and training.

In addition to a commitment to provide equal employment opportunities to all qualified individuals, SFH has established an affirmative action program to promote opportunities for individuals in certain protected classes throughout the organization.

Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or the Management. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.


## 104 Business Ethics and Conduct
Effective Date: 3/5/2012
Revision Date:


The successful business operation and reputation of Stillwater Fish House is built upon the principles of fair dealing and ethical conduct of our employees. Our reputation for integrity and excellence requires careful observance of the spirit and letter of all applicable laws and regulations, as well as a scrupulous regard for the highest standards of conduct and personal integrity.

The continued success of SFH is dependent upon our customers' trust and we are dedicated to preserving that trust. Employees owe a duty to SFH and its customers to act in a way that will merit the continued trust and confidence of the public.

SFH 00343

Stillwater Fish House will comply with all applicable laws and regulations and expects its officers and employees to conduct business in accordance with the letter, spirit, and intent of all relevant laws and to refrain from any illegal, dishonest, or unethical conduct. Specifically the areas of key focus are any and all alcohol, sanitary and health regulations.

In general, the use of good judgment, based on high ethical principles, will guide you with respect to lines of acceptable conduct. If a situation arises where it is difficult to determine the proper course of action, the matter should be discussed openly with your immediate supervisor and, if necessary, with the General Manager for advice and consultation.

Compliance with this policy of business ethics and conduct is the responsibility of every SFH employee. Disregarding or failing to comply with this standard of business ethics and conduct could lead to disciplinary action, up to and including possible termination of employment.

## 105 Personal Relationships in the Workplace

Effective Date: 3/5/2012
Revision Date:

The employment of relatives or individuals involved in a dating relationship in the same area of an organization may cause serious conflicts and problems with favoritism and employee morale. In addition to claims of partiality in treatment at work, personal conflicts from outside the work environment can be carried over into day-to-day working relationships.

For purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage. A dating relationship is defined as a relationship that may be reasonably expected to lead to the formation of a consensual "romantic" or sexual relationship. This policy applies to all employees without regard to the gender or sexual orientation of the individuals involved.

Relatives of current employees may not occupy a position that will be working directly for or supervising their relative. Individuals involved in a dating relationship with a current employee may also not occupy a position that will be working directly for or supervising the employee with whom they are involved in a dating relationship. Stillwater Fish House also reserves the right to take prompt action if an actual or potential conflict of interest arises involving relatives or individuals involved in a dating relationship who occupy positions at any level (higher or lower) in the same line of authority that may affect the review of employment decisions.

8

SFH 00344

If a relative relationship or dating relationship is established after employment between employees who are in a reporting situation described above, it is the responsibility and obligation of the supervisor involved in the relationship to disclose the existence of the relationship to management. The individuals concerned will be given the opportunity to decide who is to be transferred to another available position. If that decision is not made within 30 calendar days, management will decide who is to be transferred or, if necessary, terminated from employment.

In other cases where a conflict or the potential for conflict arises because of the relationship between employees, even if there is no line of authority or reporting involved, the employees may be separated by reassignment or terminated from employment. Employees in a close personal relationship should refrain from public workplace displays of affection or excessive personal conversation.

## 201 Employment Categories
Effective Date: 3/5/2012
Revision Date:

It is the intent of Stillwater Fish House to clarify the definitions of employment classifications so that employees understand their employment status and benefit eligibility. These classifications do not guarantee employment for any specified period of time. Accordingly, the right to terminate the employment relationship at will at any time is retained by both the employee and SFH.

Each employee is designated as either NONEXEMPT or EXEMPT from federal and state wage and hour laws. NONEXEMPT employees are entitled to overtime pay under the specific provisions of federal and state laws. EXEMPT employees are excluded from specific provisions of federal and state wage and hour laws. An employee's EXEMPT or NONEXEMPT classification may be changed only upon written notification by SFH management.

In addition to the above categories, each employee will belong to one other employment category:

REGULAR FULL-TIME employees are those who are not in a temporary or introductory status and who are regularly scheduled to work Training's full-time schedule. Generally, they are eligible for Stillwater Fish House benefit package, subject to the terms, conditions, and limitations of each benefit program.

PART-TIME employees are those who are not assigned to a temporary or introductory status and who are regularly scheduled to work less than 35 hours per week. While they do receive all legally mandated benefits (such as Social Security and workers' compensation insurance), they are ineligible for all of Stillwater Fish House's other benefit programs.

INTRODUCTORY employees are those whose performance is being evaluated to determine whether further employment in a specific position or with SFH is appropriate. Employees who satisfactorily

9

SFH 00345

complete the introductory period will be notified of their new employment classification.

## 202 Access to Personnel Files
Effective Date: 3/5/2012
Revision Date:

Stillwater Fish House maintains a personnel file on each employee. The personnel file includes such information as the employee's job application, resume, records of training, documentation of performance appraisals and salary increases, and other employment records.

Personnel files are the property of Stillwater Fish House, and access to the information they contain is restricted. Generally, only supervisors and management personnel of SFH who have a legitimate reason to review information in a file are allowed to do so.

Employees who wish to review their own file should contact the General Manager. With reasonable advance notice, employees may review their own personnel files in Stillwater Fish House's offices and in the presence of an individual appointed by SFH to maintain the files.

## 203 Employment Reference Checks
Effective Date: 3/5/2012
Revision Date:

To ensure that individuals who join Stillwater Fish House are well qualified and have a strong potential to be productive and successful, it is the policy of SFH to check the employment references of all applicants.

The General Manager will respond in writing only to those reference check inquiries that are submitted in writing. Responses to such inquiries will confirm only dates of employment, wage rates, and position(s) held.

## 204 Personnel Data Changes
Effective Date: 3/5/2012
Revision Date:

It is the responsibility of each employee to promptly notify Stillwater Fish House of any changes in personnel data. Personal mailing addresses, telephone numbers, number and names of dependents, individuals to be contacted in the event of an emergency, educational accomplishments, and other such status reports should be accurate and current at all times. If any personnel data has changed, notify the General Manager

SFH 00346

## 205 Introductory Period
Effective Date: 3/5/2012
Revision Date:

The introductory period is intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations. Stillwater Fish House uses this period to evaluate employee capabilities, work habits, and overall performance. Either the employee or SFH may end the employment relationship at will at any time during or after the introductory period, with or without cause or advance notice.

All new and rehired employees work on an introductory basis for the first 90 calendar days after their date of hire. Any significant absence will automatically extend an introductory period by the length of the absence. If SFH determines that the designated introductory period does not allow sufficient time to thoroughly evaluate the employee's performance, the introductory period may be extended for a specified period.

Upon satisfactory completion of the introductory period, employees enter the "regular" employment classification.

During the introductory period, new employees are eligible for those benefits that are required by law, such as workers' compensation insurance and Social Security. After becoming regular employees, they may also be eligible for other Stillwater Fish House-provided benefits, subject to the terms and conditions of each benefits program. Employees should read the information for each specific benefits program for the details on eligibility requirements.

## 208 Employment Applications
Effective Date: 3/5/2012
Revision Date:

Stillwater Fish House relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and employment. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in the exclusion of the individual from further consideration for employment or, if the person has been hired, termination of employment.

11

SFH 00347

## 209 Performance Evaluations
Effective Date: 3/5/2012
Revision Date:

Supervisors and employees are strongly encouraged to discuss job performance and goals on an informal, day-to-day basis. A formal written performance evaluation will be conducted at the end of an employee's initial period of hire, known as the introductory period. Additional formal performance evaluations are conducted to provide both supervisors and employees the opportunity to discuss job tasks, identify and correct weaknesses, encourage and recognize strengths, and discuss positive, purposeful approaches for meeting goals.

Performance evaluations are scheduled approximately every 3 months, coinciding generally with the anniversary of the employee's original date of hire.

Stillwater Fish House awards merit-based pay adjustments and incentive-based bonuses in an effort to recognize truly superior employee performance. The decision to award such an adjustment is dependent upon numerous factors, including the information documented by this formal performance evaluation process.

## 210 Job Descriptions
Effective Date: 3/5/2012
Revision Date:

Stillwater Fish House makes every effort to create and maintain accurate job descriptions for all positions within the organization. Each description includes a job information section, a job summary section (giving a general overview of the job's purpose), an essential duties and responsibilities section, a supervisory responsibilities section, a qualifications section (including education and/or experience, language skills, mathematical skills, reasoning ability, and any certification required), a physical demands section, and a work environment section.

SFH maintains job descriptions to aid in orienting new employees to their jobs, identifying the requirements of each position, establishing hiring criteria, setting standards for employee performance evaluations, and establishing a basis for making reasonable accommodations for individuals with disabilities.

The General Manager prepares job descriptions when new positions are created. Existing job descriptions are also reviewed and revised in order to ensure that they are up to date. Job descriptions may also be rewritten periodically to reflect any changes in the position's duties and responsibilities. All employees will be expected to help ensure that their job descriptions are accurate and current, reflecting the work being done.

12

SFH 00348

Employees should remember that job descriptions do not necessarily cover every task or duty that might be assigned, and that additional responsibilities may be assigned as necessary. Contact the General Manager if you have any questions or concerns about your job description.

## 306 Workers' Compensation Insurance
Effective Date: 3/6/2012
Revision Date:

Stillwater Fish House provides a comprehensive workers' compensation insurance program at no cost to employees. This program covers any injury or illness sustained in the course of employment that requires medical, surgical, or hospital treatment. Subject to applicable legal requirements, workers' compensation insurance provides benefits after a short waiting period or, if the employee is hospitalized, immediately.

Employees who sustain work-related injuries or illnesses should inform their supervisor immediately. No matter how minor an on-the-job injury may appear, it is important that it be reported immediately. This will enable an eligible employee to qualify for coverage as quickly as possible.

Neither Stillwater Fish House nor the insurance carrier will be liable for the payment of workers' compensation benefits for injuries that occur during an employee's voluntary participation in any off-duty recreational, social, or athletic activity sponsored by Stillwater Fish House

## 401 Timekeeping
Effective Date: 3/6/2012
Revision Date:

Accurately recording time worked is the responsibility of every nonexempt employee. Federal and state laws require Stillwater Fish House to keep an accurate record of time worked in order to calculate employee pay and benefits. Time worked is all the time actually spent on the job performing assigned duties.

Nonexempt employees should accurately record the time they begin and end their work, as well as the beginning and ending time of each meal period. They should also record the beginning and ending time of any split shift or departure from work for personal reasons. Overtime work must always be approved before it is performed.

Altering, falsifying, tampering with time records, or recording time on another employee's time record

13

SFH 00349

may result in disciplinary action, up to and including termination of employment.

Stillwater Fish House utilizes both the Aloha Point-of-Sale system and the Hot Schedule Internet software package to publish, manage and record all scheduling data for all employees. Hot Schedule allows the employee to see their schedule from anywhere they might be either through Internet phone system or regular telephone access. All schedule requests, trading of shifts, or any other modifications initiated by an employee must be approved through the same system by management. Note that the management team addresses schedule changes at noon every day. Changes to the schedule affecting the same day as the request cannot be guaranteed approval. It is the initiating employees responsibility to communicate through all means necessary any and all changes.

Stillwater Fish House reserves the right to modify the scheduled ending time of any employees shift if made necessary by volume of business the day of the shift.

Nonexempt employees should report to work no more than 5 minutes prior to their scheduled starting time nor stay more than 5 minutes after their scheduled stop time without expressed, prior authorization from their supervisor.

It is the employees' responsibility to sign their time records to certify the accuracy of all time recorded. The supervisor will review and then initial the time record before submitting it for payroll processing. In addition, if corrections or modifications are made to the time record, both the employee and the supervisor must verify the accuracy of the changes by initiating the time record.

## 403 Paydays
Effective Date: 3/6/2012
Revision Date:


All employees are paid on the 1st Day of the Month and the 15th Day of the Month. Each paycheck will include earnings for all work performed through the end of the previous payroll period.

In the event that a regularly scheduled payday falls on a weekend or holiday, employees will receive pay on the last day of work before the regularly scheduled payday.

If a regular payday falls during an employee's vacation, and employee is not enrolled in the direct deposit program, the employee's paycheck will be available upon his or her return from vacation.

Employees may have pay directly deposited into their bank accounts if they provide advance written authorization to Stillwater Fish House. Employees will receive an itemized statement of wages when Stillwater Fish House makes direct deposits

SFH 00350

## 405 Employment Termination
Effective Date: 3/6/2012
Revision Date:

Termination of employment is an inevitable part of personnel activity within any organization, and many of the reasons for termination are routine. Below are examples of some of the most common circumstances under which employment is terminated:

* Resignation - voluntary employment termination initiated by an employee.
* Discharge - involuntary employment termination initiated by the organization.
* Layoff - involuntary employment termination initiated by the organization for nondisciplinary reasons.

Stillwater Fish House will generally schedule exit interviews at the time of employment termination. The exit interview will afford an opportunity to discuss such issues as employee benefits, conversion privileges, repayment of outstanding debts to Stillwater Fish House, or return of SFH-owned property. Suggestions, complaints, and questions can also be voiced.

Since employment with Stillwater Fish House is based on mutual consent, both the employee and SFH have the right to terminate employment at will, with or without cause, at any time. Employees will receive their final pay in accordance with applicable state law.

Employee benefits will be affected by employment termination in the following manner. All accrued, vested benefits that are due and payable at termination will be paid. Some benefits may be continued at the employee's expense if the employee so chooses. The employee will be notified in writing of the benefits that may be continued and of the terms, conditions, and limitations of such continuance.

## 410 Pay Deductions and Setoffs
Effective Date: 3/6/2012
Revision Date:

The law requires that Stillwater Fish House make certain deductions from every employee's compensation. Among these are applicable federal, state, and local income taxes. Stillwater Fish House also must deduct Social Security taxes on each employee's earnings up to a specified limit that is called the Social Security "wage base." SFH matches the amount of Social Security taxes paid by each employee.

All employees of Stillwater Fish House who receive tips as a regular reward from guests are required to report all such income to the company. The Aloha Point-of-Sale system provides specific data entry

SFH 00351

windows to be used for this reporting. These reported incomes will affect the various taxes and deductions calculated on your paycheck. It is to your long-range benefit to report these funds with precise accuracy.

Stillwater Fish House offers programs and benefits beyond those required by law. Eligible employees may voluntarily authorize deductions from their paychecks to cover the costs of participation in these programs.

Pay setoffs are pay deductions taken by SFH, usually to help pay off a debt or obligation to Stillwater Fish House or others.

If you have questions concerning why deductions were made from your paycheck or how they were calculated, your supervisor can assist in having your questions answered.

## 501 Safety
Effective Date: 3/6/2012
Revision Date:

To assist in providing a safe and healthful work environment for employees, customers, and visitors, Stillwater Fish House has established a workplace safety program. This program is a top priority for SFH. The General Manager has responsibility for implementing, administering, monitoring, and evaluating the safety program. Its success depends on the alertness and personal commitment of all.

Stillwater Fish House provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, memos, or other written communications.

Employees and supervisors receive periodic workplace safety training. The training covers potential safety and health hazards and safe work practices and procedures to eliminate or minimize hazards.

Some of the best safety improvement ideas come from employees. Those with ideas, concerns, or suggestions for improved safety in the workplace are encouraged to raise them with their supervisor, or with another supervisor or manager, or bring them to the attention of the General Manager. Reports and concerns about workplace safety issues may be made anonymously if the employee wishes. All reports can be made without fear of reprisal.

Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination

16

SFH 00352

of employment.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the General Manager or the appropriate supervisor. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

## 502 Work Schedules
Effective Date: 3/6/2012
Revision Date:

Work schedules for employees vary throughout our organization. Supervisors will advise employees of their individual work schedules. Staffing needs and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each day and week.

Flexible scheduling, or flextime, is available in some cases to allow employees to vary their starting and ending times each day within established limits. Flextime may be possible if a mutually workable schedule can be negotiated with the supervisor involved. However, such issues as staffing needs, the employee's performance, and the nature of the job will be considered before approval of flextime.

Stillwater Fish House utilizes both the Aloha Point-of-Sale system for clock in and clock out for all employees. Schedules for all Back-of-the-House and Front-of-the-House are managed through the Hot Schedule Internet software systems. Immediate supervisors will conduct training in the use of these systems

Schedules will be posted every Monday by noon and will cover the forthcoming two-week period.

Please refer to the section in this manual called Time-Keeping for specific policies regarding the Hot Schedule system.

## 504 Use of Phone and Mail Systems
Effective Date: 3/6/2012
Revision Date:

Personal use of telephones for outgoing calls, including local calls, is not permitted. Personal phone calls received by Stillwater Fish House are also prohibited unless identified as an emergency. Cell phone use either as a phone or Internet device is prohibited while an employee is clocked in to the Point-of-Sale

SFH 00353

system. Under no circumstances may camera capacities of an employees phone be used during the work shift.

The mail system is reserved for business purposes only. Employees should refrain from sending or receiving personal mail at the workplace.

To ensure effective telephone communications, employees should always use the approved greeting and speak in a courteous and professional manner. Please confirm information received from the caller, and hang up only after the caller has done so.

## 505 Smoking
Effective Date: 3/6/2012
Revision Date:

In keeping with Stillwater Fish House's intent to provide a safe and healthful work environment, smoking in the workplace is prohibited except in those locations that have been specifically designated as smoking areas. In situations where the preferences of smokers and nonsmokers are in direct conflict, the preferences of nonsmokers will prevail.

This policy applies equally to all employees, customers, and visitors.

## 506 Rest and Meal Periods
Effective Date: 3/6/2012
Revision Date:

Each workday, full-time nonexempt employees are provided with 2 rest periods. Supervisors will advise employees of the regular rest period length and schedule. To the extent possible, rest periods will be provided in the middle of work periods. Since this time is counted and paid as time worked, employees must not be absent from their workstations beyond the allotted rest period time.

In keeping with standard hospitality industry practices Back-of-the-House employees utilize official rest periods. No employee can be away from his or her designated work area without supervisor consent.

All full-time employees are provided with one meal period each workday. Supervisors will schedule meal periods to accommodate operating requirements. Employees will be relieved of all active responsibilities and restrictions during meal periods and will not be compensated for that time. Employee meal policy at Stillwater Fish is as follows:

18

SFH 00354

25% Discount on any menu item. Note management may limit selections due to availability.
Pre-Shift meals must be finished before the scheduled clock in time.
After-Shift meals must be enjoyed after clock out and all side-work assignments are
   completed.
Employees may enter the dining room area after their scheduled shift as long as they are
   clocked out, their work completed and they are out of uniform.
An on-duty server must ring all Employee meals into the Point-of-Sale system
The kitchen will produce no Employee meals without an order chit from the POS.

## 507 Overtime
Effective Date: 3/6/2012
Revision Date:

When operating requirements or other needs cannot be met during regular working hours, employees will be given the opportunity to volunteer for overtime work assignments. All overtime work must receive the supervisor's prior authorization. Overtime assignments will be distributed as equitably as practical to all employees qualified to perform the required work.

Overtime compensation is paid to all nonexempt employees in accordance with federal and state wage and hour restrictions. Overtime pay is based on actual hours worked. Time off on sick leave, vacation leave, or any leave of absence will not be considered hours worked for purposes of performing overtime calculations.

## 514 Visitors in the Workplace
Effective Date: 3/6/2012
Revision Date:

To provide for the safety and security of employees and the facilities at Stillwater Fish House, only authorized visitors are allowed in the workplace. Restricting unauthorized visitors helps maintain safety standards, protects against theft, ensures security of equipment, protects confidential information, safeguards employee welfare, and avoids potential distractions and disturbances.

Because of safety and security reasons, family and friends of employees are discouraged from visiting. In cases of emergency, employees will be called to meet any visitor outside their work area.

All visitors should enter Stillwater Fish House at the main entrance. Authorized visitors will receive directions or be escorted to their destination. Employees are responsible for the conduct and safety of their visitors.

SFH 00355

If an unauthorized individual is observed on SFH premises, employees should immediately notify their supervisor or, if necessary, direct the individual to the main entrance.

## 516 Computer and Email Usage
Effective Date: 3/6/2012
Revision Date:

Computers, computer files, the Email system, and software furnished to employees are Stillwater Fish House property intended for business use. Employees should not use a password, access a file, or retrieve any stored communication without authorization. To ensure compliance with this policy, computer and Email usage may be monitored.

Stillwater Fish House strives to maintain a workplace free of harassment and sensitive to the diversity of its employees. Therefore, SFH prohibits the use of computers and the email system in ways that are disruptive, offensive to others, or harmful to morale.

For example, the display or transmission of sexually explicit images, messages, and cartoons is not allowed. Other such misuse includes, but is not limited to, ethnic slurs, racial comments, off-color jokes, or anything that may be construed as harassment or showing disrespect for others.

Email may not be used to solicit others for commercial ventures, religious or political causes, outside organizations, or other nonbusiness matters. Point-of-Sale systems and Scheduling systems may only used as intended and any unauthorized use of the computer systems into the general Internet is considered a serious infraction that may be cause for termination.

Stillwater Fish House purchases and licenses the use of various computer software for business purposes and does not own the copyright to this software or its related documentation. Unless authorized by the software developer, SFH does not have the right to reproduce such software for use on more than one computer.

Employees may only use software on local area networks or on multiple machines according to the software license agreement. Stillwater Fish House prohibits the illegal duplication of software and its related documentation.

Employees should notify their immediate supervisor, the General Manager or any member of management upon learning of violations of this policy. Employees who violate this policy will be subject to disciplinary action, up to and including termination of employment.

SFH 00356

## 517 Internet Usage
Effective Date: 3/6/2012
Revision Date:

Internet access to global electronic information resources on the World Wide Web is provided by Stillwater Fish House to assist employees in obtaining work-related data and technology. The following guidelines have been established to help ensure responsible and productive Internet usage. All Internet usage is limited to job-related activities. Personal use of the Internet is not permitted.

All Internet data that is composed, transmitted, or received via our computer communications systems is considered to be part of the official records of Stillwater Fish House and, as such, is subject to disclosure to law enforcement or other third parties. Consequently, employees should always ensure that the business information contained in Internet email messages and other transmissions is accurate, appropriate, ethical, and lawful.

The equipment, services, and technology provided to access the Internet remain at all times the property of SFH As such, SFH reserves the right to monitor Internet traffic, and retrieve and read any data composed, sent, or received through our online connections and stored in our computer systems.

Data that is composed, transmitted, accessed, or received via the Internet must not contain content that could be considered discriminatory, offensive, obscene, threatening, harassing, intimidating, or disruptive to any employee or other person. Examples of unacceptable content may include, but are not limited to, sexual comments or images, racial slurs, gender-specific comments, or any other comments or images that could reasonably offend someone on the basis of race, age, sex, religious or political beliefs, national origin, disability, sexual orientation, or any other characteristic protected by law.

The unauthorized use, installation, copying, or distribution of copyrighted, trademarked, or patented material on the Internet is expressly prohibited. As a general rule, if an employee did not create material, does not own the rights to it, or has not gotten authorization for its use, it should not be put on the Internet. Employees are also responsible for ensuring that the person sending any material over the Internet has the appropriate distribution rights.

To ensure a virus-free environment, no files may be downloaded from the Internet without prior authorization.

Abuse of the Internet access provided by Stillwater Fish House in violation of law or SFH policies will result in disciplinary action, up to and including termination of employment. Employees may also be held personally liable for any violations of this policy. The following behaviors are examples of previously stated or additional actions and activities that are prohibited and can result in disciplinary action:

   * Sending or posting discriminatory, harassing, or threatening messages or images

21

SFH 00357

* Using the organization's time and resources for personal gain
* Stealing, using, or disclosing someone else's code or password without authorization
* Copying, pirating, or downloading software and electronic files without permission
* Sending or posting confidential material, trade secrets, or proprietary information outside of the organization
* Violating copyright law
* Failing to observe licensing agreements
* Engaging in unauthorized transactions that may incur a cost to the organization or initiate unwanted Internet services and transmissions
* Sending or posting messages or material that could damage the organization's image or reputation
* Participating in the viewing or exchange of pornography or obscene materials
* Sending or posting messages that defame or slander other individuals
* Attempting to break into the computer system of another organization or person
* Refusing to cooperate with a security investigation
* Sending or posting chain letters, solicitations, or advertisements not related to business purposes or activities
* Using the Internet for political causes or activities, religious activities, or any sort of gambling
* Jeopardizing the security of the organization's electronic communications systems
* Sending or posting messages that disparage another organization's products or services
* Passing off personal views as representing those of the organization
* Sending anonymous email messages
* Engaging in any other illegal activities

## 522 Workplace Violence Prevention
Effective Date: 3/6/2012
Revision Date:

Stillwater Fish House is committed to preventing workplace violence and to maintaining a safe work environment. Given the increasing violence in society in general, SFH has adopted the following guidelines to deal with intimidation, harassment, or other threats of (or actual) violence that may occur during business hours or on its premises.

All employees, including supervisors and temporary employees, should be treated with courtesy and respect at all times. Employees are expected to refrain from fighting, "horseplay," or other conduct that may be dangerous to others. Firearms, weapons, and other dangerous or hazardous devices or substances are prohibited from the premises of SFH without proper authorization.

Conduct that threatens, intimidates, or coerces another employee, a customer, or a member of the public at any time, including off-duty periods, will not be tolerated. This prohibition includes all acts of harassment, including harassment that is based on an individual's sex, race, age, or any characteristic protected by federal, state, or local law.

22

SFH 00358

All threats of (or actual) violence, both direct and indirect, should be reported as soon as possible to your immediate supervisor or any other member of management. This includes threats by employees, as well as threats by customers, vendors, solicitors, or other members of the public. When reporting a threat of violence, you should be as specific and detailed as possible.

All suspicious individuals or activities should also be reported as soon as possible to a supervisor. Do not place yourself in peril. If you see or hear a commotion or disturbance near your workstation, do not try to intercede or see what is happening.

Stillwater Fish House will promptly and thoroughly investigate all reports of threats of (or actual) violence and of suspicious individuals or activities. The identity of the individual making a report will be protected as much as is practical. In order to maintain workplace safety and the integrity of its investigation, SFH may suspend employees, either with or without pay, pending investigation.

Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination of employment.

Stillwater Fish House encourages employees to bring their disputes or differences with other employees to the attention of their supervisors or the General Manager before the situation escalates into potential violence. SFH is eager to assist in the resolution of employee disputes, and will not discipline employees for raising such concerns

## 701 Employee Conduct and Work Rules
Effective Date: 3/6/2012
Revision Date:


To ensure orderly operations and provide the best possible work environment, Stillwater Fish House expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all the forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment:

* Unauthorized occupancy of private property for recreational use
* Theft or inappropriate removal or possession of property
* Falsification of timekeeping records
* Working under the influence of alcohol or illegal drugs
* Possession, distribution, sale, transfer, or use of alcohol or illegal drugs in the workplace, while on

SFH 00359

duty, or while operating employer-owned vehicles or equipment
* Fighting or threatening violence in the workplace
* Boisterous or disruptive activity in the workplace
* Negligence or improper conduct leading to damage of employer-owned or customer-owned property
* Insubordination or other disrespectful conduct
* Violation of safety or health rules
* Smoking in prohibited areas
* Sexual or other unlawful or unwelcome harassment
* Possession of dangerous or unauthorized materials, such as explosives or firearms, in the workplace
* Excessive absenteeism or any absence without notice
* Unauthorized absence from workstation during the workday
* Unauthorized use of telephones, mail system, or other employer-owned equipment
* Unauthorized disclosure of business "secrets" or confidential information
* Violation of personnel policies
* Unsatisfactory performance or conduct

Employment with Stillwater Fish House is at the mutual consent of SFH and the employee, and either party may terminate that relationship at any time, with or without cause, and with or without advance notice.

## 702 Drug and Alcohol Use
Effective Date: 3/6/2012
Revision Date:

It is Stillwater Fish House's desire to provide a drug-free, healthful, and safe workplace. To promote this goal, employees are required to report to work in appropriate mental and physical condition to perform their jobs in a satisfactory manner.

While on SFH premises and while conducting business-related activities off SFH premises, no employee may use, possess, distribute, sell, or be under the influence of alcohol or illegal drugs. The legal use of prescribed drugs is permitted on the job only if it does not impair an employee's ability to perform the essential functions of the job effectively and in a safe manner that does not endanger other individuals in the workplace.

Due to the focus of Stillwater Fish House on wine and craft beer product knowledge a number of opportunities to experience these products for training purposes will be provided. Only with management approval will an employee engage in the consumption, in any quantity, of any alcohol product while engaged in their job duties.

Violations of this policy may lead to disciplinary action, up to and including immediate termination of

24

SFH 00360

employment, and/or required participation in a substance abuse rehabilitation or treatment program. Such violations may also have legal consequences.

To inform employees about important provisions of this policy, SFH has established a drug-free awareness program. The program provides information on the dangers and effects of substance abuse in the workplace, resources available to employees, and consequences for violations of this policy.

Employees with questions on this policy or issues related to drug or alcohol use in the workplace should raise their concerns with their supervisor or the General Manager without fear of reprisal.

## 703 Sexual and Other Unlawful Harassment

Effective Date: 3/6/2012
Revision Date:

Stillwater Fish House is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Actions, words, jokes, or comments based on an individual's sex, race, color, national origin, age, religion, disability, sexual orientation, or any other legally protected characteristic will not be tolerated. Stillwater Fish House provides ongoing sexual harassment training to ensure you the opportunity to work in an environment free of sexual and other unlawful harassment.

Sexual harassment is defined as unwanted sexual advances, or visual, verbal, or physical conduct of a sexual nature. This definition includes many forms of offensive behavior and includes gender-based harassment of a person of the same sex as the harasser. The following is a partial list of sexual harassment examples:

* Unwanted sexual advances.

* Offering employment benefits in exchange for sexual favors.

* Making or threatening reprisals after a negative response to sexual advances.

* Visual conduct that includes leering, making sexual gestures, or displaying of sexually suggestive objects or pictures, cartoons or posters.

* Verbal conduct that includes making or using derogatory comments, epithets, slurs, or jokes.

* Verbal sexual advances or propositions.

* Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually

degrading words used to describe an individual, or suggestive or obscene letters, notes, or invitations.

* Physical conduct that includes touching, assaulting, or impeding or blocking movements.

Unwelcome sexual advances (either verbal or physical), requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of employment; (2) submission or rejection of the conduct is used as a basis for making employment decisions; or, (3) the conduct has the purpose or effect of interfering with work performance or creating an intimidating, hostile, or offensive work environment.

If you experience or witness sexual or other unlawful harassment in the workplace, report it immediately to your supervisor. If the supervisor is unavailable or you believe it would be inappropriate to contact that person, you should immediately contact the General Manager or any other member of management. You can raise concerns and make reports without fear of reprisal or retaliation.

All allegations of sexual harassment will be quickly and discreetly investigated. To the extent possible, your confidentiality and that of any witnesses and the alleged harasser will be protected against unnecessary disclosure. When the investigation is completed, you will be informed of the outcome of the investigation.

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the General Manager or any member of management so it can be investigated in a timely and confidential manner. Anyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment.

## 704 Attendance and Punctuality
Effective Date: 3/6/2012
Revision Date:

To maintain a safe and productive work environment, Stillwater Fish House expects employees to be reliable and to be punctual in reporting for scheduled work. Absenteeism and tardiness place a burden on other employees and on SFH. In the rare instances when employees cannot avoid being late to work or are unable to work as scheduled, they should notify their supervisor as soon as possible in advance of the anticipated tardiness or absence.

Poor attendance and excessive tardiness are disruptive. Either may lead to disciplinary action, up to and including termination of employment.

SFH 00362

## 705 Personal Appearance
Effective Date: 3/6/2012
Revision Date:

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image Stillwater Fish House presents to customers and visitors.

During business hours or when representing SFH, you are expected to present a clean, neat, and tasteful appearance. You should dress and groom yourself according to the requirements of your position and accepted social standards. This is particularly true if your job involves dealing with customers or visitors in person.

Stillwater Fish House has designated uniform policies for both the Front-of-the House and Back-of-the House divisions. Kitchen personal will use a chef style professional pant, a clean pressed chef's jacket and industrial kitchen grade black work shoe. FOH will use a logo'd uniform shirt provided by SFH, black Dockers tm pants and strong slip resistant black shoes. Additionally the FOH staff are required to have on their person a functional wine opener and several pens of good working order. If your supervisor feels your personal appearance is inappropriate, you may be asked to leave the workplace until you are properly dressed or groomed. Under such circumstance, you will not be compensated for the time away from work. Consult your supervisor if you have questions as to what constitutes appropriate appearance. Where necessary, reasonable accommodation may be made to a person with a disability.

Without unduly restricting individual tastes, the following personal appearance guidelines should be followed:

* Shoes must provide safe, secure footing, and offer protection against hazards.
* Canvas or athletic type shoes are not appropriate professional attire.
* Tank tops, tube or halter-tops, or shorts may not be worn under any circumstances.
* Mustaches and beards must be clean, well trimmed, and neat.
* Hairstyles are expected to be in good taste.
* Long hairstyles should be worn with hair pulled back off the face and neck to avoid interfering with job performance.
* Offensive body odor and poor personal hygiene is not professionally acceptable.
* Perfume, cologne, and aftershave lotion should be used moderately or avoided altogether, as some individuals may be sensitive to strong fragrances.
* Jewelry should not be functionally restrictive, dangerous to job performance, or excessive.
* Facial jewelry, such as eyebrow rings, nose rings, lip rings, and tongue studs, is not professionally appropriate and must not be worn during business hours.
* Torso body piercings with visible jewelry or jewelry that can be seen through or under clothing must not be worn during business hours.
* Visible excessive tattoos and similar body art must be covered during business hours.

SFH 00363

## 708 Resignation

Effective Date: 3/6/2012
Revision Date:

Resignation is a voluntary act initiated by the employee to terminate employment with Stillwater Fish House. Although advance notice is not required, SFH requests at least 2 weeks' written resignation notice from all employees.

Prior to an employee's departure, an exit interview will be scheduled to discuss the reasons for resignation and the effect of the resignation on benefits.

## 716 Progressive Discipline

Effective Date: 3/6/2012
Revision Date:

The purpose of this policy is to state Stillwater Fish House's position on administering equitable and consistent discipline for unsatisfactory conduct in the workplace. The best disciplinary measure is the one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.

Stillwater Fish House's own best interest lies in ensuring fair treatment of all employees and in making certain that disciplinary actions are prompt, uniform, and impartial. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future.

Although employment with SFH is based on mutual consent and both the employee and Stillwater Fish House have the right to terminate employment at will, with or without cause or advance notice, SFH may use progressive discipline at its discretion.

Disciplinary action may call for any of four steps -- verbal warning, written warning, suspension with or without pay, or termination of employment -- depending on the severity of the problem and the number of occurrences. There may be circumstances when one or more steps are bypassed.

Progressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal warning; a next offense may be followed by a written warning; another offense may lead to a suspension; and, still another offense may then lead to termination

28

SFH 00364

of employment. If more than 12 months have passed since the last disciplinary action, the process will normally start over.

Stillwater Fish House recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or, in extreme situations, termination of employment, without going through the usual progressive discipline steps.

While it is impossible to list every type of behavior that may be deemed a serious offense, the Employee Conduct and Work Rules policy includes examples of problems that may result in immediate suspension or termination of employment. However, the problems listed are not all necessarily serious offenses, but may be examples of unsatisfactory conduct that will trigger progressive discipline.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both the employee and Stillwater Fish House.

## 718 Problem Resolution
Effective Date: 3/6/2012
Revision Date:

Stillwater Fish House is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from Stillwater Fish House supervisors and management.

SFH strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with Stillwater Fish House in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following steps. The employee may discontinue the procedure at any step.

1. Employee presents problem to immediate supervisor within 30 calendar days, after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to General Manager or any other member of management.

29

SFH 00365

2. Supervisor responds to problem during discussion or within 30 calendar days, after consulting with appropriate management, when necessary. Supervisor documents discussion.

3. Employee presents problem to General Manager within 30 calendar days, if problem is unresolved.

4. General Manager counsels and advises employee, assists in putting problem in writing, visits with employee's manager(s), if necessary, and directs employee to Owner for review of problem.

5. Employee presents problem to Owner in writing.

6. Owner reviews and considers problem. Owner informs employee of decision within 30 calendar days, and forwards copy of written response to General Manager for employee's file. The Owner has full authority to make any adjustment deemed appropriate to resolve the problem.

Problems, disputes, or claims not resolved through the preceding problem resolution steps are subject to mediation. Mediation will conducted under the Employment Mediation Rules of the American Arbitration Association. Employees who choose to use mediation to resolve a problem will be expected to share the cost of mediation with Stillwater Fish House. A complete description of the mediation procedure is available from the General Manager for review.

Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment, and helps to ensure everyone's job security.

## 722 Workplace Etiquette
Effective Date: 3/6/2012
Revision Date:

Stillwater Fish House strives to maintain a positive work environment where employees treat each other with respect and courtesy. Sometimes issues arise when employees are unaware that their behavior in the workplace may be disruptive or annoying to others. Many of these day-to-day issues can be addressed by politely talking with a co-worker to bring the perceived problem to his or her attention. In most cases, common sense will dictate an appropriate resolution. Stillwater Fish House encourages all employees to keep an open mind and graciously accept constructive feedback or a request to change behavior that may be affecting another employee's ability to concentrate and be productive.

The following workplace etiquette guidelines are not necessarily intended to be hard and fast work rules with disciplinary consequences. They are simply suggestions for appropriate workplace behavior to help

SFH 00366

everyone be more conscientious and considerate of co-workers and the work environment. Please contact the General Manager if you have comments, concerns, or suggestions regarding these workplace etiquette guidelines.

* Complete and record your side work list at the end of each shift
* Maintain a professional tone and demeanor when on the clock
* Act and speak as if you are in front of a SFH guest at all times
* At all times maintain the hospitable personality used in FOH
* Avoid public accusations or criticisms of other employees. Address such issues privately with those involved or your supervisor.
* Try to minimize unscheduled interruptions of other employees while they are working.
* Be conscious of how your voice travels, and try to lower the volume of your voice when talking on the phone or to others in open areas.
* Try not to block walkways while carrying on conversations.
* Refrain from using inappropriate language (swearing) that others may overhear.
* Avoid discussions of your personal life/issues in public conversations that can be easily overheard.
* Clean up after yourself and do not leave behind waste or discarded papers.

## 800 Life-Threatening Illnesses in the Workplace
Effective Date: 3/6/2012
Revision Date:

Employees with life-threatening illnesses, such as cancer, heart disease, and AIDS, often wish to continue their normal pursuits, including work, to the extent allowed by their condition. Stillwater Fish House supports these endeavors as long as employees are able to meet acceptable performance standards. As in the case of other disabilities, SFH will make reasonable accommodations in accordance with all legal requirements, to allow qualified employees with life-threatening illnesses to perform the essential functions of their jobs.

Medical information on individual employees is treated confidentially. SFH will take reasonable precautions to protect such information from inappropriate disclosure. Managers and other employees have a responsibility to respect and maintain the confidentiality of employee medical information. Anyone inappropriately disclosing such information is subject to disciplinary action, up to and including termination of employment.

Employees with questions or concerns about life-threatening illnesses are encouraged to contact the General Manager for information and referral to appropriate services and resources.

SFH 00367